IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVIEL COLÓN, | No. 1:24-cv-12191 |
| Plaintiff | |
| v | **COMPLAINT** |
| CITY OF BOSTON, BISOLA OJIKUTU in her official and individual capacities, TAMMY PUST in her official and individual capacities, LISA O'BRIEN in her official and individual capacities, BOSTON POLICE PATROLMEN'S ASSOCIATION, AND LAWRENCE (LARRY) CALDERONE, | |
| Defendants | |

Respectfully submitted,
Plaintiff,
By his attorney,

_____
Ilya I. Feoktistov, Esq.
B.B.O. No. 704458
LAW OFFICE OF ILYA FEOKTISTOV
292 Newbury Street, No. 544
Boston, MA 02115
(617) 462-7938
if@ilyafeoktistov.com

DATED: August 23, 2024.

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 3

PARTIES ....................................................................................................................... 4

JURISDICTION AND VENUE .................................................................................... 6

STATEMENT OF FACTS ............................................................................................ 7

   I.    Plaintiff's Sincerely-Held Religious Beliefs ...................................................... 7

      A.   Religious Beliefs of Jehovah's Witnesses Related to Patriotic Acts, Municipal Ordinances, and Medical Treatment ....................................................... 7

      B.   Plaintiff's Biographic Background and Personal Religious Beliefs ............... 10

   II.   Plaintiff's Employment with the City of Boston Police Department ................. 12

   III.  The Boston Public Health Commission Executive Director and Her Professional Work Combatting Black American "Medical Mistrust" ..................................... 13

   IV.  The City of Boston Institutes the Vaccine Verification or Required Testing Policy ("Vaccine or Test Policy") ..................................................................... 15

   V.   Plaintiff Requests Religious Accommodation Exempting Him from the Vaccine or Test Policy .............................................................................................. 17

   VI.  Plaintiff is Placed on Unpaid Administrative Leave ........................................ 20

   VII. Plaintiff's Union Refuses to Support Plaintiff's Religious Objections and Advance His Grievance ................................................................................... 21

   VIII. Plaintiff files EEOC Complaint and State Court Claims, but Is Ordered Back to Work, Declared AWOL, and Terminated .......................................................... 25

   IX.  Boston's Vaccine or Test Policy and Mandatory Vaccine Policy Had No Rational Relationship to its Purpose of Minimizing Exposure to and Transmission of SARS-CoV-2 in City Workplaces ......................................... 29

      A.   Definitions of "Infection," "Exposure," "Transmission," "Disease," and "Asymptomatic Transmission" ........................................................................ 30

      B.   COVID-19 Vaccine Was Tested Only for Its Effectiveness at Preventing Disease ......................................................................................................... 31

      C.   Real-World Data Published in 2021 and 2022 Showed that COVID-19 Vaccines Were not Effective at Preventing SARS-CoV-2 Infection or Transmission after Exposure ......................................................................... 32

      D.   Judicial Notice of COVID-19 Vaccine Science is Deeply Tainted by Reliance on Memory-Holed Claims from CDC Websites .............................................. 34

      E.   Popular Understanding of COVID-19 Vaccine Science Is Deeply Tainted by Political Scapegoating ................................................................................... 37

   X.   Plaintiff is Unable to Work Another Police Job ................................................ 39

COUNT I  42 U.S.C. § 1983 (Substantive Due Process Under Fourteenth Amendment) 42

COUNT II Mass. Gen. Laws. ch. 12, sec. 11I (Massachusetts Substantive Due Process)45

COUNT III 42 U.S.C. § 1983 (Free Exercise Under First Amendment) ......................... 47

COUNT IV 42 U.S.C. § 1983 (Equal Protection Under Fourteenth Amendment – Disparate Treatment and Impact Based on Race) ............................................................. 50

COUNT V 42 U.S.C. § 2000e-2 (Disparate Treatment Religious Discrimination) ......... 52

COUNT VI Mass. Gen. Laws ch. 151B, § 4 (Disparate Treatment Discrimination Based on Religion) ...................................................................................................................... 54

COUNT VII 42 U.S.C. § 2000e-2 (Disparate Treatment and Impact Discrimination Based on Race) ......................................................................................................................... 54

COUNT VIII 42 U.S.C. § 12112 (Americans with Disabilities Act) .............................. 56

COUNT IX 42 U.S.C. § 1983 (Procedural Due Process Under Fourteenth Amendment)58

COUNT X 42 U.S.C. § 1983 (Takings Clause of the Fifth Amendment) ........................ 59

COUNT XI 42 U.S.C. §§ 1985(2), 1985(3) (Obstruction of Justice and Conspiracy to Deprive of Equal Protection of Laws) ............................................................................. 61

COUNT XII  (Breach of Duty of Fair Representation) .................................................... 62

COUNT XIII (Breach of Contract) ................................................................................... 62

COUNT XIV (Mass. Gen. Laws ch. 12, § 11I) ............................................................... 63

JURY DEMAND ............................................................................................................... 64

Plaintiff, Saviel Colón, by and through undersigned counsel, brings this Complaint against Defendants City of Boston, Boston Police Department, Bisola Ojikutu, Tammy Pust, Lisa O'Brien, Boston Police Patrolmen's Association, and Lawrence (Larry) Calderone, and alleges as follows:

## INTRODUCTION

1.   The case brings for review another episode in the conflicts between Jehovah's Witnesses and government authority.

2.   It is a core religious tenet of the Jehovah's Witness faith to view the motives of any human government as inherently corrupt, and even the most ethical human ruler as subject to inherent imperfection. As the Bible says, "there is no righteous man on earth who always does good and never sins." *See* Ecclesiastes 7:20 (New World).

3.     Jehovah's Witnesses believe that the most they can hope to do as citizens of secular
       governments is to limit the scope and destructive effects of corruption. This hope is why
       Plaintiff, Saviel Colón ("Plaintiff" or "Mr. Colón"),, a practicing Jehovah's Witness,
       became a Boston police officer.

4.     Jehovah's Witnesses also believe that health care decisions are a personal matter. Based
       on Mr. Colón's sincerely held religious beliefs, Mr. Colón has decided that the
       introduction of unnatural substances into his body or testing his body with unnatural
       substances can make it unholy.

5.     During the COVID-19 pandemic, Boston's COVID-19 vaccine and biochemical testing
       mandates came into direct conflict both with the tenets of Mr. Colón's sincerely held
       religious beliefs and with good medical science, costing Mr. Colón his job and causing
       him other harm.

6.     It is well past time for the U.S. courts to resume their task of assuring Jehovah's
       Witnesses and other Americans that the motives of this government, though imperfect,
       tend to be good.

## PARTIES

7.     Plaintiff, Saviel Colón, ("Mr. Colón" or "Plaintiff"), was at all times relevant to this
       complaint a citizen of the United States with a primary domicile in South Boston,
       Massachusetts.

8.     Defendant City of Boston ("Boston" or "the City"), is a body politic having its principal
       office at 1 City Hall Square, Boston, MA 02118. The Boston Police Department, is a
       municipal department of the Defendant City of Boston, having its principal office at
       Boston Police Department Headquarters, 1 Schroeder Plaza, Boston, MA 02120.

9.     Defendant Bisola Ojikutu ("Dr. Ojikutu") was at all times relevant to this complaint a
       citizen of the United States, and has been domiciled in Dorchester, Massachusetts since
       2021. On July 2, 2021, Dr. Ojikutu was appointed the Executive Director of the Boston
       Public Health Commission (BPHC), and remains in this position as of the date of this
       complaint. She is sued in her official and individual capacities. She is sued in her official
       and individual capacities.

10.    Defendant Tammy Pust ("Pust") was at all times relevant to this complaint a citizen of
       the United States domiciled in Minneapolis, Minnesota. In October 2021, Ms. Pust was
       appointed Director of the City of Boston Office of Labor Relations (OLR), and left the
       position seven months later in April 2022. She is sued in her official and individual
       capacities.

11.    Defendant Lisa O'Brien ("O'Brien") was at all times relevant to this complaint a citizen
       of the United States domiciled in West Roxbury, and the Chief of the Boston Police
       Department's Bureau of Administration and Technology. She is sued in her official and
       individual capacities.

12.    Defendant Boston Police Patrolmen's Association ("BPPA") is the exclusive
       representative, for the purpose of collective bargaining relative to wages, hours, and other
       conditions of employment, of all police patrolmen and patrolwomen in the service of the
       City of Boston. BPPA's principal office is located at 295 Freeport St Boston, MA 02122.

13.    Defendant Lawrence "Larry" Calderone ("Calderone") was at all times relevant to this
       complaint a citizen of the United States, domiciled in Medway, Massachusetts, and a
       Boston police officer. Since 2020, Calderone has served as the President of BPPA.

## JURISDICTION AND VENUE

14. This Court has original jurisdiction over Mr. Colón's claims pursuant to 28 U.S.C. §§ 1331 and 1343 under the rights of action available in 42 U.S.C. §§ 1981, 1983, 1985, 2000e-5(f)(3), 12117. Mr. Colón's claims arise under the First, Fifth and Fourteenth Amendments to the U.S. Constitution, as well as under 42 U.S.C. §§ 2000e-2, 12112.

15. This Court has supplemental jurisdiction over Mr. Colón's state law claims pursuant to 28 U.S.C. § 1367.

16. Claims under 42 U.S.C. §§ 2000e-5(f)(3) are properly brought in this Court after the exhaustion of administrative remedies. Mr. Colón was placed on administrative leave without pay by the City of Boston on October 26, 2021. Mr. Colón filed a timely charge against the City of Boston with the Equal Employment Opportunity Commission (EEOC) pursuant to 42 U.S.C.S. § 2000e-5(b) on November 22, 2021. The EEOC dismissed Mr. Colón charge without ruling on the merits and provided Mr. Colón with a "permission to sue" letter on August 30, 2022. Mr. Colón filed a claim for the violation of 42 U.S.C.S. § 2000e-2 in Massachusetts State Court on November 28, 2022, and the claim remains pending as of the date of the instant Complaint.

17. Claims under Mass. Gen. Laws 151B, § 9 are properly brought in this Court after the exhaustion of administrative remedies. Mr. Colón was placed on administrative leave without pay by the City of Boston on October 26, 2021. Mr. Colón filed a timely charge against the City of Boston with the EEOC pursuant to 42 U.S.C.S. § 2000e-5(b) on November 22, 2021. The EEOC dual-filed Mr. Colón's charge with the Massachusetts Commission Against Discrimination (MCAD) under Mass. Gen. Laws ch. 151B, § 5. After the EEOC dismissed Mr. Colón's charge, MCAD issued a Notice of Substantial

Weight Review to Mr. Colón on March 13, 2023, informed Mr. Colón of his rights to file

a court action pursuant to Mass. Gen. Laws ch. 151B, § 9, and closed the administrative

matter. Mr. Colón filed a claim pursuant to Mass. Gen. Laws ch. 151B, § 9 for the

violation of Mass. Gen. Laws ch. 151B, § 5 in Massachusetts State Court on November

22, 2022, and the claim remains pending as of the date of the instant Complaint.

18.     Venue in the District of Massachusetts is appropriate pursuant to 42 U.S.C.S. § 2000e-

5(f)(3) because the herein alleged unlawful employment practices by the City of Boston

against Mr. Colón occurred in Massachusetts.

## STATEMENT OF FACTS

**I.      Plaintiff's Sincerely-Held Religious Beliefs**

19.     Plaintiff, Saviel Colón (Mr. Colón), is a member of a religion called Jehovah's

Witnesses.

**A.      Religious Beliefs of Jehovah's Witnesses Related to Patriotic Acts, Municipal Ordinances, and Medical Treatment**

20.     Jehovah's Witnesses consider themselves citizens of God's Kingdom—a real government

of earthly affairs that began ruling from heaven in 1914, with Jesus as King. They believe

that God's Kingdom alone has the legal right to rule earthly affairs, and ultimately will

overthrow the current international system of earthly governments, replacing them with

direct heavenly rule.

21.     Jehovah's Witnesses believe that earthly government officials lack both the will and the

ability to overcome entrenched corrupt motives, such as greed and selfishness.

