**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**
**Civil Action No. 1:24-cv-12191**

| | |
|---|---|
| **Saviel Colon,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **Bisola Ojikutu, et. al.,** | ) |
| **Defendants.** | ) |

## <u>DEFENDANT MEMORANDUM IN SUPPORT OF MOTION TO DISMISS ORIGINAL COMPLAINT</u>

Now comes, the Boston Public Health Commission, on behalf of Defendant Bisola Ojikutu, M.D., M.P.H., (hereinafter, "Dr. Ojikutu," or the "Defendant"), and hereby moves pursuant to Massachusetts Rules of Civil Procedure, 12(b)(1) and (6), to dismiss all counts in Plaintiffs' Complaint.[1]

Plaintiffs' Complaint must be dismissed because:

I.      Plaintiff's claims against Dr. Bisola Ojikutu are barred by qualified immunity;

II.      Plaintiff has n not alleged any conduct of Dr. Ojikutu has caused him harm;

III.      Plaintiff's contention that vaccines are ineffective at reducing transmission of COVID-19 is patently false based on overwhelming scientific consensus;

IV.      Dr. Ojikutu's history of research on vaccine hesitancy in not evidence of discriminatory animus;

V.      Plaintiff has failed to assert a claim for substantive due process;

---

[1] This refers to Plaintiff's original complaint, as the Proposed First Amended Complaint ha not, as of writing, been accepted.

VI.      Plaintiff has failed to assert a claim pursuant to the Free Exercise Clause both because he has not alleged that refusing to vaccinate or test is a sincere religious belief or that Dr. Ojikutu's conduct in any way interfered with a protected right;

VII.     Plaintiff's labor law claims must be dismissed against Dr. Ojikutu because she is not his employer or a labor organization;

VIII.    Plaintiff's equal protection claim is insufficiently alleged as he has failed to allege discriminatory intent;

IX.      Plaintiff's ADA claims must be dismissed because Dr. Ojikutu is not a covered entity pursuant to the ADA, and he has failed to allege conduct in violation of the act;

X.       Plaintiff has failed to state a cause of action for due process violations;

XI.      Plaintiff has failed to allege a cause of action for unconstitutional taking as no taking has occurred; and

XII.     Plaintiff has failed to allege a claim for relief pursuant to Section 1985(3) as he has not alleged facts to support the existence of a conspiracy.

Additionally, the Defendant reserves the right to serve a second motion to dismiss and/or a motion to strike should the court grant Plaintiff's pending Motion to Amend Complaint.

## **FACTS**

Defendant Dr. Bisola Ojikutu, MD, MPHC, ("Dr. Ojikutu"), who is named in the Complaint in both her personal and professional capacities, is the current Executive Director of the Boston Public Health Commission (the "Commission"). Dr. Ojikutu has dedicated her career as a physician scientist to public health and especially the treatment of infectious disease. *See* Affidavit of Bisola Ojikutu.

Pursuant to the Commission's enabling statute, the Boston Public Health Commission is an independent body politic and political subdivision of the Commonwealth, and is not an agency of the City of Boston ("COB"). *See* Boston Public Health Act of 1995, Mass. Gen. L. App. 111, §1-3, et seq. On July 1, 1996, the Commission undertook the operations, responsibilities and liabilities of the former City of Boston Department of Health and Hospitals. Id. at §2-3. The Commission is thus an entirely separate entity from the City of Boston.

The Boston Public Health Commission is controlled by the Board of Health, whose members make up an independent governing body. Id. Dr. Ojikutu was appointed by and serves at the discretion of this body. Id. Additionally, her checks are paid by the Commission. Id. Neither the mayor nor the COB have the power to appoint or fire Dr. Ojikutu. The only powers Dr. Ojikutu possesses as Executive Director are those conferred by the enabling statute of the Boston Public Health Commission. M.G.L. c. 111, § 30. The powers held by the Executive Director of the Boston Public Health Commission are specifically enumerated in its enabling statute, and do not allow it to control policy decisions within the COB.

Dr. Ojikutu does not play any role in the HR processes of the Boston Police Department, and did not write, enact, or enforce the COB employee Vaccine or Test Policy at issue in the Complaint, nor the Boston employee Vaccine Mandate Policy, which never went into effect, and is also mentioned in the Complaint. Id. Nor is Dr. Ojikutu an employee of, or member of, any union which serves employees of the Boston Fire Department. Id.

Saviel Colon has never worked for the Commission or been an employee under the oversight of Dr. Ojikutu in any way. Id.

## **STANDARD OF REVIEW**

A. <u>12(b)(1) lack of standing</u>

Any claim requires, at constitutional minimum, that there be a current case in controversy, for which a court is likely to be able to afford relief, in order to retain jurisdiction in an Article III court. <u>American Civil Liberties Union of Massachusetts v. U.S. Conference of Catholic Bishops</u>, 705 F.3d 44, 52 (1st Cir. 2013). As the party invoking federal jurisdiction, a plaintiff has the responsibility to demonstrate that they have standing, and a live controversy exists. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992).

B. <u>12(b)(6) failure to state a claim</u>

The Supreme Court has interpreted Federal Rule of Civil Procedure 8(a)(1) to mean that for a petition in federal court to state a claim and survive a motion to dismiss pursuant to 12(b)(6), a plaintiff must have plead "enough factual matter" to state a claim for relief that "is plausible on its face". <u>Bell Atlantic Corp. v. Twombly</u> 550 U.S. 544 (2007); <u>See also</u>, <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). A complaint that alleges conduct "merely consistent with unlawfulness is insufficient." <u>Id</u>. Rather, the pleadings must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. 662, 678.

