IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVIEL COLÓN,<br><br>Plaintiff<br><br>v<br><br>CITY OF BOSTON, BISOLA OJIKUTU in her official and individual capacities, TAMMY PUST in her official and individual capacities, LISA O'BRIEN in her official and individual capacities, BOSTON POLICE PATROLMEN'S ASSOCIATION, AND LAWRENCE (LARRY) CALDERONE,<br><br>Defendants | No. 1:24-cv-12191 |

## AFFIDAVIT OF SAVIEL COLÓN REGARDING PERSONAL PREJUDICE OF HONORABLE JUDGE DENISE J. CASPER AGAINST MR. COLÓN AND IN FAVOR OF DEFENDANTS

I, Saviel Colón, declare the following pursuant to 28 U.S.C. §§ 144, 1746:

### Introduction

1. The matters set forth herein are based on the review of Thermo Fisher Scientific, Inc. proxy statements, quarterly earnings reports, and other publicly-available information. If called to testify upon these matters, I could and would testify competently thereto. The Exhibits annexed to this Affidavit are true and accurate copies of the original documents.

2. I believe that Judge Casper has personal prejudice against me and in favor of the government Defendants in this matter.

3. The instant matter concerns the mandated use by me specifically, and by Black Americans as a group, of commercial products manufactured and/or developed in large

part by a private corporation where Judge Casper's spouse has served as Chief Executive Officer since 2009.

4. Judge Casper and her spouse have personal financial and other interests in the continued and/or future mandatory use of Judge Casper's spouse's commercial products.

5. Because I am challenging such mandatory use on various grounds in the above-captioned matter, these interests could be substantially negatively affected by favorable outcomes for me in pending proceedings in this matter.

**Spouse's Financial Interests**

6. Judge Casper has served as a district judge at the U.S. District Court for the District of Massachusetts since 2010.

7. Judge Casper's spouse, Marc Casper ("Mr. Casper"), has served as the Chief Executive Officer ("CEO") of Thermo Fisher Scientific, Inc. ("TFS") since 2009, and is currently the TFS Chairman, President, and CEO.

8. On March 13, 2020, TFS received an emergency use authorization from the U.S. Food and Drug Administration to sell biochemical test kits allowing "qualitative detection of nucleic acid from [the COVID-19 virus] in nasopharyngeal swab, nasopharyngeal aspirate, and bronchoalveolar lavage (BAL) specimens" by means of the polymerase chain reaction (PCR). *See* Exhibit A at 1, n.2.

9. According to the TFS 2020 Proxy Statement,

> Within weeks of the first case of the coronavirus in the U.S., the Food and Drug Administration issued emergency use authorization for production of millions of our diagnostic tests. Optimized for our real-time PCR instruments and using our master mixes and sample prep platforms and kits, these tests provide accurate results to medical personnel within four hours, enabling the U.S. and other governments to meet surging demand.
>
> Exhibit B at 3.

10. Consequently, as Mr. Casper reported to TFS investors in its 2021 Proxy Statement, TFS "rapidly established leadership in PCR-based COVID-19 testing and in enabling development and production of vaccines and therapies."

11. According to TFS's 2021 Proxy Statement:

> We enabled widespread COVID-19 testing, creating a leading molecular diagnostic business in just a few months to support hundreds of millions of polymerase chain reaction ("PCR") tests around the world, and we provided our pharma and biotech customers with the set of products and services they needed to develop and produce vaccines and therapies.

Exhibit C at 1.

12. By December 2020, over 50% of COVID-19 testing globally was performed on TFS technology. *See* Exhibit D.

13. By 2021, TFS was supporting the development and production of over 250 COVID-19 vaccine and therapy projects, including the market-dominant vaccines produced by Pfizer, Inc. and Moderna, Inc. See Exhibit E.

14. In 2020, billions of dollars in COVID-19 response revenue began to flow into TFS coffers, and millions of dollars in higher annual incentive bonuses began to flow therefrom to Mr. Casper.

15. In 2020, TFS earned $6.6 billion in combined revenue related to the global COVID-19 response. *See* Exhibit C at 41.

16. In 2020, Mr. Casper earned a 250 % annual incentive bonus of $ 7,750,000—almost double the $ 4,154,303 bonus he had earned in 2019. *Compare* Exhibit B at 49, *with*, Exhibit C at 52.

