## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVIEL COLÓN, )<br><br>Plaintiff )<br><br>v. )<br><br>CITY OF BOSTON, BISOLA OJIKUTU in her )<br>official and individual capacities, TAMMY )<br>PUST in her official and individual capacities, )<br>LISA O'BRIEN in her official and individual )<br>capacities, BOSTON POLICE PATROLMEN'S )<br>ASSOCIATION, AND LAWRENCE )<br>CALDERONE, )<br><br>Defendants. ) | Case No. 24-cv-12191 |

## MEMORANDUM AND ORDER

CASPER, C. J.                                        March 5, 2026

## I.    Introduction

Plaintiff Saviel Colón ("Colón") has filed this lawsuit against Defendants City of Boston ("Boston"), Bisola Ojikutu ("Ojikutu"), Tammy Pust ("Pust"), Lisa O'Brien ("O'Brien"), Boston Police Patrolmen's Association ("BPPA"), and Lawrence Calderone ("Calderone") (collectively, "Defendants").  D. 1.  Against all Defendants in the operative, first amended complaint ("FAC"), D. 25, he alleges violations of his Fourteenth Amendment rights under 42 U.S.C. § 1983 (Counts I and IX) and Massachusetts law (Count II) in connection with Boston's policy requiring Boston employees to be fully vaccinated against COVID-19 or to submit to weekly testing (the "Vaccine

1

or Test Policy" or the "Policy"), and violations of his First Amendment rights under § 1983 in connection to the denial of his religious exemption request under the Policy (Count III).  As to Boston, Pust and Ojikutu, Colón alleges violations of his Fourteenth Amendment rights under § 1983 based on race-based disparate treatment and impact under the Policy (Count IV); as to Boston and O'Brien, Colón alleges conspiracy to deprive equal protection of laws under 42 U.S.C. § 1985 (Count XI); as to BPPA, Colón alleges breach of duty of fair representation (Count XII); and as to Boston, Colón alleges violations of Title VII (Counts V and VII), Massachusetts law (Count VI), the Americans with Disabilities Act ("ADA") (Count VIII), and breach of contract (Count XIII).[1] Defendants move to dismiss the FAC under Fed. R. Civ. P. 12(b)(6).  D. 48; D. 52; D. 55.  Ojikutu also moves to dismiss under Fed. R. Civ. P. 12(b)(1).  D. 55.  For the reasons stated below, the Court ALLOWS Ojikutu's motion to dismiss under Fed. R. Civ. P. 12(1), D. 55, and ALLOWS the motions to dismiss under Fed. R. Civ. P. 12(b)(6), D. 48; D. 52; D. 55.

## II.    Standard of Review

### A.    <u>Motion to Dismiss for Lack of Standing under Rule 12(b)(1)</u>

When confronted with a Rule 12(b)(1) motion, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." <u>Aversa v. United States</u>, 99 F.3d 1200, 1209-10 (1st Cir. 1996) (citing <u>Murphy v. United States</u>, 45 F.3d 520, 522 (1st Cir. 1995)).  The Court may widen its gaze, however, and look beyond the pleadings to determine subject matter jurisdiction. <u>Martínez-Rivera v. Commonwealth of Puerto Rico</u>, 812 F.3d 69, 74 (1st Cir. 2016). "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its

---

[1] Colón appears to have withdrawn Count X in his amended pleading, <u>see</u> D. 55-1 at 25 n. 15; D. 25, as no Count X is alleged in the FAC, <u>see</u> D. 25 at 65.

existence." Murphy, 45 F.3d at 522 (quoting Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)).  Standing is a jurisdictional issue, see P.R. Tel. Co. v. T-Mobile P.R. LLC, 678 F.3d 49, 57 (1st Cir. 2012), and, accordingly, challenges to standing are properly considered under Rule 12(b)(1), see Kolancian v. Snowden, 532 F. Supp. 2d 260, 261 (D. Mass. 2008).

### B.    Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may move to dismiss an action arguing that it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  The Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while conclusory legal allegations are not entitled credit. Id.  Second, the Court must "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Schatz, 669 F.3d at 55.  If they do not, then dismissal is warranted. See Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

## III.    Factual Background

For the purposes of the respective motions to dismiss, D. 48; D. 52; D. 55, the Court confines itself to and accepts as true all well-pleaded facts in the FAC, save for considering "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011).

### A.    Introduction

During the COVID-19 pandemic, Boston adopted the Vaccine or Test Policy, discussed further below, requiring Boston employees to either submit verification that they have been fully vaccinated or to submit to weekly testing.  D. 25 ¶ 70; D. 53-1.  Colón, a Boston police officer, sought a religious exemption from the Policy which Boston denied, D. 25 ¶¶ 79-137, and Colón was placed on unpaid administrative leave for his failure to comply with the Policy until it was lifted, id. ¶¶ 100-88.  Colón alleges that Defendants violated his constitutional, state and common law rights by denying his religious exemption and placing him on unpaid administrative leave.  Id. ¶¶ 254-350.

### B.    Boston's August 12, 2021 Vaccine or Test Policy

On August 12, 2021, Boston adopted the Vaccine or Test Policy requiring Boston employees to either verify by October 18, 2021 that they have been fully vaccinated against COVID-19 or "submit proof every seven (7) days of a negative COVID-19 screening test result and be subject to restrictions on official travel."  D. 25 ¶¶ 70-72; D. 53-1 at 1.  Boston stated that the purpose of the Policy was to "minimize exposure to and transmission of the COVID-19 virus in City workplaces by providing occupational protection to all City employees and preventing exposure to members of the community."  D. 25 ¶ 71; D. 53-1 at 1.  Employees who "fail[ ] to submit the required proof of a negative test will be placed on unpaid administrative leave until verification or vaccination or a reasonable accommodation [was] approved if required by law."  D. 25 ¶ 73; D. 53-1 at 3.  The Policy permitted reasonable accommodations, D. 25 ¶ 74; D. 53-1 at 4-5, and detailed processes for employees to request a medical exemption for the vaccination component and a religious exemption for either the vaccination or testing component, D. 25 ¶¶ 74-78; D. 53-1 at 5.  Employees requesting a religious exemption had to submit documentation to the

Office of Human Resources ("OHR").  D. 25 ¶ 77; D. 53-1 at 4.  Upon receipt of the required documentation, OHR began an "interactive accommodation process with the employee," D. 25 ¶ 78; D. 53-1 at 4-5, and would grant accommodations "when the required legal standards are met and the accommodation does not cause undue hardship or pose a direct threat to the health and safety of others," D. 25 ¶ 78; D. 53-1 at 5.  Requests for religious accommodations required, among other things, an "explanation of [an employee's] religious or religious-type beliefs and why those beliefs prevent vaccination and/or testing."  D. 25 ¶ 77; D. 53-1 at 5.

On October 1, 2021, BPPA and Calderone, BPPA's President, entered into a private memorandum of agreement (the "October MOA") with Boston and Pust, the Director of Boston's Office of Labor Relations, agreeing to the terms of the Vaccine or Test Policy on behalf of BPPA members.  D. 25 ¶¶ 112-13; D. 30-1 at 1.  Under the agreement, BPPA agreed not to "grieve, appeal, or otherwise challenge the provisions of this Agreement or the Policy via the Parties' collective bargaining agreement, through the contractual grievance process, through the Department of Labor Relations, or in any other forum, except to enforce its terms," D. 25 ¶ 115; D. 30-1 at 2, and Boston agreed to provide ten days of sick leave for union employees, to be renewed on the anniversary of the October MOA's execution, as well as up to ten additional sick days for union employees who complied with the Policy, tested positive for COVID-19 and had already exhausted their sick leave before June 30, 2022, D. 25 ¶ 117; D. 30-1 at 1-2.

### C.    Colón's Religious Exemption

Colón, a Jehovah's Witness, D. 25 ¶¶ 19, was a police officer in the Boston Police Department ("BPD") from 2019-2023, id. ¶¶ 51, 200.  While employed with BPD, Colón was a dues-paying member of BPPA and protected under BPPA's collective bargaining agreement.  Id. ¶¶ 55-56.  Prior to COVID-19, Colón "made the religious decision that he will no longer consent

to vaccinations" and, by 2020, decided to stop taking "medical treatments that involve introducing synthetic or 'foreign' chemical substances into his body" because he believes "the human body is a temple to Jehovah" and "[t]herefore, introducing foreign substances directly into the body, or even using foreign substances to test his bodily fluids can contaminate this temple, making it unholy and ritually impure" in accordance with 1 Corinthians 6:19-20 (New World) and 2 Corinthians 7:1 (New World).  Id. ¶¶ 41-44.

On September 20, 2021, Colón submitted a request for a religious exemption to the Vaccine or Test Policy "due to [his] sincerely held Religious beliefs."  Id. ¶¶ 1, 79.  By October 11, 2021, Colón had received no response to his request and "fearing the loss of his employment," he took a COVID-19 test to comply with the Policy.  Id. ¶ 80.  When he inserted the COVID-19 test swab into his nose, he felt "an intense burning sensation in his nose" which he contributed to "having introduced foreign substances into his body, thereby contaminating it and making it unholy."  Id. ¶¶ 81-82.  On October 18, 2021, OHR responded to Colón's request and prompted him to complete a Religious Accommodation Request form.  Id. ¶ 84.  Colón submitted the form that day, stating: "[b]ased on my Religious beliefs, I do not accept any foreign substance into my body … Work is requiring that I get vaccinated or submit to weekly testing, [b]oth of which contain substances that will make my body unholy . . . I am invoking my Religious exemption to any and all vaccinations as well as weekly testings. This will ensure that I keep my body Holy."  Id. ¶¶ 86-87.

On October 21, 2021, Colón received a notice of non-compliance with the Vaccine or Test Policy informing him that he would be placed on "unpaid administrative leave" if he was not in compliance by October 25, 2021.  Id. ¶ 95.  The BPD Office of Labor Relations and Calderone were copied on the notice.  Id. ¶ 96.  On October 22, 2021, Colón informed OHR that he had not yet received a response for his accommodation request and asked that his exemption proceed in a

timely manner.  Id. ¶ 97.  Colón received a second notice of non-compliance several days later.