22.     While Jehovah's Witnesses obey secular laws that do not conflict with those of Jehovah,

they reject patriotic allegiance to any earthly governments.

23. When Jehovah's Witnesses believe a conflict exists between obeying secular laws and those of Jehovah, they seek exemptions or changes in the laws to accommodate their beliefs. In doing so, Jehovah's Witnesses have had "a profound and extensive impact on the development of" U.S. constitutional law in the twentieth century.[1]

24. When no change is possible, Jehovah's Witnesses respectfully choose to "obey God as ruler rather than men." *See* Acts 5:29 (New World).

25. Because of Jehovah's Witnesses' rejection of secular governments, they have faced frequent religious persecution in both authoritarian and democratic countries. During the twentieth century, they were among the targeted victims of Nazism, fascism, communism, and dictatorships in Asia, Africa, and Latin America. Thousands of them also were mobbed and prosecuted for their faith in democratic countries such as Canada, Great Britain, and the United States.

26. According to a YouGov poll of Americans' attitudes toward thirty-five different religious groups, Jehovah's Witnesses were the third most despised religion in 2022. Only the Churches of Satan and Scientology received higher net unfavorable ratings.

27. Three areas of frequent friction between Jehovah's Witnesses and their secular governments are relevant to the instant Complaint: a) patriotic acts; c) municipal permits and licenses; c) medical treatment.

28. As to patriotic acts, Jehovah's Witnesses believe in an expansive interpretation of Exodus 20:3-5 (New World):

> You must not have any other gods besides me. You must not make for yourself a carved image or a form like anything that is in the heavens above or on the earth below or in the waters under the earth. You must not bow down to them nor be

---

[1] *See* William Shepard McAnnich, *A Catalyst for the Evolution of Constitutional Law: Jehovah's Witnesses in the Supreme Court,* 55 U. Cin. L. Rev. 997, 999 (1986-1987).

enticed to serve them, for I, Jehovah your God, am a God who requires exclusive devotion.

29. Consequently, Jehovah's Witnesses refuse to participate in the symbolic acts, gestures, and ceremonies of secular institutions, which they believe are tantamount to confessing their faith in these institutions by word or act.[2]

30. For the same scriptural reason, Jehovah's Witnesses resent having to ask secular government authorities for permission to perform Jehovah's commandments. Witnesses believe that such requests for permission are acts of disobedience against Jehovah that could result in everlasting destruction.[3]

31. Consequently, Jehovah's Witnesses have refused to request municipal permits or licensing for public conduct that they consider to be religious.[4]

32. Lastly, Jehovah's Witnesses believe, based on Isaiah 33:24, that if they become reconciled to Jehovah by obeying His wise principles, they will eventually enjoy perfect health in an earthly paradise.

33. In 1923, the official publication of the Jehovah's Witnesses at the time published an article titled *The Vaccination Fraud*. The article described vaccination as "the most unnatural unhygienic, barbaric, filthy, abhorrent, and most dangerous system of infection known," and stated: "to suppose that disease can be prevented by inoculating the system with the products of disease is as sensible as to invoke the power of Satan to cast out sin." According to the article, "[d]iet is the fundamental principle, not only of getting well, but also of keeping well."

---

[2] *See, generally*, *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 629 (1943).
[3] *See, generally*, *Lovell v. Griffin*, 303 U.S. 444, 448 (1938).
[4] *See, generally*, *Largent v. Texas*, 318 U.S. 418 (1943).

34.     The article's author complained that "the political doctors are using the legislatures of the various states to pass laws which they can use to compel whole communities to submit to the indignity of having their blood contaminated with a manufactured filthy pus to accommodate big medics and big business."

35.     Modern Jehovah's Witnesses continue to refuse blood transfusions or other medical procedures using blood products, but believe that most other health-care decisions are a personal matter. They derive this belief from an interpretation of Galatians 6:5 (New World): "For each one will carry his own load."

36.     Therefore, one Jehovah's Witness might decide to accept a particular medicine or treatment, while another might reject that same treatment. It is the choice itself that is considered holy.

37.     Jehovah's Witnesses continue to believe that vaccination is "a contamination of the human system," but is not as peremptorily forbidden as blood transfusions. Since 1965, the official position of Jehovah's Witnesses on "[t]he question as to whether you and your children should be vaccinated is [that this is] something for personal decision."

**B.     Plaintiff's Biographic Background and Personal Religious Beliefs**

38.     Mr. Colón has a very intimate relationship with Jehovah, which grows stronger on a daily basis. He believes that he always must obey and put Jehovah before any men. He bases his decisions on what would make Jehovah happy rather than what would make men happy. In doing so, his decisions almost always have a positive outcome.

39.     To stay healthy, Mr. Colón maintains a vegetarian diet and uses natural remedies like honey, garlic, ginger, herbs, and teas instead of foreign substances. Mr. Colón also exercises regularly to keep his body strong and ensure that he does not get sick.

40.     As much as possible, Mr. Colón avoids providing samples of his body tissues or fluids for chemical testing because only God, not men, has the authority to judge his body and health.

41.     Many years before COVID-19 emerged, Mr. Colón made a religious decision that he will no longer consent to vaccinations.

42.     By 2020, as his relationship with Jehovah grew stronger, Mr. Colón had stopped taking any other medical treatments that involve introducing synthetic or "foreign" chemical substances into his body.

43.     Mr. Colón believes that synthetic "foreign" substances are unholy from the standpoint of Jehovah's true worship. According to 2 Corinthians 7:1 (New World):

> "Therefore, get out from among [the unbelievers], and separate yourselves," says Jehovah, "and quit touching the unclean thing"; "and I will take you in." "And I will become a father to you and you will become sons and daughters to me," says Jehovah, the Almighty. Therefore, since we have these promises, beloved ones, let us cleanse ourselves of every defilement of flesh and spirit, perfecting holiness in the fear of God.

44.     Mr. Colón believes that the human body is a temple to Jehovah. Therefore, introducing foreign substances directly into the body, or even using foreign substances to test his bodily fluids can contaminate this temple, making it unholy and ritually impure. This belief is based on 1 Corinthians 6:19-20 (New World): "Do you not know that your body is the temple of the holy spirit within you, which you have from God? Also, you do not belong to yourselves, for you were bought with a price. By all means, glorify God in your body."

45.     During the COVID-19 pandemic, Mr. Colón learned and came to sincerely believe that COVID-19 tests use reagents containing harmful foreign substances, which could enter and contaminate his body after spilling or evaporating out of the test tube.

46. Mr. Colón also learned and came to sincerely believe that COVID-19 test swabs, which must be inserted into the body as part of the test, can contaminate his body because they are sterilized by harmful irradiation or infusion with a harmful foreign substance called ethylene oxide.

47. Mr. Colón wanted to be a police officer since he was a young child. Although Jehovah's Witnesses do not believe in violence or war, Mr. Colón believes that a police officer can serve Jehovah in his role as a peacemaker. As Matthew 5:9 (New World) states: "Happy are the peacemakers, since they will be called sons of God."

48. Mr. Colón began his law enforcement career as a Florida police officer in 2004, ultimately becoming an Osceola County sheriff's deputy before he moved back to Boston in 2011. As a Florida law enforcement officer, Mr. Colón served as a firearms instructor, as a defensive tactics instructor, as an emergency vehicle driving instructor, and as a field training officer with a specialty in report writing.

49. Mr. Colón took great pride in wearing the uniform every day, and in being able to actually help people during their time in need. He was not the typical police officer who mechanically made arrests to maximize his statistics. He followed the law and applied it in such a way that protected both the victim and the suspect's rights.

50. After moving back to Boston in 2011, Mr. Colón founded a cleaning and trucking business, which made good money, but did not satisfy Mr. Colón's continued desire for a law enforcement career.

## II.    Plaintiff's Employment with the City of Boston Police Department

51. Mr. Colón attempted to join the Boston Police Department ("BPD") in 2015, suffered a training injury in the Academy, overcame the injury, and finally joined BPD as a probationary police officer in 2019.

52. On or about August 26, 2019, during the medical portion of Mr. Colón's initial hiring process at BPD, Mr. Colón informed the examining physician that he is a practicing Jehovah's Witness and refused to receive any injections due to his sincerely held religious beliefs. The examining physician clearly documented these facts in Mr. Colón's medical records and provided the documentation to the City of Boston ("Boston").

53. Boston did not challenge Mr. Colón's religious objections to receiving injections in 2019.

54. On June 2, 2021, Mr. Colón completed his statutory probationary period under Mass. Gen. Laws ch. 31, § 61, and became a full police officer.

55. While employed at the Boston Police Department, Mr. Colón was a dues-paying member of the Boston Police Patrolmen's Association ("BPPA").

56. A collective bargaining agreement ("CBA") between BPPA and the City of Boston, effective at all times relevant to this Complaint, provides that "no bargaining unit member who has completed his one year probationary period shall be disciplined or discharged without just cause."

57. The CBA creates a labor grievance procedure for aggrieved bargaining unit members, in accordance with statutory requirements for such procedure in Mass. Gen. Laws ch. 150E, §§ 5, 8-9.

## III. The Boston Public Health Commission Executive Director and Her Professional Work Combatting Black American "Medical Mistrust"

58. Mr. Colón is Black American.

59. On July 2, 2021, Boston appointed Harvard Medical School assistant professor Bisola Ojikutu as the Executive Director of the Boston Public Health Commission (BPHC). Dr. Ojikutu started her position at BPHC on September 1, 2021 and remains in the position as of the date of this complaint.

60. Dr. Ojikutu was responsible for setting Boston's COVID-19 vaccination and other pandemic-related policies.

61. Dr. Ojikutu's published research largely focuses on ways "to mitigate medical and research mistrust" including "vaccine hesitancy," which, she has argued, "is particularly prevalent among Black Americans, compared with other races/ethnicities."

62. According to Dr. Ojikutu, "[m]edical mistrust has been associated with suboptimal health behaviors among Black individuals," and "has been characterized as a thwarter of public health mitigation efforts."

63. In their published research, Dr. Ojikutu and her colleagues have defined Black American medical mistrust as the "distrust of health care providers, the health care system, medical treatments, and the government as a steward of public health, i[n] a response to current and historical systemic racism in health care and society as a whole." (Quotation marks and citations omitted.)

64. According to Dr. Ojikutu and colleagues: "As a multidimensional belief system, medical mistrust likely exists on a spectrum from skepticism, to active suspicion, to belief in conspiracy theories or secret plots concerning perpetrators, motivations, and *modi operandi* that are not necessarily apocryphal."

65. In a peer-reviewed study published on February 1, 2021, Dr. Ojikutu and several colleagues argued that, during the early stages of the COVID-19 pandemic,

> medical mistrust specific to COVID-19 has been prevalent worldwide and in the United States, particularly among Black Americans. Such mistrust has taken the form of what has been called "conspiracy beliefs," which are explanations of "the origin, treatment, and transmission of infection by reference to the actions of powerful people who attempt to conceal their role." [Citations omitted.]

66. According to a qualitative study conducted by Dr. Ojikutu and several colleagues between November 2020 and March 2021, Black American participants "reported perceptions that the vaccines would eventually become mandatory, but many of them felt that such a requirement would cause them to seek workarounds, including alternative employment should their current employer mandated [sic] the vaccine."

67. In a peer-reviewed article published in January 2022, Dr. Ojikutu reported on the results of a nationwide survey of Black Americans, which she and her colleagues carried out to "enable the tailoring of policy approaches by the community." The survey found that

> over a third [of study participants] had low intentions to get vaccinated (11.4% agreed and 23.5% strongly agreed that they would not get a COVID-19 vaccine), and an additional 25.2% said "don't know"; only two-fifths agreed (21.6%) or strongly agreed (18.4%) that they would get vaccinated. In addition, 30.4% said that they were willing to get vaccinated for COVID-19, 31.6% said that they were not willing to get vaccinated, and 37.9% said "don't know/not sure.