In determining whether the plausibility standard for stating a claim has been met, courts must engage in a "fact specific" inquiry, using "common sense." <u>Id</u>. at 679. While there is no hardline rule for the level of detailed pleading which will suffice, this requirement "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Id</u>. at 678.

Additionally, while a court must, on a motion to dismiss, generally assume that all facts plead are true, this is not always the case. <u>A.G. ex rel. Maddox v. v. Elsevier</u>, Inc., 732 F.3d 77, 80-81 (1st Cir. 2013). Conclusory allegations are not entitled to a presumption of truth, including both rote recitation of the elements of a cause of action and allegations which, while clothed as factual statements, are unsupported speculation by the plaintiff. <u>Id</u>. As stated in <u>Correa-Martinez</u>

4

v. Arrillaga-Belendez, "In the menagerie of the Civil Rules, the tiger patrolling the courthouse gates is rather tame, but not entirely toothless. A court assessing a claim's sufficiency has no obligation to take the allegations of the complaint on blind faith; despite the highly deferential reading which the court accords a litigant's complaint under Rule 12(b)(6), the court need not credit *bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation.*" Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990) (internal citation omitted) (overruled on other grounds)(emphasis added).

## ARGUMENT

The Plaintiff's Complaint, despite the periphrastic approach taken to stating the 14 claims therein, critically fails to meet the pleading standard required to maintain a cause of action against Defendant Dr. Bisola Ojikutu. Therefore, the Complaint must be dismissed.

I.  <u>Plaintiff's claims against Dr. Ojikutu are barred by qualified immunity, as Dr. Ojikutu is a government official performing discretionary functions, and her actions did not violate a clearly established statutory or constitutional right of which a reasonable person would have known.</u>

The claims against Dr. Ojikutu are barred by qualified immunity. The Supreme Court has held that public officials are entitled to qualified immunity for their performance of discretionary functions when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). Pursuant to this rule, public officials are not subject to damages or liability when qualified immunity is available. Id. The First Circuit has noted that "qualified immunity sweeps so broadly that 'all but the plainly incompetent or those who knowingly violate the law' are protected from civil rights suits for money damages." Hegarty v. Somerset County, 53 F.3d 1367, 1373 (1st Cir.1995), quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991).

Moreover, "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." Id. at 306 (internal citation omitted). Cristo v. Evangelidis, 90 Mass.App.Ct. 585 (Ap. Ct. 2016) (dismissing case against defendant, town sheriff, due to qualified immunity). See also Duarte v. Healy, 405 Mass. 43 (Mass. 1989) (upholding dismissal due to qualified immunity of chief of fire department and city manager for policy requiring urine testing of employees, finding that this was not a violation of a clearly established right, and that policy making is a discretionary function). Even if the violated right was clearly established at the time of the violation, a public official may *still* be shielded from liability if their actions were reasonable. Courts have held that it may be "difficult for [the defendant] to determine how the relevant legal doctrine . . . will apply to the factual situation the [defendant] confronts. . . ." therefore, "if the [defendant's] mistake as to what the law requires is reasonable . . . the [defendant] is entitled to the immunity defense." Saucier v. Katz, 533 U.S. 194, 205 (2001).

In the instant case, it is clear that Dr. Ojikutu has qualified immunity, because the conduct challenged is discretionary rather than ministerial, and because Plaintiff has not alleged that his clearly established right was violated. Firstly, the conduct that Plaintiff alleges and attributes to Dr. Ojikutu, consists of the discretionary acts of writing and enforcing a policy, providing medical opinions, and contributing to scientific research in the public health field. All of these are discretionary functions, rather than purely ministerial.

Secondly, Plaintiff has not asserted a "clearly established" right has been violated, such that an official would know that their acts were unlawful. Read generously, the Complaint here amounts to a request to overturn standing precedent which permits vaccine mandates. *See* Jacobson v. Massachusetts, 197 U.S. 11 (1905). As discussed above, public officials are not

required, under the doctrine of qualified immunity, to predict changes in constitutional or statutory law to remain entitled to immunity.

Therefore, Dr. Ojikutu is entitled to qualified immunity, and Complaint is thus barred and must be dismissed.

II.    This case must be dismissed as Plaintiff has not alleged that there is an actual case in controversy as to Dr. Ojikutu, because he has not alleged that any act or omission by Dr. Ojikutu has caused him any harm.

Plaintiff has failed to allege any conduct of Defendant Bisola Ojikutu or the Commission (collectively, "Dr. Ojikutu"), whether act or omission, caused him any harm. It is a constitutional minimum, in order to show a case in controversy, that a defendant must have acted or failed to act in a way that harmed the plaintiff.

Plaintiff's verbose Complaint, despite spanning 70 pages, only mentions Dr. Ojikutu a scant few times, and the relevant allegations are not linked to Plaintiff's stated causes for relief.[2] While Plaintiff seeks to equate Dr. Ojikutu with the City of Boston and list her as responsible for the City of Boston's action, he does not allege a factual basis for doing do so, and any attempt to do so is merely an implausible fabrication. In similar instances, Massachusetts courts have held that failure to plead any tortious conduct against a defendant is cause for dismissal.