17. According to TFS's 2021 Proxy Statement, Mr. Casper received this large bonus "in order to reward exceptional performance in supporting the societal response to the

COVID-19 pandemic and delivering the strongest financial results in our Company's history." *See* Exhibit C at 9.

18. In 2021, TFS earned over $ 7 billion in revenue from COVID-19 testing and approximately $ 2 billion in revenue from the development and production of COVID-19 vaccines and therapies. *See* Exhibit F at 51.

19. In 2021, Mr. Casper earned an annual incentive bonus of $ 6,334,565. *See id.* at 52.

20. In 2022, TFS earned $ 3.1 billion in revenue from COVID-19 testing and $ 1.7 billion in revenue from the development and production of COVID-19 vaccines and therapies. *See* Exhibit G at 35.

21. In 2022, Mr. Casper earned an annual incentive bonus of $ 5,547,713. *See id.* at 36.

22. In 2023, as institutional testing mandates ended, the bottom fell out of the COVID-19 testing market, causing TFS to earn only $ 0.303 billion in revenue from COVID-19 testing (while still earning a healthy $ 2 billion in revenue from the development and production of COVID-19 vaccines and therapies). See Exhibit H at 40.

23. In 2023, Mr. Casper's annual incentive bonus fell to $2,623,068—an even smaller payout than he received in 2019, pre-pandemic. *Compare id.* at 41, *with*, Exhibit B at 49.

24. According to TFS's 2024 Proxy Statement, Mr. Casper's low bonus came after TFS failed to meet most of its financial goals in 2023 because:

> From the time the target goals were set, market conditions deteriorated significantly throughout the year due to the unwind of the COVID-19 pandemic, cautious customer spending, particularly from our biotech customers, and low economic activity in China. . . . [This was despite the 2023 target goals already] including the expected negative impact in 2023 from the roll-off of COVID-19 pandemic related revenue, which was expected to decline year over year as the societal need for COVID-19 testing, vaccines and therapies declined.

Exhibit H at 32.

25. Indeed, according to the 2024 Proxy Statement, the total package of "[c]ompensation realized by [the TFS] CEO and by [the] other [TFS named executive officers] in 2023 is 35% and 40% of target compensation, respectively." *See id.* at 33.

26. Since 2020, according publicly-available data, Mr. Casper's financial interests have risen and fallen with the number of COVID-19 tests sold by his company.





**Judge Casper's Financial Interests**

27. As a perquisite of Mr. Casper's employment as the CEO of TFS, he is allowed to use the TFS corporate aircraft for his personal travel without having to pay for the fixed costs of "pilots' salaries, the acquisition costs of the aircraft, and the cost of maintenance not related to Mr. Casper's personal trips."

28. Mr. Casper also gets a prepaid allowance for incremental costs of the personal trips, such as "fuel, crew trip expense, crew meals, catering, landing fees, hangar/parking costs and other miscellaneous expenses."

29. Prior to 2020, "Mr. Casper's annual allowance for personal use of the Company aircraft [was] limited to $150,000 in incremental cost to the Company . . . ; however, given safety concerns associated with commercial air travel in light of the COVID-19 pandemic, the [TFS] Compensation Committee increased the allowance for 2020, 2021, and 2022 to $225,000." *See* Exhibit F at 59.

**Spouse's Ideological, Social, and Political Interests**

30. ESG [Environment, Society, and Governance] is a 21st century euphemism for a 19th century philosophy that prioritizes ideological, social, and political interests in commercial relationships.

31. According to the TFS 2024 Proxy Report: "Our Company leadership team ensures our ESG priorities are embedded in business decisions and operating practices. . ." See E

32. For the purposes of calculating Mr. Casper's annual incentive bonus in the years 2020-2023, TFS assessed his annual contribution to the corporation's financial performance and "non-financial strategic measures, including ESG priorities," which are weighted as 70 % and 30 % of the total annual performance score, respectively. *See* Exhibit G at 41;

Exhibit H at 35. *See also* Exhibit B at 48 (euphemized as "diversity, involvement and inclusion"); Exhibit C at 34 (euphemized as "diversity and inclusion," or "D&I"); Exhibit F (same as Exhibit C).