Id. ¶ 98.  On October 26, 2021, Colón was notified by O'Brien, the Chief of BPD's Bureau of

Administration and Technology, that he was being placed on "unpaid administrative leave

effective at the beginning of [his] scheduled work shift today."  Id. ¶¶ 100, 102.  The notice

informed Colón that a non-compliance hearing would take place on October 29, 2021.  Id. ¶ 103.

The morning of October 28, 2021, Colón's BPPA representative, Frederick Mendes, called

Colón to ask why he had not complied with the Vaccine or Test Policy.  Id. ¶ 118.  Upon learning

that Colón submitted a request for religious accommodation, Mendes urged him to comply with

weekly testing.  Id. ¶ 119.  Shortly after this call, Colón received another call from Mendes,

Calderone and two BPPA attorneys who attempted to convince Colón to comply with the Policy.

Id. ¶¶ 120, 122.  Calderone told Colón that BPPA drafted the Policy with Boston officials, BPPA

agreed to the testing requirement on behalf of its members and Colón "ha[d] no choice but to

submit to weekly testing."  Id. ¶ 121.  Later that day, Colón attended a reasonable accommodation

interactive dialogue with Pust where Colón suggested several possible accommodations to the

Policy.  Id. ¶¶ 125-27; 53-2 at 1.  Pust did not ask any questions about Colón's religious beliefs

and "appeared frustrated" by Colón's accommodation suggestions.  D. 25 ¶¶ 126, 128.

On October 29, 2021, Colón, along with his BPPA representative, attended the non-

compliance hearing led by Pust's subordinates at Boston's Office of Labor Relations.  Id. ¶¶ 132-

33.  Later that afternoon, Boston denied his request as to both the vaccination and weekly testing

components of the Policy.  Id. ¶ 135.  Boston stated that it denied Colón's request for a vaccination

accommodation because that component was "voluntary," D. 53-2 at 2; D. 25 ¶ 136, and that it

denied Colón's request for a testing accommodation because his duties as a police officer required

him to be in close proximity with others and allowing him to perform those duties without regular

testing would jeopardize others' health, D. 53-2 at 2; D. 25 ¶ 137.  Boston informed Colón that he should continue testing to comply with the Policy and could use alternative forms of testing such as "sputum collection or other mechanisms other than the Steripack nasal swabs" to do so.  D. 53-2 at 2.  Colón submitted a grievance based on the denial of his religious exemption, D. 25 ¶ 139, which BPPA never responded to or advanced to Boston, id. ¶ 140.

On November 22, 2021, Colón made a *pro se* complaint inquiry with the U.S. Equal Employment Opportunity Commission ("EEOC") that led to a charge of religious discrimination against Boston that and was dual-filed with the Massachusetts Commission Against Discrimination ("MCAD").  Id. ¶¶ 17, 117.  On August 30, 2022, the EEOC dismissed Colón's charge and issued a permission-to-sue letter.  Id. ¶ 183.  MCAD likewise informed Colón of his right to file a court action following its issuance of a notice of substantial weight review on March 13, 2023.  Id. ¶ 17.

### D.    Colón's Termination

On May 11, 2023, Boston ended the Vaccine or Test Policy.  Id. ¶ 185.  While the Policy was effective, three Boston employees were put on unpaid administrative leave for failure to comply, id. ¶ 172, two of which, including Colón, were Black, id. ¶ 173; see id. ¶ 59.  On May 23, 2023, O'Brien left Colón two voicemails asking him to return her calls.  Id. ¶ 187.  On May 25, 2023, O'Brien informed Colón that since the federal and Massachusetts public health emergencies relating to the COVID-19 pandemic expired on May 11, 2023 and the Policy was lifted, he was ordered to return to work on May 26, 2023.  Id. ¶ 188.  On May 26, 2023, Colón's counsel informed Boston that "Colón will not return to work without receiving compensation for Boston's violations of his legal rights."  Id. ¶ 190.

Previously, on June 2, 2022, BPD had classified Colón as Medically Incapacitated.  Id. ¶ 182.  On June 2, 2023, Colón received a "return to work order" from Boston stating that he has been cleared from this status as of May 26, 2023.  Id. ¶ 197.  On June 5, 2023, Colón received a message from BPD stating that Colón was back on full duty, but if he did not show, BPD would "be forced to declare [him] AWOL."  Id. ¶ 198.  On July 13, 2023, Boston informed Colón that he had "been absent without approved leave since May 27, 2023" and based on this "unauthorized absence from the Boston Police Department for more than fourteen days, the Department must conclude that you have voluntarily abandoned your position."  Id. ¶ 200.

## IV.    Procedural History

Colón initiated this lawsuit on August 23, 2024, D. 1, and later filed the operative FAC, D. 25.  Defendants now have moved to dismiss Colón's FAC.  D. 48; D. 52; D. 55.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 72.

## V.    Discussion

### A.    <u>Standing as to Ojikutu</u>

Ojikutu moves for dismissal of all counts against her under Rule 12(b)(1) on the ground that Colón lacks standing because he failed to allege conduct by Ojikutu that caused him harm.  D. 55-1 at 7-12.  To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021).  In determining whether a plaintiff has met this burden, a court "takes all well-pleaded facts in the complaint as true and indulge[s] all reasonable inferences in [plaintiff's] favor."  Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc., 958 F.3d 38, 46-47 (1st Cir. 2020) (internal quotation marks omitted).  "If the plaintiff does not

claim to have suffered an injury that the defendant caused . . . there is no case or controversy for the federal court to resolve." TransUnion, 594 U.S. at 423 (citation and quotation marks omitted).

Colón brings five claims against Ojikutu. In Colón's substantive due process claims (Counts I and II) and free exercise claim (Count III), Colón alleges that he was injured by the denial of his religious exemption to the Vaccine or Test Policy and his resulting unpaid administrative leave. D. 25 ¶¶ 254-94. In Colón's equal protection claim (Count IV), he alleges that he was injured because his religious exemption was denied on the basis of his race. Id. ¶¶ 295-304. In Colón's procedural due process claim (Count IX), he alleges that he was injured by inadequate process for his placement on unpaid leave. Id. ¶¶ 331-41. For each of these claims, he alleges that he was deprived of nearly twenty months of pay, suffered social and emotional harm and lost expected retirement compensation. Id. ¶¶ 100, 188, 242-44, 248-50, 252-53.

As to standing to assert these claims, Ojikutu focuses her challenge on the second element for standing, that any injury was likely caused by her. D. 55-1 at 7-12. The second element, traceability, "requires the plaintiff[s] to show a sufficiently direct causal connection between the challenged action and the identified harm." In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prod. Liab. Litig., 54 F.4th 28, 34 (1st Cir. 2022) (internal quotation omitted). The traceability requirement "does not require a tort-like showing of proximate causation." Conservation L. Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 90 (1st Cir. 2025) (citing Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 134 n.6 (2014)). Still, even where there were multiple alleged cause of plaintiff's injury, a plaintiff must show that a defendant's conduct "nevertheless causes a concrete and particularized portion of that injury." Id. (internal citation and quotation marks omitted).

10

Colón provides five, core allegations about Ojikutu's conduct causing his injury: (1) Ojikutu set Boston's COVID-19 policies in her position as Executive Director of the Boston Public Health Commission, D. 25 ¶¶ 61-62; (2) Ojikutu published studies on Black vaccine hesitancy and medical mistrust, id. ¶¶ 62-69; (3) "on information and belief," Ojikutu "had the ultimate authority to grant or deny City of Boston employee requests for religious accommodations from the Vaccine or Test Policy," id. ¶ 130; (4) "on information and belief," Ojikutu denied requests made by Black employees that were based on "medical mistrust," id. ¶ 131; and (5) Boston issued the Mandatory Vaccine Policy under the guidance of Ojikutu, id. ¶ 143. Colón fails to establish traceability as to the first allegation because, as Colón appears to acknowledge, Ojikutu started her position as Executive Director of the Commission two weeks after Boston enacted the Vaccine or Test Policy, and thus could not have set that Policy. Id. ¶¶ 60-61 (alleging that Ojikutu began as the Executive Director of the BPHC on September 1, 2021), 70 (Vaccine or Test Policy issued on August 12, 2021); D. 68 at 4. Likewise, Colón fails to establish traceability under the fifth allegation because, as he stipulates, the Mandatory Vaccine Policy was never enforced against him or any other BPPA members. D. 62 at 3. Colón also fails to establish traceability under the second allegation as to Ojikutu's published studies as this conduct, alone, is unconnected to any alleged injury.

As for allegations three and four, Ojikutu challenges them, made "on information and belief," D. 25 ¶¶ 130-31, as speculative, D. 55-1 at 10-12. At the motion to dismiss stage, while the Court "may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable,'" Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)), the Court need not accept conclusory or speculative allegations, Twombly, 550 U.S. at 555. Under this standard, allegations made on "information and belief," without facts to support it, may be disregarded.

11

Menard v. CSX Transp., Inc., 698 F.3d 40, 44-45 & n.5 (1st Cir. 2012) (noting that "information and belief" does not mean "pure speculation, but if plaintiff had any facts to support assertion, they should be alleged").   "This is so not only of legal boilerplate (e.g., "conspiracy," "willfully") but also of assertions nominally cast in factual terms but so general and conclusory as to amount merely to an assertion that unspecified facts exist to conform to the legal blueprint."   Id. at 45; see, e.g., Ward v. Auerbach, No. 16-cv-12543-FDS, 2017 WL 2724938, at *11 (D. Mass. June 23, 2017) (rejecting allegation made "in conclusory terms, on information and belief, without any factual detail"), aff'd sub nom. Ward v. AlphaCore Pharma, LLC, 89 F.4th 203 (1st Cir. 2023); Gladu v. Maine Dep't of Corr., No. 20-cv-00449-JDL, 2022 WL 2068245, at *5 (D. Me. June 8, 2022) (rejecting claim that "upon information and belief" defendants conspired because "[w]hile it 'may be in the realm of possibility;' that Defendants conspired [] 'nothing in the SAC's factual allegations permit a reasonable inference to that effect'") (quoting Alston v. Spiegel, 988 F.3d 564, 577 (1st Cir. 2021)), report and recommendation adopted, No. 20-cv-00449-JDL, 2022 WL 17369430 (D. Me. Dec. 2, 2022)).