68. In a peer-reviewed article submitted for publication on September 7, 2021 and published on May 3, 2022, Dr. Ojikutu cited the CDC's National Immunization Survey data showing that, as of August 2021, "Black Americans ha[d] the lowest vaccination rate (25.4% fully vaccinated) compared to White Americans (33.7%)."

**IV. The City of Boston Institutes the Vaccine Verification or Required Testing Policy ("Vaccine or Test Policy")**

69. On or about August 12, 2021, Defendant Boston issued a "Vaccine Verification or Required Testing for COVID-19" policy (Vaccine or Test Policy), which was mandatory for all Boston city "employees irrespective of whether an individual has been diagnosed with COVID-19 in the past."

70. The stated purpose of the policy was "to minimize exposure to and transmission of the COVID-19 virus in City workplaces by providing occupational protection to all City employees and preventing exposure to members of the community we serve."

71.   The Vaccine or Test Policy required Boston employees like Mr. Colón to verify by
      October 18, 2021 that that they have been fully vaccinated against COVID-19.
      Alternatively, employees could choose to "submit proof every seven (7) days of a
      negative COVID-19 screening test result and be subject to restrictions on official travel"
      starting on October 11, 2021.

72.   Pursuant to Boston's Vaccine or Test Policy, unvaccinated Boston employees who failed
      "to submit the required proof of a negative test" after October 11, 2021 were to "be
      placed on unpaid administrative leave until verification of vaccination or a reasonable
      accommodation is approved if required by law."

73.   The Vaccine or Test Policy permitted reasonable accommodations based on both medical
      and religious reasons.

74.   Medical reasons were sufficient to exempt Boston employees from receiving the COVID-
      19 vaccination under the Policy, but not to "exempt the employee from the requirement
      of regular testing."

75.   By contrast, religious reasons were sufficient to exempt Boston employees from
      both/either "vaccination and/or testing."

76.   To obtain a religious exemption under the Vaccine or Test Policy, a Boston employee
      was required to submit to the Boston Office of Human Resources (OHR) a religious
      statement containing the "employee's explanation of their religious or religious-type
      beliefs and why those beliefs prevent vaccination and/or testing."

77.   Upon receiving the religious statement, Boston's OHR would "begin the interactive
      accommodation process with the employee," granting accommodations "when the

required legal standards are met and the accommodation does not cause undue hardship or pose a direct threat to the health and safety of others."

## V. Plaintiff Requests Religious Accommodation Exempting Him from the Vaccine or Test Policy

78. On September 20, 2021, Mr. Colón emailed to Boston's OHR his request for a reasonable religious accommodation, stating in full: "To whom it may concern, My name is Saviel Colón ID# 140312 employed by Boston Police Department. I am invoking my Religious Exemption to both the City of Boston's vaccination policy and the City of Boston's testing policy due to my sincerely held Religious beliefs. Thank you."

79. By October 11, 2021, Mr. Colón had received no response from Boston to his September 20, 2021 request for vaccine and testing accommodations. Consequently, under duress and fearing the loss of his employment, Mr. Colón felt coerced into taking a COVID-19 test to comply with the Defendant's Vaccine or Test Policy.

80. When Mr. Colón inserted the COVID-19 test swab into his nose to take a sample from his body, he began to feel an intense burning sensation in his nose that lasted for two days.

81. Mr. Colón understood this burning to have been a consequence of having introduced foreign substances into his body, thereby contaminating it and making it unholy. Mr. Colón was convinced that the burning sensation was a message from Jehovah for him not to deviate from his sincerely held religious beliefs.

82. Mr. Colón decided that to keep his body spiritually pure, he will avoid taking COVID-19 tests ever again.

83. On October 18, 2021, Mr. Colón received a reply email from OHR, stating:

> "To request an accommodation from the City's [August 30 Vaccination Policy] based upon a sincerely held religious belief, please complete the attached form

and submit it to Accommodation@boston.gov. Once the form is completed and submitted, the Accommodation staff will be back in touch with you directly. Please note: You are not exempt from complying with the City's Vaccine Verification or Regular Testing Policy unless and until the date you receive a written approval of your request.

84. Attached to the email was a "Religious Accommodation Request" form.

85. Mr. Colón completed and submitted the Religious Accommodation Request form as soon as he received it on October 18, 2021.

86. In filling out the Religious Accommodation Request form, Mr. Colón stated:

> Based on my Religious beliefs, I do not accept any foreign substance into my body . . . Work is requiring that I get vaccinated or submit to weekly testing, [b]oth of which contain substances that will make my body unholy. . . . I am invoking my Religious exemption to any and all vaccinations as well as weekly testings. This will ensure that I keep my body Holy.

87. The Religious Accommodation Request form required Mr. Colón to check one of two boxes either affirming or disavowing his "knowledge and understanding that social, political, or economic beliefs, as well as mere personal preferences, are not religious beliefs protected by applicable law."

88. Mr. Colón's sincerely-held religious beliefs as a member of a strictly theocratic religion like the Jehovah's Witnesses necessarily encompass his social, political, and economic beliefs. Unsure how to convey this, Mr. Colón checked both of the boxes.

89. The Religious Accommodation Request form asked Mr. Colón to state if he would be willing to provide "documentation or other authority regarding your religious practice or belief," including confirmation from "your religion's spiritual leader (if applicable) or religious scholars."

90. Mr. Colón believed that consenting to such intrusive information requests from secular government authorities would be tantamount to seeking permission to perform Jehovah's commandments, and therefore an act of disobedience against Jehovah.

91.    Mr. Colón also knew that it is unnecessary to be an adherent or member of a recognized
       church or religious denomination in order to receive a religious accommodation.

92.    Therefore, he responded: "not applicable."

93.    Soon after submitting his Religious Accommodation Request form to Boston, Mr. Colón
       received confirmation that the form was received, and that Boston would "respond to it
       shortly."

94.    On October 21, 2021, Mr. Colón received a "Notice of Non-Compliance with City
       Policy" (Notice of Non-Compliance) by email and U.S. mail, informing him that he is not
       in compliance with the August 30 Vaccination Policy and warning:

           If you are not in compliance by the close of business on Monday, October 25,
           2021, you will be placed on unpaid administrative leave at the start of your
           work shift beginning on Tuesday, October 26, 2021. This step is being taken in
           order to ensure the health and safety of the City's workforce and the public we
           serve. You must come into compliance immediately. Please note that the City
           reserves the right to implement discipline up to and including termination as
           well should you not comply with this Policy by the close of business on
           Monday, October 25, 2021.

95.    The Notice of Non-Compliance was carbon copied to the BPD Office of Labor Relations
       and to the President of the Boston Police Patrolmen's Association (BPPA), Lawrence
       "Larry" Calderone ("Calderone") at his personal email address from free email provider
       GMail.

96.    On October 22, 2021, Mr. Colón mailed a letter to the Boston Police Department Office
       of Human Resources, stating:

           Unpaid administrative leave is not a reasonable response to my lawful request for
           accommodation. I have yet to receive a response to my request for
           accommodation and the threat of unpaid leave subsequent to my request appears
           both hostile and retaliatory in nature. I ask that my exemption be processed in a
           timely [manner] and in accordance with federal law. . . . I would like to resolve
           this matter and continue to serve the residents of the City of Boston.

97.   On October 25, 2021, Mr. Colón received an email from Boston containing only the text:
      "SECOND REMINDER" and attaching the same Notice of Non-Compliance.

**VI.   Plaintiff is Placed on Unpaid Administrative Leave**

98.   Mr. Colón had taken some time off in October, and was scheduled to be back at work on
      Tuesday October 26, 2021.

99.   On October 26, 2021, without any interactive dialogue or without any notification
      whether his request for a religious accommodation to the Vaccine or Test Policy would
      be approved or denied, Mr. Colón received a "Notice of Written Warning and Unpaid
      Administrative Leave," informing him that, due to his noncompliance with Boston's
      Vaccine or Test Policy, he was being placed "on unpaid administrative leave effective at
      the beginning of [his] scheduled work shift today, Tuesday, October 26, 2021."

100.  The October 26, 2021 notice did not refer at all to Mr. Colón's request for a religious
      exemption from the Vaccine or Test Policy.

101.  The notice was sent by civilian Boston employee Lisa O'Brien, who served as the Chief
      of BPD's Bureau of Administration and Technology. The notice also was copied to
      Calderone's personal Gmail address, in direct violation of Mr. Colón's prior written
      request.[5]

102.  According to the October 26, 2021 notice, Mr. Colón was to attend a virtual hearing on
      October 29, 2021 "to determine whether [Mr. Colón has] come into compliance with the
      [Vaccine or Test] Policy. If [he] fail[s] to do so, [he] will be subject to discipline up to

---

[5] Mr. Colón was concerned about potential animosity from coworkers towards his
religious beliefs and the unauthorized sharing of his personal medical information. Specifically,
he was concerned that his medical information might be shared via unsecured personal email.
Therefore, Mr. Colón explicitly requested Boston's OHR not to disclose his vaccination status
and religious beliefs to any member of the Boston Police Department, including Calderone, and
particularly not through personal email.

and including termination and may be kept on unpaid administrative leave." Mr. Colón would be entitled to a union representative at this hearing.

## VII.   Plaintiff's Union Refuses to Support Plaintiff's Religious Objections and Advance His Grievance

103.   On the morning of October 28, 2021, Mr. Colón received a telephone call from his union representative, Frederick Mendes, who asked Mr. Colón why he had not complied with the Vaccine or Test Policy.

104.   When Mendes learned that Mr. Colón had submitted a request for religious accommodation from the Vaccine or Test Policy, Mendes attempted to coerce Mr. Colón into submitting to the weekly testing option of the Policy notwithstanding Mr. Colón's religious beliefs. Mendes's tone was defensive, and he clearly expressed dissatisfaction with Mr. Colón's explanations of his sincerely held religious beliefs regarding religious purity and biochemical testing.

105.   Within thirty minutes after the initial call from Mendes, Mr. Colón received another phone call. This time, Mendes was on the line with BPPA President Larry Calderone and two BPPA attorneys.

106.   Calderone told Mr. Colón that Calderone had participated personally in drafting the Vaccine or Test Policy on behalf of BPPA, and that Mr. Colón therefore must submit to weekly testing.

107.   After numerous attempts by Mendes and Calderone to get Mr. Colón to comply with the testing policy despite Mr. Colón's sincerely held religious beliefs, Mr. Colón told all the participants on the phone call that he would rather be fired than do something that was against his sincerely held religious beliefs. Mr. Colón told Mendes and Calderone that

what they were forcing him to do was akin to forcing a Muslim to eat a bacon sandwich while awaiting a religious exemption on eating pork.

108.   Calderone told Mr. Colón that he supports Boston's position on the testing policy, and that he did not understand why it was such a big deal to Mr. Colón. In a mocking fashion, Calderone told Mr. Colón that he voluntarily tests himself for COVID-19 every five days.

109.   Calderone insisted that Mr. Colón must attend his noncompliance hearing on October 29, 2021.

110.   On the morning of October 28, 2021, after the initial phone conversation with Mendes, Mr. Colón received an email invitation to a "Reasonable Accommodation Interactive Dialogue" with Defendant Tammy Pust, the director of Boston's Office of Labor Relations. The dialogue with Pust had been scheduled for a virtual hearing for later afternoon on the same day.

111.   Pust did not ask any questions about Mr. Colón's religious beliefs, or about the nature of his religion's conflict with vaccination and testing of his body for COVID-19.

112.   During the dialogue hearing, Mr. Colón suggested several possible accommodations, such as being placed behind the glass windows at the front desk or serve as a booking officer, which would minimize his contact with fellow employees and the public.

113.   Pust appeared frustrated with Mr. Colón's suggestions, and with his refusal to comply with the Vaccine or Test Policy. Pust stated that she had no further questions, and ended the interactive dialogue.

114.   Before Pust ended the dialogue, Mr. Colón stated that the process seemed disorganized and Pust replied: "This is new for all of us. We make fun of ourselves and say we are building a plane in mid-flight."

115.    On information and belief, Dr. Ojikutu had the ultimate authority to grant or deny City of Boston employee requests for religious accommodations from the Vaccine or Test Policy based on Pust's recommendations after the employees' interactive dialogues.