Padmanabhan v. City of Cambridge, 166 N.E.3d 1010, (Mass. App. Ct. 2021)(holding that plaintiff's "failure to allege tortious (or any) conduct by these defendants means he cannot plausibly recover from them")(emphasis added).

a.    Plaintiff's allegations that Dr. Ojikutu contributed to published research which addressed vaccine hesitancy is completely unconnected to any claim for relief, and thus does not meet the requirement that a plaintiff to allege of some conduct of the defendant harmed him.

---

[2] This is also true for the Proposed First Amended Complaint, in which the Plaintiff alleges Dr. Ojikutu mislead a different court by submitting "contradictory" affidavits, however, this does not relate in any way to any harm suffered by the Plaintiff.

Plaintiff dedicated a large portion of the Complaint to describing several works of public health research regarding vaccine hesitancy and medical mistrust among Black Americans, to which Dr. Ojikutu contributed. This appears to be his primary factual allegation against Dr. Ojikutu: that she contributed to medical literature, with which he disagrees. However, Plaintiff does not allege that this research caused him any harm or violated his rights. Plaintiff has not alleged that Dr. Ojikutu participating in research harmed or affected him in any way. Simply contributing to scholarship which Plaintiff finds objectionable does not constitute a violation of Plaintiff's rights.

Additionally, Plaintiff alleges that the research in which Dr. Ojikutu participated is biased in some way towards an ill-defined class of persons with vaccine hesitancy, or is evidence of religion or race based animus generally, which can be imputed to the City of Boston as evidence that their actions were motivated by discriminatory intent. This argument fails to transform this unrelated activity into culpable conduct giving rise to standing in this case for several reasons.

Firstly, the research could not have contributed to the decision making of the City of Boston, because it was *published after the decisions* which Plaintiff objects to in the Complaint. Plaintiff fails to cite his sources or even provide the names of the articles which he references in the Complaint, but it appears that his criticism mainly stems from the article, "A qualitative study of COVID-19 vaccine intentions and mistrust in Black Americans: Recommendations for vaccine dissemination and uptake."[3] This peer reviewed article, with six named authors, was not published until May 3, 2022, and therefore, the statements and conclusions in the article could not have contributed to any policy making or employment decisions occurring between September and December 2021. Moreover, Plaintiff falsely suggests this article was submitted

---

[3] https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0268020

for publication in September 2021, but the abstract makes clear that the research was not even completed until March of 2022. The second research study Plaintiff cites to appears to be "COVID-19 Vaccine Intentions and Mistrust in a National Sample of Black Americans""[4], another prestigious peer reviewed paper, in which Dr. Ojikutu is the seventh listed author. This article appears to have been published in January 2022.

Additionally, the independent work of Dr. Ojikutu (and multiple other authors) cannot rationally be imputed onto the mindset of actors from the City of Boston, which is a separate agency not under her control, in order to find evidence of animus. The City of Boston was not bound to follow any advice or opinions derived from Dr. Ojikutu. Dr. Ojikutu and the Boston Public Health Commission had no role in writing, enacting, or enforcing the City of Boston Vaccine or Test Policy.  See attached, Affidavit of Dr. Ojikutu; **Exhibit A**, Vaccine or Test Policy; **Exhibit B**, Vaccine Mandate Policy.[5] Therefore, the allegations regarding her scholarly work fail to provide standing.

Finally, studying medical mistrust does not constitute evidence of animus against any racial, religious, or other group of persons. Please see Section IV below.

b. <u>Plaintiff's allegation that "on information and belief" Dr. Ojikutu contributed to the denial of his request for a religious exemption is insufficient to maintain this action, and he has not alleged any other conduct by Dr. Ojikutu on which he alleges liability.</u>

Plaintiff has not raised a plausible inference that the City of Boston's acts can be attributed to Dr. Ojikutu, because the City of Boston is an entirely separate entity from the Boston Public Health Commission. See Affidavit of Dr. Bisola Ojikutu. The Complaint is devoid

---

[4] Bogart LM, Dong L, Gandhi P, Klein DJ, Smith TL, Ryan S, Ojikutu BO. COVID-19 Vaccine Intentions and Mistrust in a National Sample of Black Americans. J Natl Med Assoc. 2022 Jan;113(6):599-611. doi: 10.1016/j.jnma.2021.05.011. Epub 2021 Jun 20. PMID: 34158171; PMCID: PMC8214755. https://pubmed.ncbi.nlm.nih.gov/34158171/

[5] Additionally, Defendant contends that the research itself was not evidence of bias and was not discriminatory, and was in fact the opposite.  This is discussed below, in Section IV.

of any factual allegations linking Dr. Ojikutu to the decisions regarding enactment and enforcement of the Vaccine or Test Policy, or deny Plaintiff's request for an exemption.

The only direct "factual" allegation that Dr. Ojikutu took any action that harmed Plaintiff is found incongruously in the center of the Complaint: "On information and belief, the City of Boston, Dr. Ojikutu, and Pust denied employee requests for religious accommodations from the Vaccine or Test Policy, if such requests were based on what Dr. Ojikutu defines as "conspiracy beliefs" or as "medical mistrust."" Complaint paragraph 115-116. These are the exact sort of "the plaintiff unlawfully harmed me" type statements which cannot withstand dismissal under Twombley and Iqbal. Without connecting Dr. Ojikutu's acts or omissions to the harm he allegedly suffered in any way, Plaintiff cannot withstand dismissal by only stating this connection "on information and belief." This is especially true because it would be improbable for Dr. Ojikutu to make the final decision in an HR matter for a Boston Police Department employee, when she is entirely outside of the chain of command in the City of Boston and is not an employee of the City of Boston.