33. TFS's non-financial performance metric assesses "performance in [the company's] five identified areas of strategic importance." *See* Exhibit C at 51. One area, "Employer of Choice and Workforce Diversity," references D&I jargon and appears to reflect TFS's ESG priorities. *See id.*

34. In 2020, as part of accomplishing its goals within the Employer of Choice and Workforce Diversity area of strategic importance, TFS "[s]upported Historically Black Colleges and Universities by standing up testing capabilities" of their administrations. *See* Exhibit C at 51.

35. According to Mr. Casper's claims in the TFS 2021 Proxy Statement: "In 2020, we significantly increased our impact by launching The Just Project with a donation of $25 million in diagnostic instruments, test kits and related supplies to support the safe reopening of historically Black colleges and universities ("HBCUs") in the U.S." *See id.* (on inside cover).

36. The project continued in 2021. In its 2022 Proxy Statement, TFS reported: "In the U.S., the Just Project is our health equity initiative supporting historically Black colleges and universities. With more than $30 million in donated COVID-19 testing and lab infrastructure, this program serves students and school communities disproportionately impacted by the pandemic." *See* Exhibit F at 35.

37. I am aware that biochemical testing mandates targeting Black Americans by race on the premise that Black Americans are disproportionately impacted by certain diseases have

led, in the past, to stigmatization of and discrimination against Black Americans, as well as unnecessary fear among Black Americans themselves. *See. e.g.*, Genetic Information Nondiscrimination Act of 2008, § 2, 110 P.L. 233, 122 Stat. 881, 882 (2008) ("State legislatures began to enact discriminatory laws in the [biochemical testing] area, and in the early 1970s began mandating genetic screening of all African Americans for sickle cell anemia, leading to discrimination and unnecessary fear. To alleviate some of this stigma, Congress in 1972 passed the National Sickle Cell Anemia Control Act, which withholds Federal funding from States unless sickle cell testing is voluntary.").

### Effect of the Outcome of Proceedings in this Matter

38. In my First Amended Complaint, I allege that, starting on October 11, 2021, I was required to use a nasal swab for a biochemical test for the presence of the COVID-19 virus as a condition of my employment by Boston city government Defendants, in violation of my bodily integrity rights, in violation of my sincerely held religious beliefs, and in a racially-discriminatory fashion. *See* First Amended Complaint ("FAC"), ¶¶ 46, 79-83.

39. In 2021, TFS earned over $ 7 billion in revenue and Mr. Casper earned a significant part of his $ 6.33 million annual incentive bonus by selling nasal swab COVID-19 test kits of the type at issue in the instant proceedings. *See* Exhibit F at 51-52.

40. In late 2020, TFS enjoyed over 50 % market share in COVID-19 testing technology. *See* Exhibit D.

41. I believe it is likely and provable with the discovery of competent evidence that a significant portion of TFS's 2020 over-50 % market share in and over $ 7 billion revenue from COVID-19 technology in 2021, as well as of Mr. Casper's $ 6.33 million bonus that

year, came from selling COVID-19 test kits to governments or to persons like me, who were required to participate in frequent routine asymptomatic COVID-19 testing by government and/or employer mandate.

42. Mr. Casper therefore has a financial interest in ensuring that governments are able to continue mandating frequent routine asymptomatic testing for any number of current and future diseases, which interest could be substantially affected by the outcome of the proceeding if such mandates are found to be unlawful on any of the various grounds claimed in the FAC.

43. Mr. Casper reported in TFS's 2021 Proxy Statement that the company "played a very significant role in enabling pharmaceutical, biotech and healthcare customers and governments around the world to respond to the pandemic through our molecular diagnostics and pharma services capabilities." *See* Exhibit C (inside cover).

44. According to the 2021 Proxy Statement, TFS serves "more than 400,000 customers working in pharmaceutical and biotech companies, hospitals and clinical diagnostic labs, universities, research institutions and government agencies." *See id.* at 1.

45. It is possible, and potentially provable with the discovery of competent evidence, that TFS has a commercial relationship with the Defendant government of Boston or other governments relevant to the instant matter that is factually sufficient for TFS to be exposed to state actor liability in the instant matter. This, depending on the outcome of future proceedings in this matter, could substantially affect Mr. Casper's financial interests.