Allegations three and four both hinge on whether Colón has pled facts to support the claim that Ojikutu had authority to grant or deny religious exemptions under the Policy.  D. 25 ¶ 130. Colón's allegation that Ojikutu passed a regulation ordering all individuals entering any dining, entertainment or fitness establishment in Boston to demonstrate proof of being vaccinated, D. 25 ¶ 148; D. 55-6 (dated Dec. 20, 2021), does not support the allegation that she had authority to grant or deny exemptions under the Vaccine or Test Policy, a separate policy.  Likewise, Colón's references to Ojikutu's January 22, 2022 affidavit ("Ojikutu's state affidavit"), quoted and cited in the FAC, in Boston Firefighters Union, Local 718, Int'l Ass'n of Fire Fighters, AFL-CIO ("Local 718") v. Boston, 205 N.E.3d 282, 294-95 (2023), a lawsuit challenging the later Mandatory

Vaccine Policy to which Colón was not subject, speaks only to her involvement with that policy, not the Vaccine or Test Policy at issue here, D. 25 ¶ 223; D. 55-5.  Moreover, Ojikutu's state affidavit merely states that she "routinely advise[s] members of the City of Boston's Cabinet and other senior officials regarding public health related policy questions, including the employee vaccination policy."  D. 25 ¶ 225; D. 55-5.  This statement does not plausibly establish that she had authority to grant or deny religious exemptions to Colón under the Vaccine or Test Policy. Moreover, in Ojikutu's affidavit in Browder v. Boston et al., No. 24-cv-11588-AK (2024) ("Ojikutu's federal affidavit"), which Colón also excerpted in his FAC, D. 25 ¶ 225, she states: "[i]n my role as the Executive Director of the Boston Public Health Commission, I do not contribute to any employment decisions from any outside municipality or agency.  For example, I do not contribute to outside agency decisions regarding termination, employment, enforcement of policies, or reviewing requests for exemptions to policies.  I am not part of the City of Boston chain of command . . . I did not write, authorize, enact, or enforce the City of Boston's employee Vaccine or Test Policy, or Mandatory Vaccine Policy," id.; see Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co., 228 F.3d 24, 32 (1st Cir. 2000) (noting that "[i]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations") (quoting Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 454 (7th Cir. 1998)); Dayutis v. Powell, No. 93-cv-257-B, 1994 WL 258785, at *5 n.11 (D.N.H. May 2, 1994) (noting that plaintiff's allegations that "contradict and/or misconstrue the disciplinary record referenced in his complaint" were "meritless").

Without plausible allegations as to the traceability of Ojikutu's alleged conduct to the alleged injury from the denial of his religious exemption, Colón fails to allege traceability as to Counts I, II, III and IV as to Ojikutu.  Additionally, as to Count IX, Colón fails to allege conduct

by Ojikutu that caused his claimed deprivation of procedural due process.  Thus, Ojikutu's motion to dismiss on the basis of lack of standing under Rule 12(b)(1) for the claims against her (Counts I, II, III, IV and IX) is ALLOWED.

Although the Court dismisses all counts against Ojikutu on standing grounds, in the interest of completeness, the Court addresses the arguments raised by Ojikutu in her Rule 12(b)(6) motion along with the arguments of the other Defendants below.

### B.    State Action Under 42 U.S.C. § 1983

In Counts I, III and IX, Colón brings claims under 42 U.S.C. § 1983 against all Defendants,[2] including Boston,[3] BPPA and Calderone.  BPPA and Calderone move to dismiss these claims on the ground that they cannot be sued under § 1983 because "BPPA is a private association and Calderone is a private citizen."  D. 49 at 6, 11-13.  There are two elements to a § 1983 claim:  (1) that the conduct complained of transpired under the color of state law; and (2) as a result, the plaintiff suffered a deprivation of his rights.  Klunder v. Brown Univ., 778 F.3d 24, 30 (1st Cir. 2015) (citing Santiago v. Puerto Rico, 655 F.3d 61, 68 (1st Cir. 2011)).  Although Calderone is a public employee in his role as a police officer, the allegations against Calderone pertain solely to his role as BPPA President.  D. 25; D. 49 at 11 n.3.  Thus, for BPPA and Calderone to have acted

---

[2] Colón sues all individual defendants employed by the Commonwealth in both their official and individual capacities.  D. 25 ¶¶ 9, 10, 11.  Although Colón does not distinguish between official and individual capacities in his claims, Colón may not bring a § 1983 claim for monetary damages against public officials in their official capacity.  Fantini v. Salem State Coll., 557 F.3d 22, 33 (1st Cir. 2009); D. 53 at 20.  Thus, the § 1983 claims under Counts I, III, IV and IX seeking monetary damages against Ojikutu, Pust and O'Brien in their official capacities are dismissed on this ground.

[3] Neither Colón nor Boston addresses the issue of whether Boston may properly be sued under § 1983.  Generally, a city is not a person within the meaning of § 1983, Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989), however, Monell established that municipalities could be held liable under § 1983 if the deprivation of rights was the result of a municipal "'policy or custom,'" Broderick v. Callan, No. 84-cv-0707-N, 1986 WL 3003, at *2 (D. Mass. Mar. 6, 1986) (quoting City of Oklahoma City v. Tuttle, 471 U.S. 808, 809 (1985)).

under the color of state law, it must be fair to characterize them as state actors.  Klunder, 778 F.3d at 30 (citing Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4 (1st Cir. 2005)).

To assess whether a private party conducted itself as a state actor, there are three tests. Estades-Negroni, 412 F.3d at 5; see Malachowski v. City of Keene, 787 F.2d 704, 710 (1st Cir. 1986).  First, under the state compulsion test, a private party is considered a state actor if a state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State."  Estades-Negroni, 412 F.3d at 5 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982) (alteration in original)).  Second, under the nexus test, a private party can be considered a state actor when the circumstances demonstrate that the state has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant" in the alleged wrongdoing. Id. (alteration in original).  Third, under the public function test, "a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been 'traditionally the exclusive prerogative of the State.'" Id. (quoting Blum, 457 U.S. at 1005).  While a plaintiff need not specify which of the three tests apply to defeat a motion to dismiss, Cruz-Arce v. Mgmt. Admin. Servs. Corp., 19 F.4th 538, 544 (1st Cir. 2021), "the allegations in the complaint, supplemented with reasonable inferences therefrom and matters susceptible to judicial notice, must comprise a factual predicate sufficient to render it plausible that one of these tests can be satisfied," id., and if "challenged conduct cannot be classified as state action, a section 1983 claim necessarily fails," 3137, LLC v. Town of Harwich, 126 F.4th 1, 9 (1st Cir. 2025).

Colón fails to allege state action by BPPA and Calderone under any of the state action tests. As to the state compulsion test, Colón fails to allege facts to support the claim that "Boston coerced

or substantially encouraged Calderone and BPPA to help it draft and execute the Vaccine or Test

Policy." D. 25 ¶ 259. Although Colón alleges that BPPA refused to respond to his grievance

because of the October MOA with Boston, under which BPPA members received extra sick days

in exchange for BPPA's agreement not to challenge the Policy, id. ¶¶ 115, 117, this agreement is

neither coercive, nor is extra sick days substantial encouragement sufficient to constitute state

action, see Quezambra v. United Domestic Workers of Am. AFSCME Loc. 3930, 445 F. Supp. 3d

695, 703 (C.D. Cal. 2020) (noting that "[t]here is a general rule that unions are not state actors and

that rule 'is not discarded merely because of the existence of a [collective bargaining agreement]

negotiated with a government entity'") (internal citation omitted) (alteration in original)), aff'd,

No. 20-55643, 2023 WL 4398498 (9th Cir. July 7, 2023); see also Campbell v. PMI Food Equip.

Grp., Inc., 509 F.3d 776, 784 (6th Cir. 2007) (concluding that private company's decision to

"voluntarily enter into a contract with government entities [to engage in the challenged conduct]"

where "[n]o state law or any state entry required [private company] to take any of those actions"

does not constitute state action); cf. Bain v. California Tchrs. Ass'n, 156 F. Supp. 3d 1142, 1152-

53 (C.D. Cal. 2015) (dismissing case for failure to allege state action and explaining that courts

have only found state action on behalf of unions "when the compulsion is authorized by state law"

such as when "unions were authorized by law to negotiate collective bargaining agreements that

compelled employees to pay fees that could include political and ideological expenditures as

a condition of employment"); Skinner v. Ry. Lab. Executives' Ass'n, 489 U.S. 602, 613-16 (1989)

(holding that government regulations that "removed all legal barriers to the testing," "made plain

. . . [the government's] strong preference for testing" and "its desire to share the fruits of such

intrusions," and "mandated that [private actor] not bargain away the authority to perform tests . . .

are clear indices of the Government's encouragement, endorsement, and participation").

Colón likewise fails to allege state action under the nexus test. Under this test, "a plaintiff must show that the private party's actions are attributable to the state through a symbiotic relationship between the two." Santiago, 655 F.3d at 71. "The requisite nexus is premised on a showing of mutual interdependence." Id. "The 'most salient' factor in this determination 'is the extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs.'" Id. (citing Perkins v. Londonderry Basketball Club, 196 F.3d 13, 21 (1st Cir. 1999)). Colón fails to allege facts that support state action under this test because he provides no allegations that demonstrate that a state actor was in a position of mutual interdependence with BPPA or Calderone. Although Colón alleges that BPPA and Calderone agreed not to challenge the Policy, there is no indication that Boston insinuated itself into the day-to-day operations of BPPA under this agreement. See Wolotsky v. Huhn, 960 F.2d 1331, 1335 (6th Cir. 1992) (finding no state action even though state provided a significant portion of funding of a private corporation, because state did not appoint board members, select personnel, or make decisions for organization).