116.    On information and belief, the City of Boston and Dr. Ojikutu denied requests for religious accommodations from the Vaccine or Test Policy that were made by Black employees and were based on what Dr. Ojikutu defines as "medical mistrust."

117.    On the morning of October 29, 2021, Mr. Colón participated in his non-compliance hearing, which was held by one of Pust's subordinates at Boston's Office of Labor Relations.

118.    Mr. Colón's union representative, Mendes, attended the hearing, but defended the City's actions instead of representing Mr. Colón's interests.

119.    Mr. Colón never has received any written notice of a decision from the hearing officer who presided over the October 29, 2021 noncompliance hearing.

120.    On the afternoon of October 29, 2021, Mr. Colón received an emailed letter denying his requested accommodation to be exempted from both of the two components of the Vaccine or Test Policy.

121.    According to the denial, the request for accommodation from the vaccine component of the Policy was denied because that component was voluntary.

122.    According to the denial, the request for accommodation from the test component of the Policy was denied, without "making any determination with regard to the sincerity of [Mr. Colón's] beliefs," on the following undue hardship grounds:

> Your work duties as a police officer require you to be in close physical proximity to other City employees, including those who are scheduled to work the same tours as you do. Your job responsibilities require you to be in close contact with co-workers while in the station and when responding to calls in City vehicles.

> Your job duties also put you in close physical contact with members of the public on a regular basis. During the COVID-19 pandemic, allowing you to perform your job duties without regular testing for the virus would jeopardize the health of your co-workers and the public we all serve, which constitutes an undue hardship under applicable legal guidance.

123.   On November 16, 2021, Mr. Colón applied for unemployment assistance. During Mr. Colón's  hearing before the Department of Unemployment Assistance, Lisa O'Brien testified that, while the City of Boston provided medical exemptions to the Vaccine or Test Policy, "they felt that the religious exemption, you know, you know, with weekly testing there was no need to approve a religious exemption, because of that, because of the weekly testing being offered."

124.   On November 18, 2021, Mr. Colón drafted a bargaining unit member grievance document detailing his dispute with Boston. He sent the grievance by certified mail to the BPPA headquarters, to be presented to Boston pursuant to the CBA's grievance procedure on Mr. Colón's behalf by BPPA.

125.   Mr. Colón never received any reply to his grievance from BPPA or Boston.

126.   Mr. Colón sent multiple letters to various Boston and BPPA officials concerning his religious accommodation, its denial, and his ongoing unpaid administrative leave.

127.   Mr. Colón never received any reply to his communications with the various Boston and BPPA officials.

128.   When Boston later made COVID-19 vaccination mandatory for all employees, three other Boston first responder unions, together comprising all Boston first responder unions *except BPPA*, sued for injunctive relief against the mandate in Massachusetts Superior Court.

129.   After Boston ended its mandatory COVID-19 policy, a Boston spokesman claimed that no employee was "held out" on unpaid administrative leave "just for refusing the

vaccination," and only three employees were put on unpaid administrative leave for refusing both vaccination and testing.

130. Mr. Colón and at least one of the two other employees who were put on unpaid administrative leave for refusing both vaccination and testing are Black employees.

131. BPPA president Larry Calderone is White.

132. In recent years, BPPA's attitudes on race and religion have attracted controversy.

133. In 2012, the Massachusetts Association of Minority Law Enforcement Officers called on the editor of BPPA's newsletter to resign following an outcry over the paper's content, which critics claimed was often hostile toward racial and religious minorities.

134. In 2020, Defendant Calderone sent a controversial letter to the Boston Teacher's Union on behalf of the BPPA, opposing Boston public school involvement in the National Black Lives Matter Week. The letter urged BTU's president to "reconsider the BTU's decision to support Black Lives Matter, an anti-police organization whose activities have the effect of making my members less safe."

## VIII.   Plaintiff files EEOC Complaint and State Court Claims, but Is Ordered Back to Work, Declared AWOL, and Terminated

135. After his communications to the city of Boston in November 2021 went unrequited, Mr. Colón believed that he had lost his job for good, and began searching for another one.

136. The job search proved to be difficult, especially because Colón turned 40 in 2021. Mr. Colón searched numerous police jobs in other municipalities, but did not qualify because of his Boston residency and because of his age.

137. After being terminated by BPD, Mr. Colón was forced to go into another line of work entirely. Starting on July 5, 2022, he has held two office desk jobs, both in the field of human resources.

138. On November 22, 2021, Mr. Colón made a *pro se* complaint inquiry with the U.S. Equal Employment Opportunity Commission. Mr. Colón was interviewed by EEOC intake personnel, who drafted a charge of religious discrimination against the City of Boston and filed it with the EEOC.

139. On January 14, 2022, the City of Boston filed a position statement with the EEOC in response to Mr. Colón's religious discrimination complaint.

140. In its position statement, Boston argued that Mr. Colón "has never shown that he has a sincerely held religious belief about vaccination" because he failed to satisfy the City's detailed requirements for asserting a religious exemption, including a signature from Mr. Colón's spiritual leader, an express certification "that political, social, scientific, or other non-religious views are not sufficient justification for a religious exemption," and a detailed explanation of "why" Mr. Colón's "beliefs prevent vaccination and/or testing."

141. According to Boston's EEOC position statement, "Complainant's request for religious exemption never came close to meeting these requirements."

142. Furthermore, according to Boston's EEOC position statement: "The City made a determination that allowing employees, and police officers in particular, to remain unvaccinated would impose an undue hardship because of the risk of the spread of COVID-19 to other employees or to the public." (Internal citation omitted.)

143. On June 2, 2022, without giving any prior notification or conducting an individualized medical assessment, the BPD classified Mr. Colón as Medically Incapacitated and assigned him to the Medically Incapacitated Section (MIS).

144. On August 30, 2022, the EEOC dismissed Mr. Colón's charges without a finding on the merits and issued a permission-to-sue letter to Mr. Colón.

145. Mr. Colón retained counsel and, on November 28, 2022, filed claims in Massachusetts Superior Court, where the claims remain pending.

146. On May 11, 2023, Boston ended the Vaccine or Test Policy.

147. Mr. Colón retained new counsel; and on May 16, 2023, Mr. Colón's counsel communicated by telephone and email with his Boston counterpart. Mr. Colón's counsel asked that all communications about the matter of Mr. Colón's former employment by Boston be done through counsel.

148. On May 23, 2023, Mr. Colón received two voicemails from Lisa O'Brien, asking him to return her calls.

149. On May 25, 2023, two armed plainclothes BPD officers delivered a letter from Lisa O'Brien to Mr. Colón's residence. The letter stated, in relevant part:

> As you may know, the federal and Massachusetts state public health emergencies relating to the COVID-19 pandemic expired on May 11, 2023. Accordingly, effective May 11, 2023, the City of Boston has lifted all policies requiring its employees to submit proof of COVID-19 vaccination or regular negative test results to report to work. . . . In light of the recent policy change, you are hereby ordered to return to work on Friday, May 26, 2023.

150. Mr. Colón felt that, by delivering the letter to him in such a matter, O'Brien and Boston were attempting to intimidate Mr. Colón from asserting his legal rights under federal law, as he is doing now in the instant Complaint.

151. On May 26, 2023, counsel for Mr. Colón again spoke with his Boston counterpart and stated that Mr. Colón will not return to work without receiving compensation for Boston's violations of his legal rights.

152. Boston's counsel confirmed in a May 26, 2023 email:

> This is to confirm in writing that Mr. Colón has received the letter from the police department but will not be returning to work as a police officer. . . . I have let the police department know that Mr. Colón will not be returning to work.

153.    On May 26, 2023, without having returned to work, Mr. Colón received a paycheck from
the BPD for the pay period from May 13, 2023, through May 19, 2023. The paycheck
compensated Mr. Colón for thirty-two hours of alleged vacation time and eight hours of
alleged work and shift differential pay.

154.    Mr. Colón did not work any amount of time for BPD between May 13, 2023 and May 19,
2023 and did not request any vacation.

155.    On June 2, 2023, Mr. Colón received another check from BPD for the pay period from
May 20, 2023, through May 26, 2023. The paycheck compensated Mr. Colón for forty-
eight hours of alleged vacation time and a shift differential.

156.    Mr. Colón did not work any amount of time for BPD between May 20, 2023 and May 26,
2023 and did not request any vacation.

157.    BPPA deducted dental insurance and member fees from both paychecks.

158.    On June 2, 2023, Mr. Colón received a "return to work" form from Boston's
Occupational Health Services Unit, stating that he had been cleared from his Medically
Incapacitated status as of May 26, 2023. This clearance was issued without any
individualized medical assessment, or even any prior contact with Mr. Colón.

159.    On June 5, 2023, Mr. Colón received a voicemail from Officer Carlos Martinez in BPD's
District E-13, where Mr. Colón had worked. Martinez stated in the voicemail:

> The department has put you back on full duty, but you have to pick up your study
> materials from the academy and report back here [on] Squad 1 schedule. Can you
> give us a call back to confirm? If not, we're gonna be forced to declare you
> AWOL. Thank you, let us know what's going on.

160.   On June 5, 2023, Mr. Colón's counsel contacted his Boston counterpart and reiterated his request that all communications between the parties occur through counsel. Boston's counsel replied:

> On the communications point, I will contact only you about the lawsuit, but Mr. Colón has never resigned from the Boston Police Department and thus remains an employee. As long as that is the case, the department is entitled to communicate with him directly regarding work-related topics, in the same way that it communicates directly with any of its 2000+ employees.

161.   On July 13, 2023, Mr. Colón received a letter from Boston stating: "You have been absent without approved leave since May 27, 2023. Based on your unauthorized absence from the Boston Police Department for more than fourteen days, the Department must conclude that you have voluntarily abandoned your position."

**IX.   Boston's Vaccine or Test Policy and Mandatory Vaccine Policy Had No Rational Relationship to its Purpose of Minimizing Exposure to and Transmission of SARS-CoV-2 in City Workplaces**

162.   There is no rational relationship between COVID-19 vaccination, on the one hand, and minimizing exposure to and transmission of the virus that causes COVID-19, SARS-CoV-2, on the other hand. This is because the COVID-19 vaccines do not prevent exposure to and transmission of the COVID-19 virus, SARS-CoV-2. The vaccines were developed, tested, and shown solely to prevent or reduce the severity of COVID-19 disease, rather than prevent asymptomatic infection or transmission.

163.   Moreover, because vaccinated employees also can become infected with and transmit the SARS-CoV-2 virus, there is no rational relationship between minimizing exposure to and transmission of SARS-CoV-2, on the one hand, and testing *only* unvaccinated employees for SARS-CoV-2 infection, on the other hand.

**A.    Definitions of "Infection," "Exposure," "Transmission," "Disease," and "Asymptomatic Transmission"**

164.    SARS-CoV-2 *infection* is defined as the state produced by the establishment and multiplication of the SARS-CoV-2 virus in the body of a person.

165.    *Exposure* to SARS-CoV-2 is defined as a close contact with a known SARS-CoV-2-infected person.

166.    *Transmission*, known colloquially as *"spread"* of SARS-CoV-2 is defined as the establishment and multiplication of SARS-CoV-2 in the body of a person after exposure to another person infected with SARS-CoV-2.

167.    COVID-19 *disease* is defined as a set of symptoms, ranging from mild ones like cough to life-threatening ones like respiratory failure and death, known to be caused by the SARS-CoV-2 virus.

168.    *Transmission*, known colloquially as "spread," of SARS-CoV-2 is defined as the establishment and multiplication of SARS-CoV-2 in the body of a person after exposure to another person infected with SARS-CoV-2.

169.    Some persons exposed to SARS-CoV-2 may develop symptoms of COVID-19 disease, in what is termed a *symptomatic infection*. Others can be exposed and not have any symptoms at all, yet still can carry and transmit the virus to others in what is known as *asymptomatic infection*.



**B.     COVID-19 Vaccine Was Tested Only for Its Effectiveness at Preventing Disease**

170.    Two primary COVID-19 vaccines were developed for the U.S. market: BNT162b2 by Pfizer, Inc. and BioNTech. Inc. ("Pfizer Vaccine"), and mRNA-1273 by Cambridge-based Moderna, Inc. ("Moderna Vaccine").