Dr. Ojikutu is the Executive Director of the Boston Public Health Commission, an independent body politic of the commonwealth of Massachusetts, and had no part in granting or denying any requests for reasonable accommodation within the Boston Police Department ("BPD"), or any other agency or employer; nor writing, enacting, or enforcing the policies in question. Th Vaccine or Test Policy was an internal policy created and enforced by the City of Boston. The policies referred to in the Complaint are labeled City of Boston, and applied to City of Boston employees. See **Exhibits A-B**.  Dr. Ojikutu has never had any place in the chain of command of BPD or City of Boston. *See* Affidavit of Dr. Ojikutu.

Therefore, Plaintiff has not alleged any culpable conduct from Dr. Ojikutu and thus has failed to plead facts plausibly entitling him to relief.

III.    <u>Vaccines are effective at reducing infection and transmission of COVID-19, including in individuals who have "asymptomatic" infections. This information was available contemporaneously when the Vaccine or test Policy was in effect.</u>

Plaintiff's contention that COVID-19 vaccines are ineffective is incorrect. The overwhelming consensus of the scientific community is that COVID-19 vaccines prevent infections, regardless of symptoms, and transmission. Like much of the rest of the Complaint, Plaintiff's argument regarding vaccine's ineffectiveness falls apart immediately under the faintest scrutiny. Plaintiff's conclusion is based on a misunderstanding of the basic science, and cherry picking select quotes from irrelevant studies in order to reach an outlandish and unscientific conclusion.

Plaintiff has two primary contentions about the COVID-19 vaccine: first, that they do not prevent transmission, and second, that they do not prevent asymptomatic infections. COVID-19 vaccines are effective at preventing transmission and infection, contrary to Plaintiff's cherry-picked argument. This was known prior to the acts alleged in the Complaint, as even in Spring of 2021, mounting evidence indicated vaccines effectiveness. A May 2021 meta study, analyzing the results of other large scale studies, found that, "There are 2 ways a vaccine can reduce transmission risk. First, a vaccine may decrease the probability of a recipient becoming infected in the first place by protecting against both symptomatic (as measured by the primary endpoints of the clinical trials) and asymptomatic infection (which can only be identified using systematic polymerase chain reaction [PCR] or serology testing). Second, a vaccine may decrease the probability of secondary transmission from an infected vaccine recipient by reducing the duration or degree of infectiousness. *Accumulating evidence suggests that severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) vaccines can substantially reduce*

*transmission through both of these mechanisms.*"[6] Thus, COVID-19 vaccines both prevent

individuals from becoming infected with COVID-19, and then reduce the likelihood of

transmission to third parties in the event of a breakthrough infection.[7] This evidence has only

grown stronger since that time. A 2023 metanalysis of 31 large vaccine studies specifically

examining the effect on transmissibility "showed the effectiveness of COVID-19 vaccination

against SARS-CoV-2 transmission… regardless of vaccine type or number of doses."[8]

     Additionally, Plaintiff is incorrect in suggesting that the COVID-19 vaccines are only

effective at preventing symptomatic cases of COVID-19, and do not affect asymptomatic cases.

Evidence that the COVID-19 vaccines prevented asymptomatic infection, too, was already

becoming well known in fall 2021 prior to the allegations of the Complaint, as research

increasingly found "vaccines across multiple platforms are associated with large reductions in all

SARS-CoV-2 infections regardless of symptoms, with protection that is almost as high as that

provided against symptomatic COVID-19."[9] Another meta analysis, analyzing 30 studies in

2021, found that, "In fully vaccinated individuals, VE—" vaccine efficacy/effectiveness—

"against symptomatic and asymptomatic infections was 80–90% in nearly all studies. Fully

vaccinated persons are less likely to become infected and contribute to transmission."[10] More

---

[6] Aaron Richterman, Eric A Meyerowitz, Muge Cevik, Indirect Protection by Reducing Transmission: Ending the Pandemic With Severe Acute Respiratory Syndrome Coronavirus 2 Vaccination, *Open Forum Infectious Diseases*, Volume 9, Issue 2, published May 2021, ofab259, https://doi.org/10.1093/ofid/ofab259, (emphasis added).

[7] A "breakthrough infection" occurs when a vaccinated person, despite decreased likelihood of infection, becomes infected with COVID-19.

[8] Oordt-Speets, Anouk, Julia Spinardi, Carlos Mendoza, Jingyan Yang, Graciela Morales, John M. McLaughlin, and Moe H. Kyaw. 2023. "Effectiveness of COVID-19 Vaccination on Transmission: A Systematic Review" *COVID* 3, no. 10: 1516-1527. https://doi.org/10.3390/covid3100103

[9] Aaron Richterman, Eric A Meyerowitz, Muge Cevik, Indirect Protection by Reducing Transmission: Ending the Pandemic With Severe Acute Respiratory Syndrome Coronavirus 2 Vaccination, *Open Forum Infectious Diseases*, Volume 9, Issue 2, February 2022, ofab259, https://doi.org/10.1093/ofid/ofab259

[10] Harder T, Koch J, Vygen-Bonnet S, Külper-Schiek W, Pilic A, Reda S, Scholz S, Wichmann O. Efficacy and effectiveness of COVID-19 vaccines against SARS-CoV-2 infection: interim results of a living systematic review, 1 January to 14 May 2021. Euro Surveill. 2021 Jul;26(28):2100563. doi: 10.2807/1560-7917.ES.2021.26.28.2100563. PMID: 34269175; PMCID: PMC8284046. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8284046/

current studies, looking at the past several years, have reaffirmed these early results. In a meta analysis of 250 prior COVID-19 studies last year, cumulatively examining the data of over 24,000,000 individuals, unvaccinated individuals were found to be 2.36 times as likely as vaccinated individuals to be become infected.[11]  The study further showed that, "vaccination against COVID-19 disease is beneficial and effective in mitigating the spread of the infection and associated clinical outcomes." Id.