46. As a consequence of the increase in Mr. Casper's incremental costs allowance for the personal use of TFS corporate aircraft during the 2020-2022 years of the COVID-19

pandemic, Judge Casper has a personal financial interest in overvaluing government and employer claims of undue hardship caused by the risk of infectious disease transmission, as pertinent to Count V in my FAC. Such interest would be substantially affected by the outcome of future proceedings in this matter—to the tune of $ 175,000 in jet fuel, etc. per annum of the existence of such risk. *See* Exhibit F at 59.

47. My racial discrimination causes of action in Counts IV, VII, and XI of my First Amended Complaint ("FAC") concern various statements by Defendant Bisola Ojikutu (Dr. Ojikutu) that Black Americans were disproportionately impacted by the COVID-19 pandemic as a consequence of what Dr. Ojikutu calls "conspiracy beliefs" and "medical mistrust," which, she believes, are disproportionately prevalent among Black Americans. *See* FAC at ¶¶ 59-69, 295-304, 315-25, 342-43. According to Dr. Ojikutu, such beliefs and mistrust make Black Americans significantly less likely to be vaccinated against COVID-19. *See id.* In the FAC, I allege that such statements tend to show that Dr. Ojikutu therefore ordered the disparate enforcement of Boston's pandemic response measures against the City's black employees, including denying Black employees religious exemptions from COVID-19 testing, thereby causing my constructive termination. *See id.*

48. Judge Casper's spouse, Mr. Casper, funded the same mandatory biochemical COVID-19 testing of Historically Black College and University students that I am challenging in the instant matter. *See* Exhibit C at 51, Exhibit F at 35. Mr. Casper did so on the same discriminatory and stigmatizing premise that Black Americans are more likely to carry COVID-19 because they were "disproportionately impacted by the pandemic" as Dr. Ojikutu used to discriminate against me on the basis of my Black race.

49. Mr. Casper benefited from discriminatory COVID-19 testing mandates targeting HBCU students by receiving a higher annual incentive bonus for funding the mandates in support of TFS's ESG priorities. *See* Exhibit G at 41; Exhibit H at 35. Therefore, if such discriminatory and involuntary testing is found in future proceedings to have been unlawful for any of the reasons in my FAC, Mr. Casper's financial, ideological, social, and political interests could be substantially affected by the outcome of future proceedings in this matter.

50. There are no proceedings currently scheduled in this matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief, and that the exhibits annexed hereto are true and accurate copies of the original documents. Executed this 20th day of February, 2025, in Boston, Massachusetts.

*Saviel Colon (Feb 20, 2025 21:25 EST)*

Saviel Colón

**CERTIFICATE OF GOOD FAITH**

I, Ilya Feoktistov, counsel for Plaintiff Saviel Colón in the above-captioned matter, hereby certify that this affidavit is made in good faith.

_____
Ilya I. Feoktistov, Esq.

**SERVICE CERTIFICATE**

I, Ilya Feoktistov, counsel for Plaintiff Saviel Colón in the above-captioned matter, hereby certify that on February 20, 2025, I served a true and accurate copy of the foregoing document on counsel for the parties of record by filing electronically.

_____
Ilya I. Feoktistov, Esq.

# Affidavit Supporting Disqualification 02-16-25 2124

Final Audit Report           2025-02-21

| | |
|---|---|
| Created: | 2025-02-21 |
| By: | Ilya Feoktistov (if@ilyafeoktistov.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAT4X2UeHKbCc7snMzHarFzPp1KXSh0E0d |

## "Affidavit Supporting Disqualification 02-16-25 2124" History

- Document created by Ilya Feoktistov (if@ilyafeoktistov.com)
  2025-02-21 - 0:48:26 AM GMT

- Document emailed to savycolon33@gmail.com for signature
  2025-02-21 - 0:48:30 AM GMT

- Email viewed by savycolon33@gmail.com
  2025-02-21 - 2:19:42 AM GMT

- Signer savycolon33@gmail.com entered name at signing as Saviel Colon
  2025-02-21 - 2:25:18 AM GMT

- Document e-signed by Saviel Colon (savycolon33@gmail.com)
  Signature Date: 2025-02-21 - 2:25:20 AM GMT - Time Source: server- Signature captured from device with phone number XXXXXXX4276

- Agreement completed.
  2025-02-21 - 2:25:20 AM GMT

Adobe Acrobat Sign