Colón also fails to allege facts to support a finding that BPPA or Calderone performed a public function. Under this test, it is not enough for the plaintiff to show that a private actor performed a public function, instead he must show that a private entity "assumed powers 'traditionally exclusively reserved to the State.'" Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 84 F.3d 487, 493-94 (1st Cir. 1996) (quoting Rockwell v. Cape Cod Hosp., 26 F.3d 254, 258 (1st Cir. 1994)). The activities that fall within the public function test "are few and far between" and "are characterized by exclusivity born of pervasive government involvement." Santiago, 655 F.3d at 69. Colón's allegations that BPPA and Calderone helped draft the Vaccine or Test Policy do not suffice, as drafting a policy is not an exclusive public function. See Omnipoint Commc'ns Inc. v. Comi, 233 F. Supp. 2d 388, 395

17

(N.D.N.Y. 2002) (concluding that "[w]here a private actor merely provides professional advice, such advice cannot be considered state action for purposes of section 1983 . . . if this Court were to adopt [the opposite view], any private citizen that recommended proposed legislation or drafted proposed legislation that was subsequently declared unconstitutional would be subject to liability under section 1983"). As Colón fails to allege state action by BPPA and Calderone, Counts I, III and IX are dismissed as against these two defendants on this ground.

C.    **Count I:  42 U.S.C. § 1983 (Substantive Due Process Under Fourteenth Amendment)**

In Count I, Colón alleges that Defendants violated § 1983 by depriving his right to refuse medical treatment in violation of his Fourteenth Amendment substantive due process rights.  D. 25 ¶¶ 254-67.  "To establish a substantive due process claim, a plaintiff 'must show . . . that the [defendant's] acts were so egregious as to shock the conscience' and 'that they deprived him of a protected interest in life, liberty, or property.'"  Pollard v. Georgetown Sch. Dist., 132 F. Supp. 3d 208, 227 (D. Mass. 2015) (quoting Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006)).  To shock the conscience, the alleged conduct must be "'extreme and egregious'" or "'truly outrageous, uncivilized, and intolerable.'"  Id. (quoting Pagan, 448 F.3d at 32).

Colón fails to state a substantive due process claim.  Even accepting the allegations in the FAC as true, Colón has not plausibly alleged actions by Defendants that would shock the conscience.  The Supreme Court has "settled that it is within the police power of a state to provide for compulsory vaccination," Zucht v. King, 260 U.S. 174, 176 (1922) (citing Jacobson v. Mass., 197 U.S. 11, 26 (1905)), and courts have routinely found that vaccine requirements do not shock the conscience, Sweeney v. Univ. of Colorado Hosp. Auth., No. 23-cv-02451-NYW-MDB, 2024 WL 3713835, at *15 (D. Colo. July 12, 2024) (collecting cases); Coughlin v. New York State

Unified Ct. Sys., No. 22-cv-04002-FB-JMW, 2023 WL 7091904, at *7 (E.D.N.Y. Oct. 26, 2023) (collecting cases).

Moreover, the Vaccine or Test Policy satisfies rational basis review. "Since Jacobson, courts have rejected the idea of a fundamental right to refuse vaccination." Massachusetts Correction Officers Federated Union v. Baker, 567 F. Supp. 3d 315, 325 (D. Mass. 2021); see, e.g., Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 23 (2020) (Gorsuch, J., concurring) (explaining that because the right to refuse vaccination is not a fundamental right, Jacobson is "essentially . . . rational basis review"); Halgren v. City of Naperville, 577 F. Supp. 3d 700, 733 (N.D. Ill. 2021) (applying rational basis review to mandated vaccination and testing), aff'd sub nom. Lukaszczyk v. Cook Cnty., 47 F.4th 587 (7th Cir. 2022); Clark v. Jackson, No. 22-5553, 2023 WL 2787325, at *6 (6th Cir. Apr. 5, 2023) (collecting cases); Child.'s Health Def., Inc. v. Rutgers, the State Univ. of N.J., 93 F.4th 66, 79-80 (3d Cir. 2024); Klaassen v. Trustees of Indiana Univ., 7 F.4th 592, 593 (7th Cir. 2021) (rejecting assertion of fundamental right in substantive due process claim because "vaccination requirements, like other public-health measures, have been common in this nation"). Accordingly, the Court considers whether the Vaccine or Test Policy lacks a "real or substantial relation" to public health and safety, whether it is "beyond all question, a plain palpable invasion of rights secured by fundamental law" and whether it is so arbitrary and oppressive as to warrant judicial interference. See Jacobson, 197 U.S. at 31-38.

Curbing the spread of COVID-19 is "unquestionably a compelling interest," Roman Cath. Diocese of Brooklyn, 592 U.S. at 18, and the Policy aimed "to minimize exposure to and transmission of the COVID-19" and "prevent[] exposure to members of the community," D. 25 ¶ 71; D. 53-1 at 1. This Policy is at least rationally related to a legitimate government interest. See

Klaassen, 7 F.4th at 593 (noting that "[v]accination protects not only the vaccinated persons but also those who come in contact with them").  In any event, rational basis does not allow courts to second-guess the wisdom of Boston's asserted reason for the Vaccine or Test Policy, so long as it is, as here, properly asserted.  See Phillips v. City of New York, 775 F.3d 538, 542 (2d Cir. 2015) (concluding that determination of effectiveness of vaccine requirement was "for the legislature, not the individual objectors"); Jacobson, 197 U.S. at 30 (explaining that courts should not determine which public health strategy "was likely to be the most effective for the protection of the public against disease").

For the aforementioned reasons, Colón fails to state a claim for substantive due process under § 1983 and the Court dismisses Count I as against all Defendants.

D.    **Count II:  Massachusetts Substantive Due Process**

Colón also fails to state a substantive due process claim under Massachusetts law.  In Count II, Colón alleges that Defendants violated Massachusetts law by forcing him to choose between his right to decline medical treatment and his "contractual, constitutional, and statutory property rights in his tenured employment and union benefits."  D. 25 ¶ 277.  "[U]nder Massachusetts law a municipality cannot be sued under the MCRA."  Kelley v. LaForce, 288 F.3d 1, 11 n.9 (1st Cir. 2002) (citing Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 591-92 (Mass. App. Ct. 2001).  Therefore, this claim is dismissed as against Boston on this basis.

As to the other Defendants, the Court turns to the elements of the MCRA claim.  To establish a claim under the MCRA, a plaintiff must demonstrate first that "his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth . . . has been interfered with, or attempted to be interfered with, and . . . that the interference or attempted interference was by 'threats, intimidation or coercion.'"  Bally v. Ne.

Univ., 403 Mass. 713, 717 (1989) (citing Mass. Gen. L. c. 12, § 11H); Kennie v. Nat. Res. Dep't
of Dennis, 451 Mass. 754, 759 (2008) (quoting Buster v. George W. Moore, Inc., 438 Mass. 635,
644 (2003)).  "The [MCRA] and 42 U.S.C. § 1983 are parallel statutes and have been interpreted
as coextensive, except that the MCRA does not require governmental action."  Morgan v. Driscoll,
No. 98-cv-10766-RWZ, 2002 WL 15695, at *5 (D. Mass. Jan. 3, 2002).  For the reasons set forth
in Count I, Colón fails to allege that a constitutionally or state protected right was interfered with
as to his alleged right to refuse vaccination and testing.  McEntee v. Beth Israel Lahey Health, Inc.,
685 F. Supp. 3d 43, 52 (D. Mass. 2023); see Willoughby v. Town of Tisbury, 750 F. Supp. 2d 374,
383 (D. Mass. 2010).

Moreover, while Colón's state claim appears additionally to raise interference with his
"property interest in his employment as a tenured Boston police officer," D. 25 ¶ 269, and his
"contractual rights as a member of BPPA," id. ¶ 270, Colón alleges no facts that Defendants
threatened,    intimidated,    or    coerced    him    as    required    for    a    MCRA    claim,
see Mass. Gen. L. c. 12, §§ 11H, 11I.  Under the MCRA, "[a]n interference with a secured right is
only a violation of the Act if it is accomplished through threats, intimidation, or coercion," which
was a purposeful limitation that "prevents the act from creating a vast, constitutional tort."  Kennie,
451 Mass. at 763.  In assessing whether a defendant's conduct constitutes a threat, intimidation or
coercion under the MCRA, the Court employs a reasonable person standard, Haufler v. Zotos, 446
Mass. 489, 505 (2006), under which "non-physical acts rarely support a basis for recovery," 3137,
LLC, 126 F.4th at 13 (internal citation omitted).  Here, Colón does not allege any physical acts by
Defendants.  While case law as to what constitutes non-physical coercion is unsettled, courts have
typically found that non-physical coercion "require[s] a pattern of harassment and intimidation."
Thomas v. Harrington, 909 F.3d 483, 493 (1st Cir. 2018) (internal citation omitted).  Non-physical

coercion, however, cannot be proven by "'a threat to use lawful means to reach an intended result'" by itself. Id. (quoting Buster, 438 Mass. at 648); see McClain v. Cape Air, No. 22-cv-10649-DJC, 2023 WL 3587284, at *9 (D. Mass. May 22, 2023) (same).

For BPPA and Calderone, Colón's allegations that his BPPA representative and Calderone made "numerous attempts" to get Colón to comply with the Policy, D. 25 ¶ 122, Calderone told Colón that he "has no choice but to submit to weekly testing," id. ¶ 121, and Calderone "insisted that Mr. Colón must attend his noncompliance hearing," id. ¶ 124, fall short of alleging a pattern of harassment, Daly v. Mason, 752 F. Supp. 3d 346, 365 (D. Mass. 2024) (finding no coercion when defendant "informed [plaintiff] he would be placed on administrative leave pending the Duty Status hearing, at which he could expect to be suspended" because "it cannot be reasonably said that [defendant]'s statements amount to the pattern of harassment and intimidation required to support a finding of non-physical coercion under the MCRA") (internal quotation omitted); Burns v. City of Worcester, 772 F. Supp. 3d 109, 143 (D. Mass. 2025) (finding that defendant "present[ing] Plaintiff with three options: submit to the test, refuse and face insubordination charges, or refuse testing but admit to drug abuse and enter rehabilitation" does not support a MCRA claim because it does not allege actual or threatened physical force, "[defendant]'s warning that Plaintiff would face disciplinary action for insubordination if he refused the drug test constitutes a threat to use lawful means"); cf. Sheehan v. Town of Carver, MA, No. 24-cv-12347-ADB, 2025 WL 1333711, at *27 (D. Mass. May 7, 2025) (finding plaintiff satisfied MCRA's intimidation requirement as "Plaintiff's allegations sufficiently plead a conspiracy between [Defendants] to violate her First Amendment rights, and this conspiracy included a sustained online and in person campaign of harassment and intimidation").