171.    Neither the Pfizer nor the Moderna Vaccine clinical trials assessed if the vaccines could reduce infection or transmission after exposure to SARS-CoV-2, and neither the companies nor the government ever claimed they did.

172.    The two COVID-19 vaccines were tested only for their efficacy at preventing COVID-19 disease with symptoms of various severity—in other words, *symptomatic infection*.



173.    On Dec. 3, 2020, Pfizer's CEO, Albert Bourla, told NBC News it was still unknown if vaccinated people could be infected with SARS-CoV-2 and transmit it to others. "I think this is something that needs to be examined. We are not certain about that right now," he said.

174.    When the Food and Drug Administration issued an emergency use authorization for the Pfizer Vaccine on December 11, 2020, the authorization clearly disclaimed: "At this time, data are not available to make a determination about how long the vaccine will provide protection, *nor is there evidence that the vaccine prevents transmission of SARS-CoV-2 from person to person*." (Emphasis added.)

**C.** **Real-World Data Published in 2021 and 2022 Showed that COVID-19 Vaccines Were not Effective at Preventing SARS-CoV-2 Infection or Transmission after Exposure**

175. Among all the science, technology, engineering, and mathematics (STEM) periodicals in the world, the periodicals New England Journal of Medicine and Cell, respectively, published the third and fourth highest-cited science, technology, engineering, or mathematics articles of 2021 and 2022.

176. The New England Journal of Medicine is based in Boston, MA and published by the Massachusetts Medical Society.

177. Cell is based in Cambridge, MA.

178. On February 18, 2021, Cell reviewed the then-current science on "[a]daptive immunity to SARS-CoV-2 and COVID-19." The review noted than neither COVID-19 vaccine was tested for transmission, and also that the Pfizer Vaccine's "protection was reported based on symptomatic cases, not number of infections. . . [as] it would be extraordinarily challenging to check 40,000 people for SARS2 infections continuously for months."

179. The February 18, 2021 Cell article explains the logical relationships among the terms infection, transmission, and disease, as they relate to a vaccine's efficacy:

> Notably, a vaccine that can prevent severe disease, or even most URT [upper respiratory tract] symptomatic diseases, would not necessarily prevent transmission of virus. For example, the current pertussis vaccine prevents clinical disease but not infection, and probably not transmission, and much SARS-CoV-2 transmission occurs early, during the pre-symptomatic phase. Several non-human primate COVID-19 vaccine studies are consistent with the possibility of COVDI-19 [sic] vaccines preventing severe disease in humans but possibly not preventing URT infection.

180. On March 12, 2021, a large group of scientists from Massachusetts General Hospital's Vaccine and Immunotherapy Center and Department of Medicine, from the Massachusetts General Hospital for Children, from Brigham and Women's Hospital in

Boston, from the Dana Farber Cancer Institute in Boston, led by the Ragon Institute of MGH, MIT, and Harvard, among others, e-published an article in Cell titled *Multiple SARS-CoV-2 variants escape neutralization by vaccine-humoral immunity*.

181.    *Neutralization* is a chemical test used to determine vaccine efficacy. At the time that the article was published, highly infectious SARS-CoV-2 strains like delta and omicron had not yet been isolated, and the relatively-weaker "beta" strain, also known as B.1.351, was the most infectious pandemic variant. The Cell article found that the Pfizer and Moderna vaccines were extremely poor at neutralizing the beta variant, with the implication that new variants would be even better at escaping neutralization by the vaccines.



Wilfredo F. Garcia-Beltran*, et al., Multiple SARS-CoV-2 variants escape neutralization by vaccine-induced humoral immunity,* 184 Cell 2372 (2021).

182.    The April 29, 2021 Cell article concluded:

> Taken together, our results highlight that BNT162b2 [Pfizer] and mRNA-1273 [Moderna] vaccines achieve only partial cross-neutralization of novel variants and support the reformulation of existing vaccines to include diverse spike sequences. Ultimately, development of new vaccines capable of eliciting broadly neutralizing antibodies may be necessary to resolve the ongoing pandemic.

183.   On March 2, 2022, the New England Journal of Medicine published the results of a study testing the effectiveness of the Pfizer and Moderna vaccines at preventing symptomatic COVID-19 disease caused by the SARS-CoV-2 "omicron" variant, also known as B.1.1.529. According to the results, the vaccines' "effectiveness was lower for the omicron variant than for the delta variant at all intervals after vaccination and for all combinations of primary courses and booster doses investigated."

**D.    Judicial Notice of COVID-19 Vaccine Science is Deeply Tainted by Reliance on Memory-Holed Claims from CDC Websites**

184.   In prior COVID-19 vaccine-related litigation, the City of Boston and Dr. Ojikutu have referenced a particular U.S. Centers for Disease Control (CDC) webpage in primary support for their conclusions that the COVID-19 vaccine is effective at minimizing exposure to and transmission of SARS-CoV-2. So have at least 185 opinions by various courts across various United States jurisdictions, including by the Massachusetts Supreme Judicial Court. The webpage is: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html ("CDC Vaccine Webpage").[6]

185.   Since it was published on March 5, 2021, the information on the CDC Vaccine Webpage has changed five times—on August 15, 2021, December 23, 2021, June 23, 2022, March 23, 2023, and March 7, 2024—without any reason given for the changes.

186.   On March 5, 2021, the CDC Vaccine Webpage was published online for the first time, under the title "COVID-19 Vaccines Work." The webpage stated categorically that "COVID-19 vaccination prevented most people from getting COVID-19." The March 5, 2021 CDC Vaccine Webpage also stated: "New variants of the virus that causes COVID-

---

[6] *See, e.g., Foster v. Commissioner of Correction*, 488 Mass. 643, 654 (2021) (citing CDC Vaccine Webpage) ("The scientific community has recognized that vaccination is highly effective in protecting against COVID-19 infection. . .").

19 illness have emerged. . . . Current data suggest that COVID-19 vaccines used in the United States should work against [new] variants."

187. Just one week later, Massachusetts scientists would be warning in Cell Magazine: "[u]ltimately, development of new vaccines . . . may be necessary" due to the emergence of new variants.

188. On August 11, 2021, the CDC published a separate webpage called "Virus Variants" on the internet. In the Virus Variants webpage, the CDC admitted: "Anyone with Omicron infection, regardless of vaccination status or whether or not they have symptoms, can spread the virus to others."

189. Yet the editors of the CDC Vaccine Webpage continued giving entirely contradictory claims. On August 16, 2021, the CDC Vaccine Webpage was edited again to falsely reassure the public that "FDA-authorized COVID-19 vaccines help protect against Delta and other known variants," and that "COVID-19 vaccination can reduce the spread of disease overall, helping protect people around you."

190. In its August 16, 2021 edit of the Vaccine Webpage the CDC also added the false claim that:

> In addition to providing protection against COVID-19, there is increasing evidence that COVID-19 vaccines also provide protection against COVID-19 infections without symptoms (asymptomatic infections). COVID-19 vaccination can reduce the spread of disease overall, helping protect people around you.

191. On December 23, 2021, the CDC Vaccine Webpage was edited again to falsely claim: "In addition to data from clinical trials, evidence from real-world vaccine effectiveness studies show that COVID-19 vaccines help protect against COVID-19 infections, with or without symptoms (asymptomatic infections)."

192.   At the same time, the editors of the CDC Vaccine Webpage finally began to walk back some of their initial claims, stating: "While COVID-19 vaccines are effective, studies have shown some declines in vaccine effectiveness against infections over time, especially when the Delta variant was circulating widely."

193.   On June 23, 2022, the CDC Vaccine Webpage was edited for the third time. In this version, the CDC editors conceded that the vaccines actually were rather ineffective, either against SARS-CoV-2 infection or against mild to moderate COVID-19 disease symptoms, writing:

> COVID-19 vaccines are working well to prevent severe illness, hospitalization, and death. However, public health experts see reduced protection over time against mild and moderate disease, especially among certain populations. . . . COVID-19 vaccines used in the United States continue to protect against severe disease, hospitalization, and death from known circulating variants. They may not be as effective in preventing infection from these variants.

194.   On March 23, 2023, the CDC Vaccine Webpage was edited for the fourth time to entirely remove all claims about COVID-19 vaccine effectiveness and the claim that "COVID-19 Vaccines Work."

195.   The March 23, 2023 version of the CDC Vaccine Webpage contains links to another CDC webpage on vaccine effectiveness studies, which states that the CDC's criteria for testing COVID-19 vaccine effectiveness are the prevention of: a) "Critical illness or death due to COVID-19"; b) "Hospitalization for COVID-19"; c) "Medically attended COVID-19 (e.g., urgent care and emergency department visits)"; and d) "Symptomatic SARS-CoV-2 infection". There is no mention of spread, transmission, or asymptomatic infection being used by the CDC as criteria for monitoring vaccine effectiveness.

196.   On March 7, 2024, the CDC Vaccine Webpage was edited for the fifth time, this time insubstantially.

197.    According to Pew Research Center polling data, the percentage of U.S. adults who lacked
confidence that medical scientists will act in the best interest of the public doubled from
11 % to 22 % during the time period between April 2020 and December 2021, and
remains at 22 % as of the latest polling.



**Majorities of Americans say they have at least a fair amount of confidence in scientists, but ratings have fallen since early in the coronavirus outbreak**

*% of U.S. adults who have ___ of confidence in the following groups to act in the best interests of the public*

● A great deal   ● A fair amount   ● Not too much/No confidence at all

E.      **Popular Understanding of COVID-19 Vaccine Science Is Deeply Tainted by Political
Scapegoating**

198.    On July 4, 2021, U.S. President Joseph Biden (President Biden) stated that the United
States is "closer than ever to declaring our independence from a deadly virus [SARS-
CoV-2]. . . . It no longer controls our lives.  It no longer paralyzes our nation.  And it's
within our power to make sure it never does again."

199.    This prediction quickly turned out to be false. In the second week of July 2021, as the
delta variant began to spread through the U.S. population, the nation's seven-day average
of new COVID-19 cases increased by nearly 70 %. Hospitalizations and deaths also
began to increase. As of the date of this Complaint, total U.S. deaths from COVID-19 are
approaching double their number on July 4, 2021.

200. In correlation with the disease's resurgence, American society began to exhibit a phenomenon that is consistent with many past historical and literary descriptions. *See, e.g.*, Leviticus 16:20-22.

201. On July 16, 2021, President Biden stated: "The only pandemic we have is among the unvaccinated."

202. On July 25, 2021, New York Times science reporter Apoorva Mandavilli published a "news analysis" article in the New York Times titled: "The Delta Variant Is the Symptom of a Bigger Threat: Vaccine Refusal."

203. In her July 25, 2021 article, Mandavilli claimed: "The unvaccinated will set the country on fire over and over again. And they will not be the only ones who are singed."

204. On December 14, 2021, as the omicron variant became the dominant SARS-CoV-2 variant circulating in the United States, President Biden falsely claimed in an interview that vaccinated persons "do not spread the disease to anyone else." President Biden added:

> This is a pandemic of the unvaccinated, the unvaccinated. Not the vaccinated, the unvaccinated. That's the problem. Everybody talks about freedom and not to have a shot or have a test. Well guess what? How about patriotism?[7] How about making sure that you're vaccinated, so you do not spread the disease to anyone else."

205. The false claim that the vaccinated do not spread COVID-19 to others, but the unvaccinated do, became conventional wisdom, with national media pundits, journalists, celebrities, politicians, and even courts using the false claim to mercilessly scapegoat persons who were not vaccinated against COVID-19 for the failure to end the pandemic.

---

[7] The beliefs of Jehovah's Witnesses explicitly reject such appeals to patriotism.

206.   As of the date of this complaint, the false claim continues to influence the personal biases of government decision-makers.

**X.      Plaintiff is Unable to Work Another Police Job**

207.   As of the date of this complaint, Mr. Colón is still working as a human resources coordinator at a mental health facility - a significant departure from his chosen career path and passion. This change represents not just a loss of income, but a loss of purpose and identity.