Nor does Plaintiff's argument justify his conclusion that requiring COVID-19 vaccination or testing is irrational, even assuming, *arguendo*, that his contentions regarding effectiveness are correct. Plaintiff argues that, because a vaccinated person may have an asymptomatic break through infection, and be able to transmit the virus to others, a policy requiring vaccination or testing is not logically or closely related to the goal of reducing the spread of COVID-19. This is clearly false. Even under Plaintiff's understanding, it is clear that this policy would naturally contribute to radically curtailing the spread of COVID-19, in all but the rare circumstance of breakthrough asymptomatic infections leading to transmission, or unvaccinated individuals transmitting the virus prior to having a positive test. Even if vaccines only turned symptomatic infection into asymptomatic infections, this would still reduce the number of individuals overtaxing local hospitals and diminishing available services and respirators. A policy does not have to absolutely prevent all infections and transmission—a scientific impossibility—to be rational, closely tailored, and justified for the purpose of reducing and minimizing the spread of infection. The City of Boston may have selected this approach as a compromise between the need to control COVID-19 and the need not to overburden staff with constant testing. Moreover,

---

[11] A Meta-Analysis To Ascertain the Effectiveness of COVID-19 Vaccines on Clinical Outcomes in Patients With COVID-19 Infection in North America; Cureus. 2023 Jun 27;15(6):e41053. doi: 10.7759/cureus.41053. PMID: 37519527; PMCID: PMC10374409. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10374409/

by refusing both to vaccinate and to test, Plaintiff would be completely unable to protect third persons, especially if he were to have an asymptomatic infection, and has not suggested any alternative, less restrictive policy which could have accomplished the same end without requiring testing or vaccinating.  Indeed he seems to suggest that only a policy of both mandatory vaccination and mandatory testing could hold up to rational scrutiny, which he could by his own admission not comply with.

Plaintiff's argument that the CDC website has changed over time is without consequence.

IV.    <u>Dr. Ojikutu's research on social determinant of health, including the reasons for vaccine hesitancy and lack of uptake among Black Americans, reflect a dedication to understanding health equity disparities in the American medical system, and are not evidence of discriminatory animus.</u>

Dr. Ojikutu's research is not, as Plaintiff conjectures, evidence of discriminatory animus against any group of individuals. Dr. Ojikutu's research on medical hesitancy is not evidence of racial, religious, or other discriminatory intent; in fact, it is the opposite.

Dr. Ojikutu's ethically informed and peer reviewed sociological research touches on critical issues of racial discrimination in medicine and the causes of the disparate impact of the COVID-19 pandemic on Black people in America, and is not evidence of race based discriminatory animus. By way of background, social determinants of health are increasingly seen as vital predictors of American's health. During the COVID-19 pandemic, Black Americans disproportionately suffered from both from illness and death. Black Americans were 1.1 times more likely to be diagnosed with COVID-19 diagnoses, 2.8 times more likely to be hospitalized, and twice as likely to die from COVID-19 as of July 2021.[12] The causes for this may have included the effects of various social determinants of health. Dr. Ojikutu's and her colleagues

---

[12] Dong L, Bogart LM, Gandhi P, Aboagye JB, Ryan S, Serwanga R, Ojikutu BO. A qualitative study of COVID-19 vaccine intentions and mistrust in Black Americans: Recommendations for vaccine dissemination and uptake. PLoS One. 2022 May 3;17(5):e0268020. doi: 10.1371/journal.pone.0268020. PMID: 35503797; PMCID: PMC9064113.

work in this field is therefore geared towards understanding what barriers contributed to this dangerous disparity, and advising on providing culturally competent informational resources moving forward. Simply contributing to important public health research which explores how race and racism affects the health of individuals is not invidious discrimination. It is clear that the purpose of Dr. Ojikutu's research was to enable practitioners to combat medical misinformation and participate in respectful informed conversations with hesitant patients our of concern for improving public health.

Dr. Ojikutu's research does not constitute discriminatory animus towards any religious group, as no religious groups were studied by Dr. Ojikutu and there is no mention of religion in either research paper. The two studies did not focus on or mention persons who refused vaccination for religious reasons. Rather, the focus of the research was on information availability and culturally conscious outreach to people possessing misinformation and mistrust of information. Plaintiff has provided no evidence that the group of individuals who possessed conspiracy theories who were studied in the research also belonged to any particular religion. There is no indication that the individuals in the study were of any particular religion, and no religious opposition is mentioned in either study. The attempts of the Plaintiff to conflate the group of individuals comprised of those with medical conspiracy theories with Jehovah's Witnesses are therefore unconvincing.