Similarly, Colón's allegations that O'Brien notified Colón of his placement on unpaid leave and upcoming compliance hearing, D. 25 ¶¶ 100-03, left him two voicemails asking him to return her calls, id. ¶ 187, and sent "two armed plainclothes BPD Officers" to deliver his return to work order, id. ¶ 188, do not constitute threats, intimidation, or coercion. Although, the involvement of a police officer in ordering an individual to engaged in conduct can constitute intimidation or coercion under the MCRA in some instances, see, e.g., Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985) (explaining that a uniformed security officer ordering a civilian to stop soliciting political handbills was sufficient conduct to constitute intimidation or coercion under MCRA); Sarvis v. Boston Safe Deposit and Trust Co., 47 Mass. App. Ct. 86, 92 (1999) (concluding that "threatening [plaintiffs] with arrest and then bringing about their arrests" constituted threats, intimidation or coercion under MCRA), the presence of officers here does not satisfy this threshold, particularly considering Colón was himself a police officer employed by the same police department and he "do[es] not allege or plead any additional facts that would show that the [conduct] was intended to coerce or intimidate them into refraining from exercising a legal right," 3137, LLC, 126 F.4th at 14. As for Pust and Ojikutu, Colón simply does not allege any conduct that could reasonably be perceived as threatening, intimidating or coercive. Accordingly, this claim, Count II, is dismissed as against all Defendants.

### E.    Count III: 42 U.S.C. § 1983 (Free Exercise Under First Amendment)

In Count III, Colón alleges that Defendants violated his First Amendment rights by "failing to administer the Vaccine or Test Policy in a generally-applicable [] and neutral manner." D. 25 ¶ 294. "The party claiming an unconstitutional burden on the free exercise of religion must show (1) a sincerely held religious belief, which (2) conflicts with, and thus is burdened by, the state requirement." Satanic Temple, Inc. v. City of Bos., 111 F.4th 156, 180 (1st Cir. 2024) (internal

citations omitted). "Only if the party is able to do so does the burden shift [] to the state" to demonstrate both that the (3) requirement pursues an unusually important government goal, and that (4) an exemption would substantially hinder the fulfillment of the goal." Id. (internal citations omitted).

Reading the FAC in the light most favorable to Colón, he plausibly alleges a sincerely held religious belief for his refusal to vaccinate or test. "While the 'truth' of a belief is not open to question, there remains the significant question of whether it is 'truly held.'" United States v. Seeger, 380 U.S. 163, 185 (1965); see E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, 279 F.3d 49, 57 (1st Cir. 2002). Accordingly, to qualify as a bona fide belief, the plaintiff must allege "both that the belief or practice is religious and that it is sincerely held," Union Independiente, 279 F.3d at 56 (citation omitted), with "some modicum of plausible facts sufficient to create an inference that the conflict arises from some specific religious tenet or principle," Munroe v. Bos. Med. Ctr., No. 22-cv-11935-FDS, 2024 WL 4203238, at *7 (D. Mass. Sept. 16, 2024). Colón alleges that his refusal to vaccinate and test are rooted in his religious belief that "the human body is a temple to Jehovah . . . [t]herefore, introducing foreign substances directly into the body, or even using foreign substances to test his bodily fluids can contaminate this temple, making it unholy and ritually impure." D. 25 ¶ 44. The First Circuit and other Circuits "have pronounced that similar my-body-is-my-temple arguments rooted in a plaintiff's religious beliefs are sufficient to plead the existence of a bona fide religious belief" in refusing COVID vaccination and testing. See, e.g., Thornton v. Ipsen Biopharmaceuticals, Inc., 126 F.4th 76, 84 (1st Cir. 2025) (citing Barnett v. Inova Health Care Servs., 125 F.4th 465, 471-72 (4th Cir. Jan. 7, 2025); Passarella v. Aspirus, Inc., 108 F.4th 1005, 1007-08 (7th Cir. 2024); Ringhofer v. Mayo Clinic, Ambulance, 102 F.4th 894, 902 (8th Cir.

24

2024)); see Prida v. Option Care Enters., Inc., No. 23-3936, 2025 WL 460206, at *4-5 (6th Cir. Feb. 11, 2025). The fact that Colón tested on October 11, 2021 does not necessarily cut against the sincerity of his religious beliefs, as he claims to have done so "out of fear" and to comply with the Policy. D. 25 ¶ 80. Accordingly, Colón has plausibly alleged a sincerely held religious belief.[4]

Colón has not, however, plausibly pled a conflict between his religious beliefs and the Policy. Although, as alleged, testing with nasal swabs conflicts with his beliefs, Boston's denial of his request for accommodation, which is sufficiently incorporated by reference to Colón's FAC, see Bazinet v. Beth Israel Lahey Health, Inc., 113 F.4th 9, 16 (1st Cir. 2024); see D. 25 ¶ 137, informed Colón that he could use "sputum collection or other mechanisms other than the Steripack nasal swabs" to comply with the Policy, D. 53-2 at 2. These testing alternatives remove the Policy's burden on Colón's beliefs as Colón does not allege that all other testing mechanisms, including sputum collection, would require him to introduce foreign substances into his body. DeVore v. Univ. of Kentucky Bd. of Trs., 118 F.4th 839, 848 (6th Cir. 2024) (concluding that plaintiff failed to allege testing policy conflicted with her religious beliefs as her "religious opposition to the Policy flows almost entirely from her objections to nasal PCR testing and vaccination, objections she raised before the University informed her that she could comply with the Policy via oral swab or saliva tests, and she fails to account for these alternatives").

---

[4] In his opposition, Colón claims a conflict between the testing requirement and Jehovah's Witnesses' beliefs concerning patriotic acts and secular government permission. D. 67 at 8. As alleged in the FAC, Colón's request for religious accommodation mentions only his religious belief against "accept[ing] any foreign substances into [his] body" as the basis for his refusal to vaccinate and test. D. 25 ¶ 87. Although the FAC mentions "friction between Jehovah's Witnesses and their secular governments," id. ¶¶ 27-31, 234 n.8, Colón does not allege that his refusal to vaccinate or test was based on this belief.

Even if Colón plausibly alleged the Policy burdened his religious beliefs, as explained above, the Policy survives judicial review.  Certainly, where a municipality has adopted religious exemptions for a policy, it must not administer them in an unconstitutional way.  See Nikolao v. Lyon, 875 F.3d 310, 316 (6th Cir. 2017).  Laws that are neutral with respect to religion and generally applicable are subject to rational basis review, Brox v. Hole, 83 F.4th 87, 93 (1st Cir. 2023) (citing Fulton v. City of Philadelphia, Pennsylvania, 593 U.S. 522, 533 (2021)), whereas laws that are neither neutral nor generally applicable "must be narrowly tailored to achieve a compelling government interest," id.  To be neutral, a law may not "single out religion or religious practices."  Does 1-6 v. Mills, 16 F.4th 20, 29 (1st Cir. 2021).  Colón has not alleged anything beyond mere conclusory allegations to suggest that Boston has administered its religious exemption policy in a way that burdens some religions but not others.  As outlined as to Count I, the Policy is rationally related to the government interest of limiting exposure to COVID and it is neutral and generally applicable.  Accordingly, Count III fails to state a claim as against all Defendants.

### F.    Counts V and VI:  Disparate Treatment Discrimination Based on Religion

Colón also fails to state a claim for religious discrimination under Title VII and Massachusetts law.  In Counts V and VI, Colón argues that Boston violated federal and state law by "discharg[ing]" him and "discriminat[ing] against [him] in compensation or in terms, conditions or privileges of employment" because of his religion.  D. 25 ¶ 314.  "Although Chapter 151B has been interpreted largely to mirror Title VII, the Supreme Judicial Court of Massachusetts at times construes the Massachusetts statute more broadly to effectuate the legislature's directive to apply it liberally."  Thornton, 126 F.4th at 81 (internal citations omitted).  "No matter the reach of

Chapter 151B, since '[n]either party has identified a material distinction between the federal and state laws . . . we will consider the claims jointly.'" Id. (quoting Bazinet, 113 F.4th at 12 n.1).

To state a claim for religious discrimination, a plaintiff must allege: "(1) that [he] has beliefs that are religious and sincerely held, and (2) that h[is] employer imposed upon h[im] an employment requirement (3) that conflicted with those beliefs and (4) 'was the reason for the adverse employment action.'" Id. (quoting Lowe v. Mills, 68 F.4th 706, 719 (1st Cir.), cert. denied, __ U.S. __, 144 S. Ct. 345 (2023)). If this showing is made, the burden shifts to the employer to show that it "'offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship.'" Bazinet, 113 F.4th at 15 (quoting Lowe, 68 F.4th at 719). With respect to elements three, as discussed as to Count III, Colón has not alleged a conflict between a sincerely held religious belief and the Vaccine or Test Policy as Boston offered alternatives to vaccine and nasal testing, D. 53-2 at 2, which Colón does not challenge, nor did he pursue. Thus, Colón fails to state a claim for religious discrimination.