208.   Becoming a Boston police officer was the fulfillment of a lifelong dream for Mr. Colón, something he had aspired to achieve since childhood. This achievement was not just a job, but the culmination of years of dedication and perseverance.

209.   When Mr. Colón joined the Boston Police Department on December 9, 2019, it was his last possible moment to do so, due to the Civil Service age limit of 40 years, which he reached in 2021. He will most likely never again be able to be a police officer.

210.   Completing the Academy was a source of immense pride for Mr. Colón and his family, especially his children. This accomplishment represented not just a personal victory, but a legacy he was creating for his family.

211.   Law enforcement had been Mr. Colón's calling since 2004 when he began his career in Florida. During his time as an officer in Florida, Mr. Colón built strong bonds of brotherhood with his fellow officers. This sense of camaraderie and belonging was a significant part of what made his work meaningful. When returning to serve as an officer in his hometown of Boston in 2019, Mr. Colón was excited not just about the job itself, but about the prospect of forging similar bonds with his new colleagues. This anticipation of recreating that sense of brotherhood made his achievement even more significant, as it represented both a professional and a deeply personal opportunity.

212.    The suspension in October 2021 was devastating for Mr. Colón. He felt forced to choose

between his faith and his profession - a choice that, while clear to him, came at an

enormous personal and professional cost. The emotional toll of this decision has been

significant and ongoing.

213.    Out of embarrassment and shock, Mr. Colón initially kept his suspension private. The

pain of having his dream job taken away simply for requesting a religious

accommodation based on his sincerely held beliefs was too intense to share with others. It

wasn't until news articles began appearing online that he had no choice but to disclose his

situation to his closest friends and family members.

214.    Although his time with the department was relatively short, Mr. Colón had begun to form

strong bonds with his fellow officers, reminiscent of the brotherhood he had experienced

in Florida. The abrupt loss of these budding relationships, coupled with the loss of his

role, has left a significant void in his life. This loss is particularly painful as it represents

not just the end of his current job, but the shattering of his hopes to recreate the deep

sense of belonging and purpose he had found in his previous law enforcement career.

215.    The unjust termination has caused severe anxiety for Mr. Colón, manifesting in

nightmares and constant distressing thoughts. This stress has triggered the return of

childhood claustrophobia and brought back anxiety, which Mr. Colón had not

experienced since college. While he had overcome a brief battle with anxiety in his

youth, the current situation has caused it to resurface with much greater intensity. As a

result, Mr. Colón can no longer enjoy certain activities with his family, which further

impacts his quality of life and relationships.

216.    Mr. Colón's career prospects in law enforcement are very poor. Due to age limits and the impact of his suspension from Boston PD, his applications to other police departments have been unsuccessful. His dreams of a long career in Boston, potentially becoming a detective and climbing the supervisory ranks, have been shattered.

217.    At his age, and after being terminated by Boston PD, it is unlikely that Mr. Colón will ever find employment as a police officer again. This realization is a never-ending source of sadness and frustration, as he grapples with the premature end of his law enforcement career.

218.    With the exception of two former colleagues, Mr. Colón rarely hears from his former police network. This loss of community compounds the personal and professional losses he has suffered.

219.    Perhaps most heart-wrenching is the impact on Mr. Colón's relationship with his children. Every time a police car passes or they see an officer, his children ask if he will ever be an officer again, expressing how much they liked seeing him in uniform. These innocent questions serve as painful reminders of what has been lost, not just for Mr. Colón, but for his entire family.

220.    The emotional distress of explaining his situation to friends, family, and potential employers has been an ongoing source of pain and humiliation for Mr. Colón. Each retelling of his story forces him to relive the injustice and loss he has experienced.

221.    The loss of Mr. Colón's position as a Boston police officer represents more than just the loss of a job. It signifies the loss of a lifelong dream, a proud identity, a close-knit community, and a secure future for himself and his family. The ripple effects of this

unjust termination continue to impact every aspect of Mr. Colón's personal and professional life.

222.   The financial impact of this termination is substantial. Mr. Colón had planned to work with the Boston Police until retirement at 65, building towards a pension and financial security for his family. This future has been taken from him.

223.   Mr. Colón expected to receive a minimum of $ 160,000 in annual compensation as a Boston police officer until his retirement at 65 years old. After his retirement, he expected to receive 48-57 % of the average of his annual compensation over the three most-highly compensated years he worked. Based on actuarial tables, Mr. Colón expected to live another 11-12 years after retirement. After Mr. Colón's death, his beneficiary would receive either a lump sum or 60 % of Mr. Colón's retirement benefits for the life of the beneficiary. Based on actuarial tables, Mr. Colon's beneficiary—his wife—is expected to outlive him by 10 years.

**COUNT I**
**42 U.S.C. § 1983 (Substantive Due Process Under Fourteenth Amendment)**

224.   Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-223 as if fully set forth herein.

225.   In the decades since Jacobson was decided, the U.S. Supreme Court has "assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment," or unwanted medical treatment of other kinds. *See Washington v. Glucksberg*, 521 U.S. 702, 705 (1997). *See also Washington v. Harper*, 494 U.S. 210, 221-222 (1990).

226.   The right to be free from nonconsensual medical attention and/or intentional medical harm at the hands of a healthcare professional is so deeply rooted in the American

people's conscience and traditions, firmly entrenched in American tort law, and securely grounded in the earliest common law as to be fundamental. Even the Hippocratic Oath, written in Ancient Greece several centuries before the Common Era, recognizes this right by obligating the novice doctor to do no harm or injustice to the patient in the doctor's hands.

227. Historically and during the COVID-19 pandemic, whenever they occurred, deviations away from Anglo-American bioethical traditions of informed consent, and toward more authoritarian doctor-patient relationships have undermined the ethical integrity of the medical profession by betraying patient trust and autonomy.

228. Lawrence Calderone and the Boston Police Patrolmen's Association acted jointly with the City of Boston, Bisola Ojikutu, Tammy Pust, and Lisa O'Brien in drafting and executing the Vaccine or Test Policy and the Mandatory Vaccine Policy.

229. The City of Boston coerced or substantially encouraged Calderone and BPPA to help it draft and execute the Vaccine or Test Policy and the Mandatory Vaccine Policy.

230. By mandating the COVID-19 test and/or the COVID-19 vaccine for Plaintiff pursuant to the Vaccine or Test Policy and the Mandatory Vaccine Policy, all Defendants deprived Plaintiff of a recognized liberty interest in refusing unwanted medical treatment that is so deeply-rooted as to be fundamental.

231. A policy of vaccination, combined with testing *only* for unvaccinated employees, was neither narrowly tailored to serve a compelling government purpose nor rationally related to the stated purpose of "minimiz[ing] exposure to and transmission of the COVID-19 virus in City workplaces." Contemporary credible Massachusetts-based research was showing that COVID-19 vaccines did not prevent asymptomatic infection with and

transmission of the SARS-CoV-2 virus by vaccinated individuals. Dr. Ojikutu and the City of Boston knew or should have known about this research when they issued the Vaccine or Test Policy and the Mandatory Vaccine Policy.

232.    Defendants violated Plaintiff's fundamental right to refuse lifesaving medical treatment in ways that shock the modern conscience.

233.    The Boston Defendants knew or were deliberately indifferent to contemporary scientific research, much of it being performed and published by Boston and Cambridge scientific institutions, which contradicted the CDC's inaccurate and since-retracted claims that a) COVID-19 vaccines were tested to provide protection from SARS-CoV-2 asymptomatic infection or transmission, and b) COVID-19 vaccines continued to provide protection from new SARS-CoV-2 variants. The Boston Defendants nevertheless mandated the COVID-19 vaccine for Boston employees (and for all persons engaged in commercial activity in Boston) based on knowingly-false claims about the COVID-19 vaccine's effectiveness at achieving the mandate's purpose.

234.    The BPPA Defendants completely abandoned Plaintiff, one of their union members, by refusing to respond to Plaintiff's grievance and any other communications, while continuing to deduct Plaintiff's union dues from his accrued vacation time.

235.    Not only were the Defendants active participants in one of the greatest government intrusions on civil liberties in the peacetime history of this country, but they were also active participants in one of the country's greatest medical hoaxes. As Dr. Ojikutu's own research indicates, medical distrust has extremely negative effects on public health. Yet her mandates, along with the mandates of government scientists across the country,

contributed to a doubled distrust of medical science among the U.S. population from the beginning of the pandemic to December 2021.

236.    By placing Plaintiff on unpaid leave or refusing to support (or even respond to) Plaintiff's grievance until he agrees to undergo vaccination against and/or tests for the presence of the SARS-CoV-2 virus, all Defendants deprived Plaintiff of his fundamental right to refuse medical treatment, under color of law, in violation of his substantive due process rights under the Fourteenth Amendment, causing him economic and emotional injury.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that all Defendants deprived Plaintiff of his fundamental right to refuse medical treatment, under color of law, in violation of his substantive due process rights under the Fourteenth Amendment, causing him economic and emotional injury; and 2) award Plaintiff actual damages against all Defendants with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Plaintiff's rights.

### COUNT II
### Mass. Gen. Laws. ch. 12, sec. 11I (Massachusetts Substantive Due Process)

237.    Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-236 as if fully set forth herein.

238.    Plaintiff's property interest in his employment as a tenured Boston police officer was protected by his Collective Bargaining Agreement, by Massachusetts civil service law, Mass. Gen. Laws ch. 31, § 1 et seq., and by Fourteenth Amendment to the U.S. Constitution.

239.    Plaintiff's contractual rights as a member of BPPA were protected by BPPA bylaws, and by the Massachusetts public sector union law, Mass. Gen. Laws ch. 150E, § 1 et seq.

240.   The Massachusetts Supreme Judicial Court recognizes a penumbral constitutional right of privacy to reject medical treatment. Under Massachusetts law, this right is balanced against very limited and carefully scrutinized overriding state interests in (1) the preservation of life; (2) the prevention of suicide; (3) the maintenance of the ethical integrity of the medical profession; and (4) the protection of innocent third parties.

241.   Plaintiff wants to live; declining life-sustaining medical treatment may not properly be viewed as an attempt to commit suicide; and where a competent adult refuses medical treatment for himself, the State's interest in preserving the particular patient's life will not override the individual's decision.

242.   Plaintiff has never been diagnosed with COVID-19, never called out sick because of COVID while working for the City of Boston during the COVID-19 pandemic, and maintains high physical fitness.

243.   There was no rational relationship between the protection of innocent third parties from exposure to and transmission of the COVID-19 virus, on the one hand, and either vaccination or testing only unvaccinated employees for the presence of the COVID-19 virus, on the other hand. The COVID-19 vaccines were never tested for effectiveness at preventing asymptomatic infection or transmission, and contemporaneous scientific data showed that the COVID-19 vaccines did not prevent asymptomatic infection with or transmission of the COVID-19 virus.

244.   The state interest in preserving the ethical integrity of the medical profession weights against the Vaccine or Test Policy and the Mandatory Vaccine Policy.

245.   Because no state interest counterbalances Plaintiff's Massachusetts constitutional right to decline medical treatment, and because Defendants forced Plaintiff to choose between

exercising this right, on the one hand, or his various contractual, constitutional, and statutory property rights in his tenured employment and union benefits, on the other hand, all Defendants interfered with Plaintiff's substantive due process rights under the Massachusetts Constitution through threats, intimidation, and/or coercion, causing Plaintiff injury.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that all Defendants interfered with Plaintiff's substantive due process rights under the Massachusetts Constitution through threats, intimidation, and/or coercion, causing Plaintiff injury; and 2) award Plaintiff actual damages against all Defendants with interest, reasonable attorney's fees and costs pursuant to Mass. Gen. Laws ch. 12, § 11I, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Plaintiff's rights.

### COUNT III
### 42 U.S.C. § 1983 (Free Exercise Under First Amendment)

246.  Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-245 as if fully set forth herein.

247.  Under the Free Exercise Clause, the government may not lend its power to one side or the other in controversies over religious authorities or dogma; and the government may not impose special disabilities on the basis of religious views or religious status. Any law or its execution must be neutral and generally-applicable.