Finally, Dr. Ojikutu's research is not derogatory or demeaning towards the ill-defined group of persons we might call those with vaccine hesitancy based on medical mistrust. Rather, the research engages with this group of persons scientifically and non-judgmentally for the purpose of furthering scientific understanding. To begin with, the policy does not require vaccination—it also allows individuals to test regularly as an alternative, so would not effect

vaccine hesitant individuals. The research acknowledges that, "medical mistrust" among Black Americans "is rooted in the historical mistreatment of Black Americans both within health care as well as U.S. society and institutions and is maintained by persistent discrimination, inequities, and injustices;" and that "recent research has shifted toward viewing medical mistrust as an adaptive and justifiable response due to negative personal experiences or historical injustice."[13] In no way does simply studying a group based on a voluntary survey, for the purpose of providing members of that group with culturally competent medical care, constitute evidence of invidious discrimination or animus. The research purports to provide, from individuals own stated experiences, ways for medical professionals and community stakeholders to respectfully engage with individuals with medical mistrust in order to work towards better health outcomes and increase voluntary vaccine uptake. Plaintiff's allegations that merely studying a group constitutes animus are likely to have a chilling effect on the freedom of the scientific and research community.

V.    Plaintiff has failed to state a claim for a Substantive Due Process violation pursuant to state or federal law, and Counts I and II must be dismissed.

Plaintiff's Counts I and II fail to state a claim under either federal or state substantive due process law.

Substantive due process prevents "governmental power from being used for purposes of oppression."  Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir.1992). Thus, a plaintiff must allege that the acts challenged "were so egregious as to shock the conscience" as a threshold matter, and that such acts deprived the plaintiff of "a protected interest in life, liberty, or property." Harron v. Town of Franklin, 660 F.3d 531 (1st Cir. 2011).

---

[13] Dong L, Bogart LM, Gandhi P, Aboagye JB, Ryan S, Serwanga R, Ojikutu BO. A qualitative study of COVID-19 vaccine intentions and mistrust in Black Americans: Recommendations for vaccine dissemination and uptake. PLoS One. 2022 May 3;17(5):e0268020. doi: 10.1371/journal.pone.0268020. PMID: 35503797; PMCID: PMC9064113.

See also, <u>Abdisamad v. City of Lewiston</u>, 960 F.3d 56 (1st Cir. 2020). Only after establishing this "constitutionally significant level of culpability" categorized by egregiousness may a plaintiff even attempt to establish that a protected interest was deprived. <u>Id</u>. In determining egregiousness, "[a] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." <u>González–Fuentes v. Molina</u>, 607 F.3d 864, 881 (1st Cir. 2010).

Here, Plaintiffs have not plead any such egregious conduct, aside from merely repeating the element of egregiousness without support. Nothing about requiring employees to test for COVID-19 or vaccinate, during the pendency of a global pandemic, evidences the type of consciousness-shocking, malicious conduct required to allege culpability of a municipality. It is clear that the policy was designed to slow the spread of the highly contagious COVID-19 virus and protect all government employees as well as the public from exposure. The issuance of this Policy in accordance with established science and data, was necessary to prevent the spread of the highly infectious strain of COVID-19 and serious illness which could result in causing an enormous strain on the City's healthcare resources. Here, there is no indication that the steps taken by the Commission and the City Defendants were the kind of egregious conduct that would result in culpability. Therefore, Plaintiff has failed at the first prong to plead a deprivation of substantive due process rights.

Plaintiff has also failed to allege that the Vaccine or Test Policy impinges any protected liberty interest under US Constitution or the Massachusetts Bill or Rights. The Supreme Court has instructed that a liberty interest can be found in only one of two scenarios: first when a

liberty right is expressly mentioned in the first through eighth constitutional amendments, and second when a liberty interest not explicitly mentioned in the constitution is divined as a fundamental right. Collins v. Harker Heights, 503 U.S. 115, 125 (1992). Liberty rights must be derived carefully and with consideration to the "history and traditions" of the country, in order to determine whether a particular interest falls within the intended meaning of liberty at the time the Fourteenth Amendment was ratified. Washington v. Glucksberg, 521 U.S. 702, 721 (1997).

Plaintiff has not identified any such fundamental protected liberty interest. There is no constitutionally recognized right to either refuse vaccination or testing for illness: testing for illness and requiring vaccination is a regular part of American life in schools, work, government, and has been for over a hundred years. Moreover, the caselaw is well settled that requiring testing or vaccination during a pandemic is not a violation of substantive due process. Plaintiff argues that refusing to vaccinate or test is substantially similar to the Massachusetts' recognized right to refuse medical treatment. However, vaccination and covid testing are not medical treatment, and do not fall within the scope of Massachusetts' right to refuse medical treatment, which either applies as a substantive due process matter to individuals refusing medical treatment at the end of life, or to individuals receiving treatment as patients in a medical setting pursuant to the Massachusetts Patient's Bill of Rights. Medical treatment implies treatment for a current illness or disease. Vaccination is inoculation to future disease, and testing is merely an assessment of current disease status. In no way does this right to refuse medical treatment, geared at the end of life choice to die or to patients in a medical setting, pertain to these facts. Nor was Plaintiff forced to undergo any testing or vaccination per the Complaint.