Alternatively, Boston also argues for dismissal on the grounds that an accommodation to the testing requirement would pose an undue hardship on the city. D. 53 at 14-15. "[C]ourts may grant a motion to dismiss based on a defendant's affirmative defense where 'the facts establishing the defense [are] clear "on the face of the plaintiff's pleadings."'" Thornton, 126 F.4th at 81-82 (citing Zenon v. Guzman, 924 F.3d 611, 616 (1st Cir. 2019) (quoting Santana-Castro v. Toledo-Davila, 579 F.3d 109, 113-14 (1st Cir. 2009)). The standard for determining whether a religious exemption would impose an undue hardship on an employer is whether "the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." Bazinet, 113 F. 4th at 18 (quoting Groff v. DeJoy, 600 U.S. 447, 470 (2023)). Even under the "heightened standard" in Groff for showing an undue hardship, such showing can,

in certain circumstances, be made as a matter of law, see, e.g., Lowe, 68 F.4th at 722 (and cases cited), but "[u]sually, however, it will not be possible to adjudicate the undue hardship defense at the pleading stage because the Groff test is 'fact-specific,'" Bazinet, 113 F.4th at 18-19 (citing Groff, 600 U.S. at 468).

Boston presents an undue hardship argument in its denial of Colón's request for religious exemption, D. 53-2 at 2; D. 25 ¶ 137, which, unlike the position statement in Bazinet, is properly before the court at this juncture, cf. Bazinet, 113 F.4th at 19 (concluding that position statement could not be considered because it was not referenced in plaintiff's complaint). Boston argues that Colón's position as a police officer required him to be in close proximity with other City employees, co-workers, and the public and "allowing [him] to perform [his] job duties without regular testing for the virus would jeopardize the health of [his] co-workers and the public." D. 53-2 at 2; see Melino v. Bos. Med. Ctr., 127 F.4th 391, 397 (1st Cir. 2025) (affirming summary judgment for defendant for Title VII and Mass. Gen. L. c. 151B, § 1 claims on the basis that "permitting [nurse] to work unvaccinated would pose an undue hardship 'by increasing the risk of COVID-19 transmission amongst staff and patients'"); Rodrique v. Hearst Commc'ns, Inc., 126 F.4th 85, 91 (1st Cir. Jan 17, 2025) (affirming summary judgment where there was no dispute that "claimed burdens and expenses" for an accommodation to vaccination policy including burden that "in-person work was an essential aspect of [plaintiff]'s job" "would be substantial for [the] business"). Even as determining whether an undue hardship occurred "cannot be accomplished at this preliminary stage of the litigation," Bazinet, 113 F.4th at 12; cf. Lowe, 68 F. 4th at 722 (holding that potential license suspension for violating state statute constituted an undue hardship as a matter of law), as discussed above, Colón fails to state a religious discrimination claim under either Title VII or Massachusetts law and the Court need not and does not reach Defendants' undue

burden defense.  Accordingly, for failure to state a claim for religious discrimination, the Court dismisses Counts V and VI.

### G.    Count IV:  42 U.S.C. § 1983 (Equal Protection)

In Count IV, Colón alleges Boston, Pust and Ojikutu violated the Fourteenth Amendment's Equal Protection Clause by refusing to grant him a religious exemption to the Vaccine or Test Policy because he is Black.  D. 25 ¶¶ 295-304.  The Equal Protection Clause "prohibits a state from treating similarly situated persons differently because of their classification in a particular group."  Pollard, 132 F. Supp. 3d at 222-23 (internal citation and quotation marks omitted). "[P]urposeful racial discrimination violative of the Equal Protection Clause falls into three categories of state action that merit strict scrutiny:  (1) where state action expressly classifies individuals by race (see, e.g., Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 194-95 (2023); Grutter v. Bollinger, 539 U.S. 306, 327-28 (2003)); (2) where a policy is facially neutral but is in fact unevenly implemented based on race (see Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886)); and (3) where a facially race-neutral, and evenly applied, policy results in a racially disparate impact and was motivated by discriminatory intent (see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977); Washington v. Davis, 426 U.S. 229, 242 (1976))."  Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos., 89 F.4th 46, 56 (1st Cir. 2023), cert. denied, __ U.S. __, 145 S. Ct. 15 (2024).

Colón fails to allege racial discrimination under category one as the Vaccine or Test Policy does not classify based on race.  D. 53-1.  Colón also fails to allege racial discrimination under category two because he does not allege that the Policy was unevenly applied.  Colón's allegation that, "on information and belief," Boston denied accommodation requests made by Black employees, D. 25 ¶ 131, is unsupported by allegations that Boston granted similar requests made

by members of other racial groups.  Likewise, Colón fails to allege racial discrimination under category three as to a disparate impact claim.  Colón's allegation that "[a]t least two of the three Boston employees who were put on unpaid administrative leave for refusing to comply with the Vaccine or Test Policy were Black Americans," D. 25 ¶ 321, is insufficient to establish discriminatory impact, Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511 (4th Cir. 1994) (finding allegations of discrimination against four employees "fails to demonstrate any discriminatory trend" because plaintiff's data "simply involved too small a sample size to have any probative value"); id. (collecting cases from sister circuits holding that samples of five, seven, eight, nine, and fifteen employees were too small to establish discriminatory impact); Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 658 (1st Cir. 1985) (ordering dismissal where four percent of twenty-four Black applicants passed the employer's entrance exam, as compared with thirteen percent of 224 white applicants was insufficient to establish disparate impact); Erazo-Vazquez v. State Indus. Prods. Corp., No. 16-cv-2709-PAD, 2021 WL 3910248, at *16 (D.P.R. Aug. 31, 2021) (noting that "the fact that a neutral policy has an adverse effect 'on a single employee or even a few employees'[s] does not by itself create a prima facie case of disparate discriminatory impact") (quoting Holt v. Gamewell Corp., 797 F.2d 36, 38 (1st Cir. 1986)).  For this reason, Colón fails to state an equal protection claim against any Defendant.[5]

**H.    Count VII:  Disparate Treatment/Impact Discrimination Based on Race**

Colón also fails to allege disparate treatment under Title VII.  Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment[ ] because of such individual's race, color, religion, sex,

---

[5] Given this conclusion, the Court does not reach the Defendants' further argument that Colón also has failed to allege plausibly that the Policy was motivated by discriminatory intent.

or national origin." 42 U.S.C. § 2000e-2(a)(1).  This provision provides protection against both disparate treatment and disparate impact discrimination.  Frith v. Whole Foods Mkt., Inc., 38 F.4th 263, 270 (1st Cir. 2022); Jones v. City of Bos., 752 F.3d 38, 46 (1st Cir. 2014).  Colón fails to state a violation of Title VII under either theory of discrimination.

"A disparate treatment claim is a claim of intentional discrimination."  Frith, 38 F. 4th at 270-71 (citing Ray v. Ropes & Gray LLP, 799 F.3d 99, 112 (1st Cir. 2015)).  Although to ultimately succeed on the claim, a disparate-treatment plaintiff must establish "that the defendant had a discriminatory intent or motive for taking a job-related action," Ricci v. DeStefano, 557 U.S. 557, 577 (2009) (internal quotation omitted), the First Circuit has "explicitly held that plaintiffs need not plead facts in the complaint that establish a prima facie case under Title VII," Garayalde-Rijos v. Mun. of Carolina, 747 F.3d 15, 24 (1st Cir. 2014).  "Rather, the complaint simply must contain facts that 'plausibly allege' that the plaintiff experienced a discriminatory employment action." Frith, 38 F.4th at 271 (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012) (emphasis in original)).  "[T]o constitute unlawful racial discrimination under Title VII, an employment action must have been taken 'because of' the race of the individual plaintiff." Id. (citing Bostock v. Clayton Cnty., Georgia, 590 U.S. 644, 658 (2020)).  Colón, however, has failed to allege plausibly that Boston denied his religious exemption request, placed him on leave and terminated him because of his race.  Looking at the core allegations that he makes for this claim, D. 25 ¶¶ 315-23, even accepting the truth of his allegations about Ojikutu being "motivated" by a professional interest in combating vaccine hesitancy and medical mistrust by African Americans and that she had no comparable interest in combating same with those of different races does not plausibly state a discriminatory intent claim where, even as alleged, Boston adopted the Policy before Ojikutu took her position, and, as discussed above as to the lack of traceability for standing

purposes, it has not been plausibly alleged that Ojikutu was involved in the denial of Colón's exemption or the subsequent leave and eventual discharge decisions. See Frith, 38 F.4th at 270 (noting that "[i]f the factual allegations in a complaint, stripped of conclusory legal allegations, raise no more than a sheer possibility that a defendant has acted unlawfully, the complaint should be dismissed") (internal citation and quotation marks omitted).

Colón also fails to allege disparate impact under Title VII. "Title VII prohibits employers from utilizing 'employment practices that cause [] a disparate impact on the basis of race' unless those practices are justified by business necessity." Jones, 752 F.3d at 46 (quoting 42 U.S.C. § 2000e-2(k)). To state a claim for disparate impact, "a plaintiff starts by 'isolating and identifying' the employment practice being challenged," id. (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988)), and then must "show that the identified practice 'causes a disparate impact on the basis of race,'" id. (quoting 42 U.S.C. § 2000e-2 (k)(1)(A)(i)). The Supreme Court has "described a prima facie showing of disparate impact as essentially a threshold showing of a significant statistical disparity . . . and nothing more." Id. (internal citation and quotation marks omitted). For the reasons addressed above as to Count IV, Colón fails to allege plausibly a disparate impact claim. Accordingly, the Court dismisses Count VII.

## I.    Count VIII: Americans with Disabilities Act

In Count VIII, Colón alleges that Boston violated § 12112(d)(4) of the ADA by requiring him to undertake a medical examination and inquiring into "whether he is an individual with a disability or as to the nature or severity of the disability," D. 25 ¶ 327, and § 12112(b)(5)(A) by failing to "make reasonable accommodations to what it considered to be Plaintiff's disability," id. ¶ 329. Boston moves for dismissal on the grounds that this claim is barred by Colón's failure to exhaust administrative remedies and Colón did not have a disability. D. 53 at 26. The ADA

prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To recover for an asserted violation of the ADA, a claimant "first must exhaust administrative remedies by filing a charge with the EEOC, or alternatively, with an appropriate state or local agency, within the prescribed time limits." Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999). Further, the lawsuit subsequently filed "'must bear some close relation to the allegations presented to the agency.'" Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 56 (1st Cir. 2019) (quoting Jorge v. Rumsfeld, 404 F.3d 556, 565 (1st Cir. 2005)).