248.  By allowing religious exemptions only to the *vaccine* portion of the Vaccine or Test Policy, all Defendants discriminated against Plaintiff's religious beliefs prohibiting biochemical testing, as compared to those religious beliefs that prohibit vaccination but do not prohibit biochemical testing.

249. The City of Boston also did not administer the Vaccine or Test Policy in a neutral fashion because Boston employees who did not religiously object to the testing requirement of the Vaccine or Test Policy, but who simply failed to comply with the testing requirement, were not placed on unpaid administrative leave by Lisa O'Brien or made to suffer any consequences whatsoever.

250. Contemporaneously to administering and/or enforcing the Vaccine or Test Policy and the Mandatory Vaccination Policy for the City of Boston, Bisola Ojikutu researched ways "to mitigate medical and research mistrust," which she defines, inter alia, as distrust in the government as a steward of public health" ranging on a "spectrum from skepticism, to active suspicion, to belief in conspiracy theories or secret plots. . ."

251. Dr. Ojikutu is motivated by a professional interest in combating medical distrust.

252. As part of Dr. Ojikutu's efforts to combat medical mistrust and "conspiracy theories" concerning COVID-19 vaccines, Dr. Ojikutu, Tammy Pust, and the City of Boston refused to grant religious exemptions from the Vaccine or Test Policy for religious beliefs that included medical mistrust, and/or so-called "conspiracy theories" about the COVID-19 vaccine.

253. Plaintiff's beliefs as a Jehovah's Witness do, indeed, have a component of what Dr. Ojikutu would define as medical mistrust. Indeed, based on his beliefs, Plaintiff distrusts secular governments to be stewards over any aspect of Jehovah's Kingdom whatsoever.

254. The official publication of Jehovah's Witnesses has promoted religious beliefs about the medical profession forcing vaccinations as a way to "accommodate big medics and big business."

255. Thus, while to Dr. Ojikutu, medical mistrust is "a thwarter of public health mitigation efforts"; to Plaintiff, it is a sincerely held religious belief.

256. Because Dr. Ojikutu's professional efforts focus on combatting medical mistrust, on the one hand, and because medical mistrust is an essential tenet of Plaintiff's religion, on the other hand, Dr. Ojikutu has animus toward Plaintiff's religious beliefs.

257. Because the City of Boston and Pust share Dr. Ojikutu's animus, Plaintiff did not receive the religious exemption that was generally available for other religious beliefs that were not based on medical mistrust.

258. Lawrence Calderone and the Boston Police Patrolmen's Association acted jointly with the City of Boston in drafting the Vaccine or Test Policy and the Mandatory Vaccine Policy.

259. The City of Boston coerced or substantially encouraged Calderone and BPPA in drafting the Vaccine or Test Policy and the Mandatory Vaccine Policy to exclude religious protections.

260. Because Calderone and BPPA share the same animus, they did not grieve or otherwise challenge the City's refusal to exempt Plaintiff from the policy.

261. The Vaccine or Test Policy neither was narrowly tailored to serve a compelling government purpose nor was rationally related to the stated purpose of "minimiz[ing] exposure to and transmission of the COVID-19 virus in City workplaces." Dr. Ojikutu and the City of Boston knew or should have known about contemporary research showing that COVID-19 vaccines did not prevent asymptomatic infection with and transmission of the COVID-19 virus by vaccinated individuals.

262.    By failing to administer the Vaccine or Test Policy in a generally-applicable manner and

        neutral manner, Dr. Ojikutu, Pust, O'Brien and the City of Boston, acting jointly with and

        providing substantial encouragement to Calderone and BPPA, deprived Plaintiff of his

        First Amendment rights under color of law; causing Plaintiff injury.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that Bisola Ojikutu,

Tammy Pust, Lisa O'Brien the City of Boston, Lawrence Calderone, and the Boston Police

Patrolmen's Association deprived Plaintiff of his First Amendment rights under color of law,

causing him injury; and 2) award Plaintiff actual damages against them with interest, reasonable

attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems

proper, including but not limited to, punitive damages for malicious deprivation of Plaintiff's

rights.

### COUNT IV
### 42 U.S.C. § 1983 (Equal Protection Under Fourteenth Amendment – Disparate Treatment and Impact Based on Race)

263.    Plaintiff hereby realleges and incorporates herein all of the allegations contained in

        paragraphs 1-262 as if fully set forth herein.

264.    To assert a disparate treatment equal protection claim, a plaintiff must state facts

        sufficient to show that, as compared to others similarly situated, the plaintiff was treated

        differently under the color of state law based on an improper consideration, such as race.

        Under the Fourteenth Amendment, government officials may not use race as a negative,

        or for any sort of stereotype.

265.    The Vaccine or Test Policy neither was narrowly tailored to serve a compelling

        government purpose nor was rationally related to the stated purpose of "minimiz[ing]

        exposure to and transmission of the COVID-19 virus in City workplaces." Dr. Ojikutu

        and the City of Boston knew or should have known about contemporary research

showing that COVID-19 vaccines did not prevent asymptomatic infection with and transmission of the COVID-19 virus by vaccinated individuals.

266.   At the same time, Dr. Ojikutu knew that a COVID-19 vaccine mandate would disproportionately affect Black Americans like Plaintiff. Between November 2020 and March 2021, Dr. Ojikutu discovered that vaccine hesitancy and medical mistrust are "particularly prevalent among Black Americans, compared with other races/ethnicities," that Black Americans are significantly less likely to get vaccinated against COVID-19 than other racial groups; and that many Black Americans would feel pressured to seek "alternative employment should their current employer mandated [sic] the vaccine."

267.   In contrast, Dr. Ojikutu's research showed that white Americans and members of other minority races are significantly less likely to hold "conspiracy beliefs" about COVID-19 vaccines, and therefore significantly more likely to get vaccinated.

268.   Armed with this information, and after being appointed as the Executive Director of the Boston Public Health Commission in July 2021, Dr. Ojikutu refused to grant sincerely-held belief exemptions from Boston's Vaccine or Test Policy to three Boston employees, at least two of whom were Black American. Dr. Ojikutu then mandated that Boston employees must get the COVID-19 vaccine, and also banned all unvaccinated persons from various commercial establishments in the City of Boston, despite knowing that doing so would disproportionately deny job opportunities and commercial activity to Black Americans.

269.   Plaintiff is a Black American employee of Boston. He was forced to seek alternative employment after the City of Boston, Pust, and Dr. Ojikutu refused to grant his request for a religious exemption from Boston's Vaccine or Test Policy because they viewed his

reasons for the exemption as mere Black American "conspiracy beliefs" that must be fought as a "thwarter of public health."

270.    Thereby, the City of Boston, Pust and Dr. Ojikutu treated Plaintiff differently on the basis of his race and/or national origin, depriving him of equal protection under the Fourteenth Amendment, and causing him injury.

271.    The necessary tendency, if not the specific purpose, of the Vaccine or Test Policy, of the Mandatory Vaccination Policy, and of refusing to grant exemptions based on Black American medical mistrust under either policy, was to drive as many Black Americans as possible out of Boston employment and commerce, in favor of employees of other races.

272.    Therefore, the Vaccine or Test Policy and the Mandatory Vaccination Policy had adverse disparate impact on Plaintiff on account of his Black race, depriving him of equal protection under the Fourteenth Amendment, and causing him injury.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that the City of Boston, Tammy Pust, and Bisola Ojikutu deprived Plaintiff of his equal protection rights under the Fourteenth Amendment, causing him injury; and 2) award Plaintiff actual damages against the City of Boston, Pust, and Dr. Ojikutu, with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Plaintiff's rights.

**COUNT V**
**42 U.S.C. § 2000e-2 (Disparate Treatment Discrimination Based on Religion)**

273.    Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-272 as if fully set forth herein.

274.    Plaintiff's sincerely-held religious beliefs prohibit him from contaminating his body with the COVID-19 vaccine and with the chemicals contained in the COVID-19 tests.

275.   These religious prohibitions conflicted with the City of Boston's Vaccine or Test Policy, and with the Mandatory Vaccination Policy.

276.   Because Plaintiff did not take the COVID-19 vaccine or submit to chemical tests for COVID-19, the City of Boston placed Plaintiff on indefinite unpaid administrative leave, thereby constructively terminating him and causing him injury.

277.   The City of Boston could have provided reasonable accommodations to Plaintiff's religious beliefs by assigning him desk jobs that did not require interaction with members of the public or other police officers, and therefore would have mitigated the risk of exposure to or transmission of the COVID-19 virus, SARS-CoV-2, from Plaintiff to others.

278.   The City of Boston did not offer any reasonable accommodations from the Vaccine or Test Policy to Plaintiff.

279.   Accommodating Plaintiff's religious beliefs would not have resulted in undue hardship, even if Plaintiff had continued to interact with members of the public. This is because COVID-19 vaccines do not prevent exposure to, infection with, and transmission of SARS-CoV-2; and consequently because testing *only* unvaccinated employees for SARS-CoV-2 infection would fail to prevent exposure, infection, and transmission among the vast majority of City of Boston employees who were vaccinated.

280.   Therefore, the City of Boston discharged Plaintiff and otherwise discriminated against Plaintiff with respect to his compensation, terms, conditions, or privileges of employment, because of Plaintiff's religion, in violation of 42 U.S.C. 2000e-2(a), causing Plaintiff injury.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that the City of Boston, discriminated against Plaintiff on the basis of religion in violation of 42 U.S.C. § 2000e-2, causing him injury; and 2) award Plaintiff actual damages against the City of Boston with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Plaintiff's rights.

### COUNT VI
### Mass. Gen. Laws ch. 151B, § 4 (Disparate Treatment Discrimination Based on Religion)

281. Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-280 as if fully set forth herein.

282. The City of Boston discharged Plaintiff from employment and otherwise discriminated against Plaintiff in compensation or in terms, conditions or privileges of employment because of Plaintiff's religious creed, without any basis in a bona fide occupational qualification, in violation of Mass. Gen. Laws ch. 151B, § 4.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that the City of Boston discriminated against Plaintiff on of his religious creed in violation of Mass. Gen. Laws ch. 151B, § 4, causing him injury; and 2) award Plaintiff actual damages against the City of Boston, with interest, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Plaintiff's rights.

### COUNT VII
### 42 U.S.C. § 2000e-2 (Disparate Treatment and Impact Discrimination Based on Race)

283. Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-282 as if fully set forth herein.

284. The Executive Director of the Boston Public Health Commission (BPHC), Dr. Ojikutu, is motivated by a professional interest in combating vaccine hesitancy, medical distrust, and

certain sincerely-held beliefs among Black Americans, which Dr. Ojikutu has deprecated as "conspiracy beliefs" or "conspiracy theories."

285. Dr. Ojikutu does not have a professional interest in combatting vaccine hesitancy, medical distrust, and certain sincerely-held beliefs among other races.

286. If Plaintiff had not been Black American, but instead a member of a different race that is not the focus of Dr. Ojikutu's professional research, she and the City of Boston would not have sought to combat his vaccine hesitancy and medical mistrust beliefs by denying his religious exemption request and placing him on unpaid administrative leave.

287. Therefore, the City of Boston discharged Plaintiff, or otherwise discriminated against Plaintiff with respect to his compensation, terms, conditions, or privileges of employment, because of Plaintiff's race, causing him injury

288. According to statistically-significant and peer-reviewed nationwide COVID-19 vaccination data for August 2021, when the Vaccine or Test Policy went into effect, Black Americans had the lowest vaccination rate out of all races, at 25.4% fully vaccinated. In comparison, 33.7 % of White Americans had been fully vaccinated by then.

289. At least two of the three Boston employees who were put on unpaid administrative leave for refusing to comply with the Vaccine or Test Policy were Black Americans.

290. Therefore, the Vaccine or Test Policy classified Boston employees in such ways that would adversely affect Plaintiff's status as an employee because of his race, in violation of 42 U.S.C. § 2000e-2(a)(2), causing Plaintiff injury.