VI.    Plaintiff has failed to state a claim pursuant to the free exercise clause or for religious discrimination, as regards Dr. Ojikutu, and thus Count III and VI and VII must be dismissed.

a. <u>Dr. Ojikutu had no role in the decision to deny Plaintiff's religious exemption request, because she is not in the chain of command for the City of Boston or Boston Police Department.</u>

As discussed above, Dr. Ojikutu's had no role in granting or denying Plaintiff's request for a religious exemption; nor writing, instituting and enforcing, the Vaccine or Test Mandate. As described at length above, Plaintiff has failed to allege facts suggesting Dr. Ojikutu played any role in the decision not to grant Plaintiff's request for an exemption to the Vaccinate or Test Policy. As is ordinarily the case, these exemption requests were most likely handled by the internal agency human resources departments. See Affidavit of Dr. Ojikutu.

b. <u>Plaintiff's refusal to test for COVID-19 is a personal belief and not a religious belief, as he admits in his Complaint.</u>

In order to succeed in a claim for religious discrimination a plaintiff must demonstrate that their beliefs are sincere religious beliefs, and not statements of a personal philosophy or preference. <u>Antredu v. Massachusetts Department of Youth Services</u>, F.Supp.3d (Mass. Dis. Ct. 2024). Additionally, while the free exercise clause guarantees a right to believe, the right to act based on religion is not absolute, and can be countervailed in the interest of public good. <u>Does 1-6 v. Mills</u>, 566 F.Supp.3d 34 (Dis. Ct. Maine 2021) (holding plaintiff had no likelihood of success in Free Exercise case against vaccine mandate, even where policy did not contain testing option or religious exemption).

The teachings of Jehovah's Witness do not prevent the Plaintiff from vaccinating or testing for COVID-19, rather, in the Complaint, Plaintiff admits that it was his personal experiencing musings which lead him to decide, after the implementation of the Policy, that he opposed vaccination and testing. Pursuant to the teachings of Jehovah's Witness outlined int eh Complaint, neither vaccination nor COVID-19 testing are prohibited, rather, both are viewed as the subject of personal choice, and neither vaccination nor testing are forbidden. Complaint 35-

19

37. Plaintiff independently decided to oppose vaccination as part of a general decision to refuse all foreign substances, not because of a religious edict.  Id. 42-3. Per the Complaint, Plaintiff later "learned and came to sincerely believe that COVID-19 test swabs, which must be inserted into the body as part of the test, can contaminate his body because they are sterilized by harmful irradiation or infusion with a harmful foreign substance called ethylene oxide." He decided not to participate in COVID-19 testing after the Vaccine or Test Policy was introduced, due to having an adverse reaction to a test, and because of his fear that the test device might expose him to harmful chemicals or radiations. Complaint at 50, 79, 86. This indicates that this is a personal choice of the Plaintiff based on research into vaccine hazards, and not an edict of his religion. Moreover, non-religious ideas are not transformed into sincere religious beliefs by mere proximity. The belief that vaccine mandates exist to enrich pharmaceutical companies, or that vaccines will not work because they are paradoxical, even if it came from a Jehovah's Witness publication, is not sincerely held religious beliefs subject to constitutional deference. Complaint 33 253-4.

Plaintiff therefore fails to allege any sincere religious reason why he could not test, and only refused testing based on personal preference.

VI.   <u>Counts V, VI and VII must be dismissed against the Commission as the statute on which they are based pertains only to the conduct employers and labor organizations.</u>

Dr. Ojikutu is not the Plaintiff's employer, nor is she employed by the City of Boston or the Boston Fire Department, nor does she have any connection to Plaintiff's union. Counts V and VII of Plaintiff's Complaint are brought pursuant to 42 U.S.C Section 2000e-2, which governs illegal acts of discrimination by employers to employees. As Plaintiff does not allege Dr. Ojikutu to the Commission have an employer-employee relationship with him, these claims must be dismissed. Similarly, Count VII is based on the Massachusetts state equivalent of the federal law,

20

which prohibits discriminatory conduct by employers or labor organizations. Again, Plaintiff has

not alleged any facts establishing such a relationship between Plaintiff and Dr. Ojikutu.

VII.    <u>Count IV must also be dismissed because Plaintiff has failed to state an equal protection
        claim for disparate impact.</u>
        First circuit precedent has been clear that a claim alleging disparate impact cannot

succeed without also pleading discriminatory intent. <u>Commonwealth v. Grier</u>, 490 Mass. 455,

469 (Mass 2022) (holding that, under both state and federal law, disparate impact of an official

act, absent discriminatory intent, would be constitutional). Plaintiff has made no such allegation

of discriminatory intent. Plaintiff has attempted to overcome the requirement of the law by

seeking to use Dr. Ojikutu's medical research on vaccine hesitancy as proof of discriminatory

intent on the part of the COB and BPD defendants.  Plaintiff's attempts in this regard nonetheless

fail, as the research is not discriminatory (see, above, Section IV) and because the intent of the

research cannot be imputed to the decisions and actions of the COB.

VIII.   <u>Count VIII must be dismissed as Plaintiff has not alleged that they come within the
        protections of the Americans with Disabilities Act.</u>
        Count VIII must be dismissed as Plaintiff has not plead facts sufficient to make plausible

a right to relief pursuant to the Americans with Disabilities Act. 42 USC Section 12111.

        As a threshold matter, Dr. Ojikutu is not one of the "covered entities" whose conduct is

regulated by this statute, in relation to Plaintiff.  As the statute states, "The term "covered entity"

means an employer, employment agency, labor organization, or joint labor-management

committee." 42 USC Section 12111 Section 2.  The statute only regulates the behavior of these

covered entities.