Although Colón filed a complaint with the EEOC and MCAD, D. 25 ¶ 17, he did not mention disability discrimination therein, id. ¶¶ 177-83 (explaining that Colón filed a "religious discrimination complaint"); D. 53-3 at 1 (alleging discrimination on the basis of religion only). See Willitts v. Engie N. Am. Inc., No. 20-cv-11255-ADB, 2023 WL 2573344, at *9 (D. Mass. Mar. 20, 2023) (dismissing ADA claim that was not included in EEOC complaint); Beaupin v. Bos. Univ., No. 24-cv-12481-BEM, 2025 WL 1617225, at *8 (D. Mass. June 5, 2025) (dismissing ADA claim because "claims raised in the present lawsuit (i.e., retaliation) are factually distinct from those raised before MCAD and the EEOC (i.e., discrimination)"). This failing alone warrants dismissal.

But even if Colón's ADA claim was not barred for failure to exhaust administrative remedies, Colón has not alleged that he had a disability under the ADA. An individual is disabled for purposes of the ADA if "he (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as

having such an impairment." Román-Oliveras v. Puerto Rico Elec. Power Auth., 655 F.3d 43, 48 (1st Cir. 2011). Colón does not claim to have a physical or mental impairment nor a record of such an impairment and thus, suggests that he satisfies the third definition of disability under the ADA. See D. 25 ¶ 328. To plead a disability under the "regarded as" prong of the ADA definition, a plaintiff must allege "that he had an actual or perceived impairment and that his employer was either aware of or perceived the impairment at the time of the allegedly discriminatory action." Mancini v. City of Providence by & through Lambardi, 909 F.3d 32, 46 (1st Cir. 2018). As Boston argues, D. 53 at 26, and Colón concedes, D. 67 at 32, courts have dismissed claims based on the theory that unvaccinated employees may be regarded as having an impairment, McCarthy v. Mass. Gen. Brigham, Inc., No. 24-cv-10184-DJC, 2024 WL 3416025, at *3 (D. Mass. July 15, 2024) (collecting cases); Gallo v. Washington Nationals Baseball Club, LLC, No. 22-cv-01092-APM, 2023 WL 2455678, at *4 (D.D.C. Mar. 10, 2023). It appears that "[e]very district court to address this issue thus far appears to have concluded the same." Ellis v. United Airlines, Inc., No. 23-cv-123, 2023 WL 5722887, at *2 (N.D. Ill. Sept. 5, 2023) (collecting cases); see, e.g., Sharikov v. Philips Med. Sys. MR, Inc., 103 F.4th 159, 168 (2d Cir. 2024) (noting same); Chancey v. BASF, No. 23-40032, 2023 WL 6598065, at *2 (5th Cir. Oct. 10, 2023) (per curiam) (concluding that plaintiff failed to state ADA discrimination claim by alleging that his employer's COVID-19 policies discriminated against him based on a "perceived disability"); Taylor v. Vanderbilt University, No. 23-5285, 2023 WL 10947219, at *1-2 (6th Cir. Nov. 1, 2023) (affirming dismissal of ADA claim brought by graduate student who was required, as a condition of continuing her studies and work as a research assistant, to take COVID-19 tests more frequently than her peers). Colón's argument that Boston classified him as "Medically Incapacitated" "as a consequence of [his] refusal to vaccinate," D. 25 ¶ 328; D. 67 at 29 & n.9, fails to overcome the persuasive

authority against vaccination-status-based disabilities as it does not allege an impairment underlying this determination, see McCarthy, 2024 WL 3416025, at *3-4; Sharikov, 103 F.4th at 168 n.7 (citing Speaks v. Health Sys. Mgmt., Inc., No. 22-cv-00077-KDB-DCK, 2022 WL 3448649, at *5 (W.D.N.C. Aug. 17, 2022) (holding that plaintiff failed to state a plausible "regarded as" claim because "[t]he Company only regarded [plaintiff] as being required -- like all of its employees -- to obtain a COVID-19 vaccine or be approved for an exemption and then 'regarded' her as having failed to do so by the deadline to become vaccinated"). For the aforementioned reasons, Colón has not plausibly pled a disability to support his ADA claim and, therefore, dismissal of Count VIII is warranted.

### J.    Count IX:  42 U.S.C. § 1983 (Procedural Due Process Under Fourteenth Amendment)

In Count IX, Colón alleges that Defendants violated his procedural due process rights by "placing him on indefinite unpaid administrative leave without adequate pre-deprivation notice, with no pre-deprivation process, and a sham post-deprivation process." D. 25 ¶ 341.  To plausibly allege a procedural due process claim, Colón "must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process." González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (internal citation and quotation marks omitted).  Constitutionally adequate process is provided if the government has afforded the plaintiff notice and an opportunity to be heard "'at a meaningful time and in a meaningful manner.'"  Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

Here, Colón asserts a property interest in his employment as a tenured police officer.  D. 25 ¶¶ 269, 332-33; Valentin-Almeyda v. Municipality Of Aguadilla, 447 F.3d 85, 100 (1st Cir. 2006) (holding that tenured police officer has property interest in position); see Burns, 772 F. Supp.

3d at 128 (noting that "Plaintiff possess a property interest in his employment as a full-time member of the Fire Department with tenure under Mass. Gen. L. c. 31, §§ 41-45").  Colón urges the Court to regard unpaid administrative leave as "discharge" within the meaning of Mass. Gen. L. c. 31, §§ 1, 41.  D. 25 ¶¶ 333-35.  Under Mass. Gen. L. c. 31, § 1, a discharge is "the permanent, involuntary separation of a person from his civil service employment by his appointing authority." Even as alleged, Colón's leave was not a "permanent" separation from his employment.  The Vaccine or Test Policy provides that failure to comply results in "place[ment] on unpaid administrative leave until verification of vaccination or a reasonable accommodation is approved if required by law," which contemplates a temporary separation from employment.  D. 53-1 at 3; D. 25 ¶ 73; see Brooks v. Civ. Serv. Comm'n, No. 2001-cv-0180-B, 2004 WL 958110, at *4 (Mass. Super. Apr. 13, 2004) (noting that "[t]here is no specific time limit placed on the duration of a suspension") (citing Board of Selectmen v. Civil Service Commission, 366 Mass. 547, 548 (1974)).  The temporary nature of Colón's leave is further evidenced by his May 25, 2023 return to work order once the Policy was lifted, D. 25 ¶ 188, his resumed salary from May 26, 2023 to June 2, 2023, id. ¶¶ 192-96, second return to work order on June 2, 2023, id. ¶ 197, notice that the "department ha[d] put him back on full duty," id. ¶ 198, and eventual termination on July 13, 2023 for being "absent without approved leave since May 27, 2023," id. ¶ 200; see Brooks, 2004 WL 958110, at *4 (declining to regard placement on unpaid leave as a discharge and concluding that a paid administrative leave "should be regarded as a 'suspension' with the meaning of  G.L. c. 31, §§ 1 and 41" and "the department's decision to [later] place [employee] on unpaid medical leave for more than five days . . . was [also] a suspension").

That Colón's leave was unpaid does not alter this conclusion.  Certain courts that have recognized that "the due process clause is implicated where the property lost due to the suspension

is so integral to the employee's position such that loss of the property could be deemed a loss of the employee's position," Selmani v. Vill. of Bartlett, 515 F. Supp. 3d 882, 887 (N.D. Ill. 2021) (internal quotation omitted), have found that "[t]he denial of [an employee's] salary constitute[s] an effective denial of his employment," id.; see also Bauchard v. Martin, No. 91-cv-7839, 1993 WL 79259, at *4 (N.D. Ill. Mar. 16, 1993) (concluding that police officer placed on indefinite leave of absence had protected property interest in continued employment). Another session of this Court, however, has noted that "[i]n the context of suspension without pay, an employee is not entitled to notice and hearing prior to his suspension without pay if the 'employee receives a sufficiently prompt post-suspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are . . . not affected at all.'" Burns, 772 F. Supp. 3d at 129 (quoting O'Connor v. Spain, No. 12-cv-40106-TSH, 2012 WL 3822101, at *10 (D. Mass. Aug. 31, 2012) (citing Gilbert v. Homar, 520 U.S. 924, 932 (1997)); see Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 9-10 (1st Cir. 2003) (explaining that "Supreme Court rejected a categorical rule imposing constitutional due process requirements on suspensions *without* pay") (emphasis in original).

Here, although Colón's deprivation of salary for nearly twenty months is certainly not "insubstantial," Burns, 772 F. Supp. 3d at 129, even as alleged, Colón was provided with adequate process. On August 12, 2021, Colón received notice of his need to either comply with the Vaccine or Test Policy or face unpaid administrative leave. D. 25 ¶ 70; D. 53-1 at 3. He was given until either October 18, 2021 to get vaccinated or October 11, 2021 to begin weekly testing. Id. ¶ 72. On October 21, 2021, he received a notice of non-compliance warning him that if he failed to comply by the close of business on October 25, 2021, "[he] will be placed on unpaid administrative leave at the start of [his] work shift beginning on [] October 26, 2021." Id. ¶ 95. He received a

37

second notice of same on October 25, 2021. Id. ¶ 98. In accordance with these notices, Colón was placed on unpaid leave for failure to comply with the Policy on October 26, 2021, id. ¶ 100, and was given notice of a virtual hearing, id. ¶ 103, which he attended on October 29, 2021, id. ¶¶ 132-33. Colón's deprivation hearing occurred before his suspension exceeded five days and he received notice of the hearing at least three days before it occurred, in accordance with Mass. Gen. L. c. 31, § 41. This notice and hearing satisfy procedural due process requirements. Brockton Power LLC v. City of Brockton, 948 F. Supp. 2d 48, 67 (D. Mass. 2013) (noting that "[p]ost-deprivation remedies have been deemed sufficient (and fatal to a procedural due process claim) even where 'relief might be delayed, and damages are unavailable'") (quoting Licari v. Ferruzzi, 22 F.3d 344, 348 (1st Cir. 1994)); Gonzalez-Droz, 660 F.3d at 14-15 (holding that five months' prior notice that practice violated regulation, fifteen days' notice of hearing and summons the day before hearing "demonstrate that the plaintiff had ample notice of the hearing, a fair indication of when it would occur, and a sufficient opportunity to prepare for it"); O'Neill v. Baker, 210 F.3d 41, 48-49 (1st Cir. 2000) (finding six days' notice sufficient when plaintiff understood the nature of the charges three months earlier).