291. The Vaccine or Test Policy is not job-related or consistent with business necessity. The stated purpose of the Vaccine or Test Policy was "to minimize exposure to and

transmission of the COVID-19 virus in City workplaces by providing occupational protection to all City employees and preventing exposure to members of the community we serve." However, COVID-19 vaccines do not prevent exposure to, infection with, and transmission of SARS-CoV-2; and consequently testing *only* unvaccinated employees for SARS-CoV-2 infection would fail to prevent transmission of the virus among the vast majority of City of Boston employees who were vaccinated.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that the City of Boston discriminated against Plaintiff with respect to his compensation, terms, conditions, or privileges of employment because of Plaintiff's race, and classified Boston employees in such ways that would adversely affect Plaintiff's status as an employee because of his race, causing him injury; and 2) award Plaintiff actual damages against the City of Boston, with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Plaintiff's rights.

## COUNT VIII
### 42 U.S.C. § 12112 (Americans with Disabilities Act)

292.   Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-291 as if fully set forth herein.

293.   Because Plaintiff was not vaccinated against COVID-19, the City of Boston required Plaintiff to take COVID-19 tests as a condition of his continued employment.

294.   Because vaccinated employees also can become infected with and transmit the SARS-CoV-2 virus, testing only unvaccinated employees for SARS-CoV-2 infection was not related to or consistent with the City of Boston's business necessity of minimizing exposure to and transmission of SARS-CoV-2, on the one hand.

295.   Therefore, the City of Boston required Mr. Colón to undertake a medical examination and made inquiries of Plaintiff as to whether he is an individual with a disability or as to the nature or severity of the disability, in violation of 42 U.S.C. § 12112(d)(4), causing Plaintiff injury.

296.   Because the City of Boston placed Plaintiff on indefinite leave, classified Plaintiff as Medically Incapacitated and placed him indefinitely in the Medically Incapacitated Section, the City of Boston regarded Plaintiff as having a physical or mental impairment that substantially limits his ability to work: being an asymptomatic carrier of COVID-19.

297.   In violation of 42 U.S.C.S. § 12112(b)(5), the City of Boston did not even attempt to make reasonable accommodations to what it considered to be Plaintiff's disability.

298.   Accommodating Plaintiff with different assignments or even letting Plaintiff return to full duty would not have imposed an undue hardship on the operation of the business of the City of Boston, since both vaccinated and unvaccinated individuals can be asymptomatic carriers of COVID-19.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that the City of Boston discriminated against Plaintiff on the basis of disability in regard to the terms, conditions, and privileges of Plaintiff's employment.; and 2) award Plaintiff actual damages against the City of Boston, with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Plaintiff's rights.

## COUNT IX
### 42 U.S.C. § 1983 (Procedural Due Process Under Fourteenth Amendment)

299.    Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-298 as if fully set forth herein.

300.    After completing his one year probationary period under Mass. Gen. Laws ch. 31, § 61 on June 2, 2021, Plaintiff became a tenured civil service employee.

301.    The Massachusetts civil service law, Mass. Gen. Laws. ch. 31, §§ 1 et seq., protects tenured civil service employees from being involuntarily "discharged, removed, suspended for a period of more than five days, laid off, [or] transferred" without just cause, and without the procedural protections of Mass. Gen. Laws. ch. 31, § 41.

302.    Mass. Gen. Laws. ch. 31, § 41 requires three days' notice and a hearing prior to discharge, removal, long-term suspension, layoff, or transfer.

303.    There is no provision in Mass. Gen. Laws ch. 31 authorizing an appointing authority to place an employee on indefinite unpaid administrative leave. Whatever its basis, because such a leave constitutes the loss of all job responsibilities and compensation for an indefinite period of time, it should be regarded as a "discharge" within the meaning of Mass. Gen. Laws ch. 31, §§ 1, 41.

304.    On October 26, 2021, while Plaintiff's request for a religious exemption from the Vaccine or Test Policy was still pending, the City of Boston and Lisa O'Brien notified Plaintiff that he is being placed on indefinite unpaid administrative leave. Plaintiff did not receive adequate notice of what was, in essence, a constructive discharge, and was given no pre-deprivation process whatsoever.

305.    Plaintiff's post-deprivation process, which was limited to the October 29, 2021 "non-compliance hearing" by Pust's office was a sham; and Plaintiff has never received any written notice of its outcome.

306.    Calderone and BPPA acted jointly with the City of Boston in pushing Plaintiff into the sham process, and took the City's side against Plaintiff.

307.    The City of Boston coerced or substantially encouraged Calderone and BPPA to push Plaintiff into the sham process, and to take the City's side against Plaintiff.

308.    All Defendants violated Plaintiff's procedural due process rights under the Fourteenth Amendment by placing him on indefinite unpaid administrative leave without adequate pre-deprivation notice, with no pre-deprivation process, and a sham post-deprivation process, causing Plaintiff injury.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that all Defendants deprived Plaintiff of due process under the Fourteenth Amendment, causing him injury; and 2) award Plaintiff actual damages against all Defendants, with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Plaintiff's rights.

### COUNT X
### 42 U.S.C. § 1983 (Takings Clause of the Fifth Amendment)

309.    Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-308 as if fully set forth herein.

310.    After completing his one year probationary period under Mass. Gen. Laws ch. 31, § 61 on June 2, 2021, Plaintiff became a tenured civil service employee.

311.    That a tenured public employee has a protected property interest in continued employment is beyond question.

312.    Dr. Ojikutu's private professional efforts to fight medical distrust and conspiracy beliefs among Black Americans are motivated by a public health purpose.

313.    The stated purpose of the Vaccine or Test Policy was to benefit the public by "minimiz[ing] exposure to and transmission of the COVID-19 virus in City workplaces[,] by providing occupational protection to all City employees and preventing exposure to members of the community we serve." Therefore, the Vaccine or Test Policy and Plaintiff's loss of income from his public employment as a consequence of the Vaccine Policy were intended for public use.

314.    Calderone and BPPA acted jointly with the City of Boston, Pust, O'Brien and Dr. Ojikutu in drafting the Vaccine or Test Policy, and applying it to Plaintiff.

315.    The City of Boston, Pust, O'Brien, and Dr. Ojikutu coerced or substantially encouraged Calderone and BPPA to help draft the Vaccine or Test Policy and apply it to Plaintiff, as well as to refuse to support Plaintiff after he was placed on indefinite unpaid administrative leave.

316.    By placing Plaintiff on indefinite unpaid administrative leave for failing to comply with the Vaccine or Test Policy due to his sincerely-held religious beliefs, all Defendants effected a taking of Mr. Colón's property for public use without just compensation, in violation of the Takings Clause of the Fifth Amendment, as applicable to the States by the Fourteenth Amendment, causing Plaintiff injury.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that the all Defendants took Mr. Colón's property for public use without just compensation, in violation of the Takings Clause of the Fifth Amendment, as applicable to the States by the Fourteenth Amendment, causing Plaintiff injury; and 2) award Plaintiff actual damages against all Defendants, with

interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief

that the Court deems proper, including but not limited to, punitive damages for malicious

deprivation of Plaintiff's rights.

### COUNT XI
### 42 U.S.C. §§ 1985(2), 1985(3) (Obstruction of Justice and Conspiracy to Deprive of Equal Protection of Laws)

317.    Plaintiff hereby realleges and incorporates herein all of the allegations contained in

paragraphs 1-316 as if fully set forth herein. The City of Boston and Lisa O'Brien were

aware that Plaintiff considered himself to be constructively discharged; that Plaintiff filed

discrimination charges with the EEOC; and that Plaintiff intended to file discrimination

claims in federal court. The City of Boston and Lisa O'Brien were also aware that

Plaintiff had counsel, as well as that Plaintiff, by counsel, had asked Boston to settle the

potential discrimination claims.

318.    The City of Boston and O'Brien nevertheless attempted to intimidate Plaintiff into

returning to work and from pursuing his federal claims by sending armed police officers

to Plaintiff's residence, and by declaring Plaintiff to be absent without leave.

319.    As part of Dr. Ojikutu's professional efforts to combat medical distrust and conspiracy

beliefs among Black Americans, all Defendants conspired for the purpose of depriving

Black Americans who worked for or did commerce in the City of Boston during the

COVID-19 pandemic of the equal protection of the laws, thereby causing Plaintiff injury.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that the City of Boston

and O'Brien conspired to deter, by force, intimidation, or threat, Plaintiff from attending a court

of the United States, causing Plaintiff injury; 2) Adjudge and declare that all Defendants

conspired for the purpose of depriving Plaintiff of the equal protection of the laws due to his

Black race, causing Plaintiff injury; and 2) award Plaintiff actual damages against all
Defendants, with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and
any other relief that the Court deems proper, including but not limited to, punitive damages for
malicious deprivation of Plaintiff's rights.

## COUNT XII
### (Breach of Duty of Fair Representation)

320.   Plaintiff hereby realleges and incorporates herein all of the allegations contained in
paragraphs 1-319 as if fully set forth herein.

321.   On November 18, 2021, Plaintiff filed a labor grievance with the City of Boston pursuant
to the CBA between BPPA and the City of Boston, as governed by Mass. Gen. Laws
150E, §§ 5, 8-9.

322.   BPPA refused to acknowledge and advance Plaintiff's grievance against the City of
Boston, in bad faith and in an arbitrary manner, as a consequence of religious
discrimination by BPPA President Lawrence Calderone against Plaintiff, breaching its
duty of fair representation to Plaintiff, and causing Plaintiff injury.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that BPPA breached its
duty of fair representation to Plaintiff, causing Plaintiff injury; and 2) award Plaintiff actual
damages against BPPA, with interest, reasonable attorney's fees and costs, and any other relief
that the Court deems proper.

## COUNT XIII
### (Breach of Contract)

323.   Plaintiff hereby realleges and incorporates herein all of the allegations contained in
paragraphs 1-322 as if fully set forth herein.

324.   By placing Plaintiff on indefinite unpaid administrative leave for noncompliance with the
Vaccine or Test Policy while Plaintiff's request for a religious exemption from the

Vaccine or Test Policy was still pending, the City of Boston breached its obligations under the CBA between itself and BPPA not to discipline or discharge Plaintiff except for just cause, as well as not to discriminate against Plaintiff on the basis of religion, causing Plaintiff injury.

325.   By abruptly ordering Plaintiff to return to work after nineteen months of unpaid administrative leave, and then terminating Plaintiff by declaring him absent without leave, thereby denying Plaintiff the recourse of an appeal of his termination before the Massachusetts Civil Service Commission and/or Human Resources Division, the City of Boston breached its duty of good faith and fair dealing under the CBA between itself and BPPA.

326.   Plaintiff exhausted the grievance process under the CBA between the City of Boston and BPPA by filing a grievance with the City of Boston, which BPPA then refused to advance on Plaintiff's behalf, or even acknowledge.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that the City of Boston breached its contract with Plaintiff, causing Plaintiff injury; and 2) award Plaintiff actual, reliance, and expectancy damages against the City of Boston, with interest, and any other relief that the Court deems proper.

## COUNT XIV
### (Mass. Gen. Laws ch. 12, § 11I)

327.   Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-325 as if fully set forth herein.

328.   By her actions, including the use of armed police officers to deliver her demands that Plaintiff return to work, Lisa O'Brien interfered with Plaintiff's contractual, statutory,

and constitutional rights through threats, intimidation or coercion, causing Plaintiff injury.

WHEREFORE, Plaintiff requests that this Court: 1) Adjudge and declare that Lisa O'Brien interfered with Plaintiff contractual, statutory, and constitutional rights, causing Plaintiff injury; and 2) award Plaintiff actual damages against Lisa O'Brien, with reasonable attorney's fees and costs pursuant to Mass. Gen. Laws ch. 12, § 11I, interest, and any other relief that the Court deems proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: August 23, 2024.

Respectfully submitted,
Plaintiff,
By his attorney,

Ilya I. Feoktistov, Esq.
B.B.O. No. 704458
LAW OFFICE OF ILYA FEOKTISTOV
292 Newbury Street, No. 544
Boston, MA 02115
(617) 462-7938
if@ilyafeoktistov.com