        Secondly, the ADA section cited by Plaintiff makes it illegal for a covered entity to

"require a medical examination" or "make inquiries of an employee as to whether such employee

is an individual with a disability or as to the nature or severity of the disability, unless such

examination or inquiry is shown to be job-related and consistent with business necessity." 42 USC Section 12111(d)(4)(A). In the present case, Plaintiff has made no allegation that any defendant made inquiries into his disability status, or required him to have a medical examination. The status of an individual being vaccinated or unvaccinated is not a disability within the definition of the act.[14] Plaintiff has not alleged he suffers from any mental or physical impairment of any kind and has, in fact, averred his own perfect health. In the alternative, such an inquiry is clearly job-related, as the health of fire-fighters is tantamount to their ability to serve in their typical role.

Therefore, because Dr. Ojikutu is not his employer, and because Plaintiff has not alleged conduct which is prohibited by the ADA, Plaintiff's Count VIII must be dismissed.

IX.    Plaintiff failed to state case for Due Process violation, and Count IX must be dismissed.

Again, Plaintiff's Count IX, alleging a violation of his due process rights, fails against Dr. Ojikutu as, while her name is mentioned, she had no role of any kind in Plaintiff's dispute with his employer. Plaintiff has not alleged any facts suggesting she was involved aside from broad conclusory statements. Dr. Ojikutu did not, and could not, control the employment decision of any City of Boston agency.

While Dr. Ojikutu has no knowledge of these events outside the Complaint, it additionally appears that Plaintiff did receive due process in the form of notification, a dialogue with HR, and a hearing on his request, on multiple occasions. It also appears that the Plaintiff

---

[14] Pursuant to the act, the definition of a disability is as follows:
"(1) Disability
The term "disability" means, with respect to an individual--
(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C.A. § 12102

was ultimately terminated not for failure to vaccinate, but for refusing to return to work following the end of the policy. Therefore, his entitlement to due process was likely satisfied.

X.  <u>Plaintiff's Count X, alleging an unconstitutional taking pursuant to the Takings Clause, must be dismissed as Plaintiff has failed to allege any taking of property occurred requiring just compensation.</u>

Plaintiff has failed to allege facts sufficient to maintain a claim for an unconstitutional taking.  The Taking's Clause pertains to misuse of state or federal eminent domain powers, in which private property is occupied or encroached on by the government for public use purposes without the owner receiving just compensation. U.S. Const. Amend. V. Pursuant to the Takings Clause, a job is not private property, nor was Plaintiff's job "taken" for public use. When analyzing what is and isn't property, the Supreme Court has held that courts must look to statutory definitions of the described property interest. In the present case, Plaintiff does not provide any such statutory definition of property. Further, nothing was taken for public use. His arguments are simply too tenuous and contrived to demonstrate that a Takings Clause violation occurred[15].

XI.  <u>Count XI must be dismissed because Plaintiff has entirely failed to allege the elements of the claim and particularly has not alleged a conspiracy occurred.</u>

Plaintiff's Count XI must be dismissed because it fails to plead any element of the claim.

Plaintiff claims pursuant to Section 1985(2) and (3), which relates to individuals conspiring to deprive an individual or class of persons of a right or privilege, must fail.  To successfully allege a 1985(3) claim, a Plaintiff must allege at minimum, "(1) a conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a

---

[15] Plaintiff has additionally withdrawn this claim in his proposed First Amended Answer.

deprivation of a constitutionally protected right or privilege." <u>Aulson v. Blanchard</u>, 83 F.3d 1 (1st Cir. 1996). In addition, there is a quasi-fifth element, that the conduct must stem from "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." <u>Id</u>. It is not enough to define a class of persons solely on the basis of the harm inflicted, the alleged class must be a readily cognizable, objectively distinct group. <u>Id</u>. at 5. The class therefore must be defined by "something more than the member's desire to engage in conduct that the … defendant disfavors." <u>Id</u>.

Plaintiff fails to allege any facts leading to a probable inference of a conspiracy between two or more persons or entities. Plaintiff does not allege any agreement between parties, meetings, acts in furtherance of a conspiracy, or any other facts raising the probable inference of a conspiracy between parties to commit illegal acts against him. *See* <u>Rolon v. Rafael Rosario & Associates, Inc.</u>, 450 F.Supp.2d 153 (Dis. Ct. Puerto Rico 2006) (dismissing suit for failure to allege "any type of communications, cooperation, or agreement amongst the co-defendants to conspire."). Therefore, for failure to allege the basic elements of a 1985(3) claim, this count must be dismissed.

XII.  <u>Counts XII-XV should be dismissed against Dr. Ojikutu, in that these counts are directed at other parties.</u>

Counts XII, XIII, XIV, and XV do not name Dr. Ojikutu. While the Counts do not appear on their face to be claims against Dr. Ojikutu, nonetheless for the sake of completeness, they must be dismissed against Dr. Ojikutu because they do not involve any conduct attributable to Dr. Ojikutu.

<u>**CONCLUSION**</u>

Therefore, for those reasons stated forthwith, Defendant Bisola Ojikutu respectfully requests this court dismiss the instant proceeding in its entirety, with prejudice.

Respectfully Submitted,
**BOSTON PUBLIC HEALTH COMMISSION**
For Bisola Ojikutu,
by its attorneys,
*/s/ Batool Raza*
*/s/ Whitney Pasternack*
Batool Raza (BBO #691173)
Whitney Pasternack (BBO #708677)
Boston Public Health Commission
Office of the General Counsel
1010 Massachusetts Avenue, 6th Floor
Boston, MA 02118
(617) 534-4651
braza@bphc.org
wpasternack@bphc.org