Colón also alleges that Boston failed to provide him with written notice of its post-hearing decision as required under Mass. Gen. L. c. 31, § 41. D. 25 ¶ 337. However, "[i]f a state provides adequate post-deprivation remedies—either by statute or through common-law tort remedies available in its courts—no claim of a violation of procedural due process can be brought under § 1983 against the state officials whose random and unauthorized conduct caused the deprivation." Murphy v. Mass. Exec. Office of Tr. Ct., 335 F. Supp. 3d 137, 148 (D. Mass. 2018) (quoting Lowe, 959 F.2d at 340). By allegedly failing to comply with the written notice requirement, Pust's subordinates, D. 25 ¶ 132, deviated from state law, "thereby committing

random and unauthorized actions," <u>Burns</u>, 772 F. Supp. 3d at 131. "Because Massachusetts provides an adequate post-deprivation remedy in the form of the Civil Service Law," Colón's procedural due process claim "is barred as a matter of law." <u>Id.</u> (citing <u>O'Neill</u>, 210 F.3d at 48 (concluding that "[t]he state procedures prescribed by chapter 31, sections 41-44 of the Massachusetts General Laws clearly fulfill the due process requirements for pre-termination notice and opportunity to be heard")); <u>Cronin v. Town of Amesbury</u>, 81 F.3d 257, 260 (1st Cir. 1996) (describing post-termination remedies provided by the Massachusetts Civil Service Law); <u>Murphy</u>, 335 F. Supp. 3d at 148. Accordingly, Colón's procedural due process claim, Count IX, is dismissed.[6]

### K.    Count XI:  42 U.S.C. §§ 1985 (Conspiracy to Deprive Equal Protection of Laws)

In Count XI, Colón raises a § 1985(3) claim. D. 25 ¶ 343. "A claim under § 1985(3) requires the plaintiff to show that (1) some class-based animus (usually racial) lay behind the conspirators'[s] action, and (2) that the conspiracy was aimed at interfering with protected rights." <u>Donahue v. City of Bos.</u>, 304 F.3d 110, 122 (1st Cir. 2002) (citing <u>Bray v. Alexandria Women's Health Clinic</u>, 506 U.S. 263, 267-68 (1993)). Since the Court has concluded that Colón's equal protection claim fails, Colón's claim of conspiracy to deprive him of equal protection fails too. <u>Rice v. New England Coll.</u>, 676 F.2d 9, 11 (1st Cir. 1982) (noting that a § 1985(3) claim requires "proof of a conspiracy to violate independent rights").

---

[6] In light of the dismissal of Counts I, III, IV and IX on the aforementioned grounds, the Court does not reach the qualified immunity challenges to those claims. D. 53 at 18-20; D. 55-1 at 6-7.

**L.**    **Counts XII and XIII:  Breach of Duty of Fair Representation and Breach of Contract**

In Count XII, Colón asserts a breach of duty of fair representation against BPPA, D. 25 ¶¶ 344-46, and, in Count XIII, a breach of contract claim against Boston, id. ¶¶ 347-50.  As to Count XII, although BPPA raises several bases for dismissal, the Court concludes that dismissal is warranted at least for the reasons that Colón failed to file the claim before the Department of Labor Relations ("DLR") and that it is time-barred. D. 49 at 15-18.  Breach of duty of fair representation claims "must ordinarily be brought in the first instance to the [DLR]," Hines v. Bos. Pub. Sch., No. 15-cv-11897-DJC, 2018 WL 4963171, at *10 (D. Mass. Oct. 15, 2018) (citing Leahy v. Local 1526, Am. Fed'n. of State, Cty & Mun. Emps., 399 Mass. 341, 349 (1987)), aff'd, No. 18-2109, 2020 WL 5904425 (1st Cir. Feb. 28, 2020), and "[e]xcept for good cause shown, no charge shall be entertained by the Department based upon any prohibited practice occurring more than six months prior to the filing of a charge with the Department," Borden v. Commonwealth Emp. Rels. Bd., 104 Mass. App. Ct. 1103, 1103 (2024) (rescript) (quoting 456 C.MR. § 15.05 (2016)) (internal quotation marks omitted).

Here, Colón's duty of fair representation claim is premised on BPPA's alleged inaction and unresponsiveness to his November 18, 2021 grievance against Boston, which he sent to "BPPA headquarters," D. 25 ¶ 139, and BPPA's alleged unresponsiveness to "multiple [additional] letters . . . concerning his religious accommodation," id. ¶¶ 140-42; see id. ¶¶ 344-46.  There is no allegation that Colón ever filed a charge with the DLR based on this conduct and alleges no "good cause" for this failure, D. 62 at 20; cf. Leahy, 399 Mass. at 349-51 (affirming lower court's refusal to invoke the doctrine of primary jurisdiction where "there were no facts requiring agency expertise, the union was not prejudiced, and the plaintiff had no notice that he should first pursue his complaint with the commission because he reasonably relied on State and Federal precedent"),

40

and as he did not file the current lawsuit until August 23, 2024, over thirty months after he allegedly presented his grievance against Boston to BPPA, D. 1; see Felton v. Lab. Rels. Comm'n, 33 Mass. App. Ct. 926, 927 (1992), the Court concludes that his duty of fair representation claim is barred on both administrative exhaustion and timeliness grounds.

As to Colón's breach of contract claim against Boston, in which Colón alleges that Boston breached its duties under the CBA between the City and BPPA not to "discipline or discharge" him "except for just cause" and not to "discriminate against [him] on the basis of religion" by placing him on administrative leave, D. 25 ¶ 348, and breached its duty of good faith and fair dealing by ordering him to return to work after his administrative leave and then terminating him when he failed to return, id. ¶ 349, Boston moves to dismiss on the ground that Colón's breach of contract claim is barred by Chapter 151B because it arises out of the same facts as his claim under Mass. Gen. L. c. 151B, § 4.  D. 53 at 28-29.  "The SJC has repeatedly held that Chapter 151B, where applicable, 'provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections.'"  James v. Bos. Police Dep't, No. 19-cv-10430-FDS, 2020 WL 108266 at *4 (D. Mass. Jan. 9, 2020) (quoting Charland v. Muzi Motors, Inc., 417 Mass. 580, 586 (1994)); see Mass. Gen. L c. 151B, § 9.  The alleged acts comprising Colón's claim that Boston breached the CBA by discriminating against him on the basis of religion "[are] the same acts upon which the employment discrimination claim was based," and are thus barred under Chapter 151B's exclusivity provision, see Robinson v. City of Boston, 71 Mass. App. Ct. 765, 767 (2008).

Colón's claim that Boston breached its duty of good faith and fair dealing under the CBA by ordering him to return to work after his administrative leave and then terminating him when he failed to return, D. 25 ¶ 349, however, is not barred under Chapter 151B claim as it is not premised

41

on employment discrimination.  Cf. James, 2020 WL 108266 at *4.  Still, dismissal of this claim

is warranted at least for the reason that Colón failed first to pursue the CBA grievance procedure

before asserting the claim here.  "As a general rule, the 'failure to pursue contractual grievance

procedures bars suit against the employer.'"  Pierce v. Superintendent of Schs. of Masconomet

Reg'l Sch. Dist., 100 Mass. App. Ct. 1107, 1107 (2021) (rescript) (quoting Johnston v. School

Comm. of Watertown, 404 Mass. 23, 25 (1989)) (citations omitted).  "This holds true even where

the agreement has expired, so long as the employee's claim arose under the agreement."  Id.

(citation omitted); see Watertown v. Watertown Mun. Employee Ass'n, 63 Mass. App. Ct. 285,

291 (2005) (noting that "[r]ights that were violated or 'which accrued or vested under the

agreement will, as a general rule, survive termination of the agreement'") (quoting Litton Fin.

Printing Div., Inc. v. National Labor Relations Bd., 501 U.S. 190, 207 (1991)).  As alleged, Colón's

breach-of-good-faith-and-fair-dealing claim arises under the CBA, D. 25 ¶ 349, and Colón makes

no allegation that he first pursued it under the CBA grievance procedures or that any exceptions

to this requirement applies, see Pierce, 100 Mass. App. Ct. at 1107 (citing Azzi v. Western Elec.

Co., 19 Mass. App. Ct. 406, 408-09 (1985)); see also Penachio v. Town of Saugus, 91 Mass. App.

Ct. 1132, 1132 (2017) (affirming ruling that employee's breach of contract claim against employer

was barred where employee failed to abide by procedures under CBA).  Accordingly, Counts XII

and XIII also fail to state a claim.[7]

---

[7] The Court has also considered Ojikutu's motion to strike D. 25 ¶¶ 223-27 under Fed. R. Civ. P. 12(f).  D. 55-1 at 26-31.  "Under Rule 12(f), a party may move to strike from any pleading any . . . redundant, immaterial, impertinent, or scandalous matter," Dennison v. LaPointe, No. 06-cv-40100-FDS, 2006 WL 3827516, at *1 (D. Mass. Dec. 21, 2006) (citing Rule 12(f)), but "[m]otions to strike under Rule 12(f) are generally disfavored," U.S. S.E.C. v. Nothern, 400 F. Supp. 2d 362, 364 (D. Mass. 2005).  Having considered Ojikutu's motion to strike, the Court, in the exercise of its sound discretion, declines to strike D. 25 ¶¶ 223-27, particularly in light of its determination that the totality of Colón's allegations have failed to state a plausible claim against her or the other Defendants.

**VI.     Conclusion**

For the foregoing reasons, the Court ALLOWS Ojikutu's motion to dismiss under Fed. R.

Civ. P. 12(b)(1), D. 55, ALLOWS Defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(6),

D. 48; D. 52; D. 55.

**So Ordered.**

<u>/s Denise J. Casper</u>
Chief United States District Judge